UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| Liana Davis, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No. 2:25-cv-220 |
| | * | |
| Christopher Cooprider, | * | |
| Aid Access GmbH, & | * | |
| Rebecca Gomperts, | * | |
| | * | |
| Defendants. | * | |

## ANSWER OF DEFENDANT CHRISTOPHER COOPRIDER TO PLAINTIFF'S COMPLAINT & COUNTERCLAIM

# TABLE OF CONTENTS
## (p. 1 of 2)

I.    PRELIMINARY STATEMENT……………………………………………………..1

II.    RULE (8) AFFIRMATIVE DEFENSES………………...…………………………......3

    A.    FEDERAL PREEMPTION……………………………………………………....3

        1.  Conflict Preemption……………………………………………………..3

        2.  Obstacle Preemption……………………………………………………....4

        3.  Field Preemption………………………………………………..…....4

    B.    DUE PROCESS VIOLATION ABSENT APPLICATION OF
        THE DOCTRINE OF   DESUETUDE…………………………………………...4

    C.    FRAUD…………………………………………………………..………..4

        1.    Intent - Her Modus Operandi - The Prior Poisoning…………...………..6

        2.    DAVIS's Poor Behavior Leads to a Failing Marriage…………………7

        3.    DAVIS & Cooprider's Brief Sexual Relationship………………………..7

        4.    DAVIS's False Claim Concerning a "First" Pregnancy………..…....……7

        5.    DAVIS's Efforts to End Her "Second" Pregnancy with COOPRIDER….11

            a.  Her Declarations Concerning Wanting a Natural Abortion ………....11

            b.  DAVIS's Erratic Behavior Towards COOPRIDER
            Becomes Stalking……………………………….…………………12

            c.  Calls The Corpus Christi Police Department ("CCPD")…………...13

            d.  COOPRIDER Tries to Slow Down the Sexual Relationship…………18

            e.  DAVIS invites COOPRIDER to her Home for "A Night of Trust" …27

            f.  After DAVIS Presses Charges, the CCPD Investigates and
            Declines to Pursue Her Allegations against COOPRIDER…..………30

    D.    SPOLIATION…………………………………………..………………...38

**TABLE OF CONTENTS**
**(p. 2 of 2)**

E.    CONTRIBUTORY NEGLIGENCE………………………………………..42

    1.  DAVIS Drank Heavily While Pregnant………………………….….…..44

    2.  Failing to Take Progesterone, As Prescribed…………………...……..46

    3.  Failure to Appropriately Treat Sexually Transmitted Disease ("STD") and
       Other Pathogens, Which Led to Prolonged Fever During Her Pregnancy…..51

    4.  Taking Medications Contraindicated During Pregnancy………………..…55

       a.  Codeine…………………………………………………………55

       b.  Benzodiazepines……...……………………………...……56

       c.  Zoloft…………………………………………………...……57

       d.  Red Bull…………………………………………………....…57

    5.  Davis Repeatedly Engaged in High-Impact Activities
       During Her Pregnancy…………………………………….……………58

    6.  When Cramping at the Carnival Day, Refusing to Go to the ER, and Instead
       Exposed Herself to the Outdoor Heat and Humidity for Four Hours...……..59

    7.  DAVIS Repeatedly Took Actions to Try to Induce
       a Spontaneous Abortion of Her Unborn Child………………………60

III.    RULE 8(b)(1)(A) DEFENSES...………………………...……....……………..71

IV.    RULE 8(b)(1)(B) RESPONSES TO ALLEGATIONS…………….…………...75

V.    COUNTERCLAIMS………………………………………...……...…..89

    A.    MALICIOUS PROSECUTION……………………………………89
    B.    INTENTIONAL INFLICTION OF EMOTION DISTRESS…………...………91
    C.    FRAUD………………………………………………………92
    D.    MALICE………………………………………………...……92
    E.    PUNITIVE DAMAGES…………………………………………92
    F.    EXCEPTIONS TO TEXAS' LIMITATIONS ON EXEMPLARY DAMAGES...92
    G.    AMOUNT OF DAMAGES SOUGHT…………………………..….…….…...93

PRAYER………………………………………………………………....…....…94

Defendant CHRISTOPHER COOPRIDER ("COOPRIDER"), by and through his counsel of record, answers the Complaint (Doc. 1) filed by Plaintiff LIANA DAVIS ("DAVIS"),[1] and files his Counterclaim against her, as follows:

## I.    PRELIMINARY STATEMENT

1.    CHRISTOPHER COOPRIDER is a Captain in the United States Marine Corps, having proudly served his country for almost five years.  He presently is stationed at Naval Air Station – Corpus Christi while training to fly the V-22 Osprey tilt-rotor aircraft.  Before DAVIS filed this suit, COOPRIDER was to continue his service in New River, North Carolina, to complete his training on the Osprey. COOPRIDER is a Marine, a son, a brother, and a proud American.

2.    DAVIS initiated a criminal investigation of COOPRIDER for the events alleged. After thoroughly investigating her charges, the Corpus Christi Police Department ("CCPD") closed its file and declined to recommend prosecution.  Her lethal lies in the malicious allegations now embedded in her made-up Complaint read like the screenplay written for Glenn Close in the movie *Fatal Attraction.* But being falsely accused of murder in a false Complaint distributed to newspapers across America is not a Hollywood move; it is a real-life cataclysm, one that is ruinously damaging.  The lies in this civil complaint were already considered and rejected as such by criminal investigators.  Why?  Because they are fabricated, and scientifically implausible.

---

[1] By freely using her name within her Complaint, and via her representatives' persistent dissemination of her story in the national press for political fodder, *see* Petri, A., *Woman Claims Marine Laced Her Drink With Abortion Pills*, THE NEW YORK TIMES, August 14, 2025, found at https://www.nytimes.com/2025/08/14/us/marine-abortion-pills-lawsuit-texas.html, DAVIS has chosen to waive her right to protect her identity from public disclosure under Section 171.047(a) of the Texas Health & Safety Code ("THSC") which otherwise provides that her identity "is not subject to public disclosure if the woman does not give consent to the disclosure."

3.      After seeing criminal authorities reject her fantastical story, why has she recycled it here in a federal court complaint filed on August 11, 2025?  So it could be immediately and widely disseminated to national and Texas media outlets that morning prior to a Senate State Affairs Committee hearing set to begin at 10:00 a.m. that same day. So Texas Senators considering S.B. 6, legislation to create civil liability for the manufacture and provision of abortion-inducing drugs could be told: "just this morning, a lawsuit was filed for wrongful death where a military guy got a next-door neighbor pregnant…"[2] The story was parroted again before the State Affairs Committee of the Texas House of Representatives on August 22[3], and the bill is set to become law.

4.      COOPRIDER files this Answer to vehemently deny the scurrilous lies contained in DAVIS' lawsuit filed against him, and to set forth the truth about what happened concerning the events that made the basis of this lawsuit.

5.      While right-to-life advocacy is commendable and perhaps justified under the Sixth Commandment that "Thou Shalt not Kill," one may not capriciously cross the Rubicon from the elevated light of righteousness brought by sincere religious advocacy into a pit of darkness and lies by purposefully ignoring the Ninth Commandment – "Thou Shalt Not Give False Testimony against Thy Neighbor."  That is what DAVIS has done here with this suit, and she must be punished for it.

6.      To deter and punish mendacious Plaintiffs like DAVIS from bringing false claims in the future against innocent individuals in the midst of the ongoing cultural warfare concerning "access to reproductive health" vs. "right-to-life" advocacy, Defendant/Counter-Plaintiff

---

[2] Video of the Texas Senate Committee on State Affairs hearing on August 11, 2025, (SB 6) https://senate.texas.gov/videoplayer.php?vid=22459&lang=en (beginning at 2:47:52, Jana Pinson testimony).

[3] Video of the Texas House Committee on State Affairs, August 11ee, 2025, (HB 7)
 https://house.texas.gov/videos/22507 (beginning at 3:53:40 - 3:55:30, Mark Lee Dickson testimony; 3:58:25 – 3:59:00, Jana Pinson testimony).

COOPRIDER brings countersuit against Plaintiff/Counter-Defendant DAVIS for $100 million in actual damages and $1 billion in exemplary damages.

## II.    RULE 8(c) AFFIRMATIVE DEFENSES

7.    Pursuant to Rule 8(c) of the Federal Rules of Civil Procedure, Defendant COOPRIDER pleads the following affirmative defenses.

### A.    FEDERAL PREEMPTION

8.    Defendant COOPRIDER pleads the affirmative defense of **federal preemption** as to the following of Plaintiffs' allegations concerning the distribution and provision of abortion-inducing drugs, by:

1.    Suing under the Texas Wrongful Death Act, Tex. Civ. Prac. & Rem. Code, §71.001, *et seq.*, and claiming "wrongful conduct" by securing abortion-inducing drugs via the mails in violation of the Comstock Act, 18 U.S.C. §§ 1461–1462 (Complaint, ¶80);

2.    doing so while not a physician, Section 171.063(a)(1), THSC (Complaint, ¶74);

3.    doing so without complying with the required protocols, Section 171.063(a)(2), THSC (Complaint, ¶75);

4.    doing so without satisfying the applicable informed consent requirements Section 171.0631, THSC (Complaint, ¶76).

### 1.    Conflict Preemption

5.    These Texas statutes prohibiting conduct concerning mifepristone explicitly permitted by FDA is conflict preempted as it is physically impossible to comply with these Texas statutes in a manner consistent with that permitted by federal law.  Forcing a party to avoid that conflict by not doing what FDA permits renders the Supreme Court's conflict preemption jurisprudence meaningless.  Conflict preemption exists with Texas' bans, akin to the Supreme Court's holdings in *Mutual Pharmaceutical Co., Inc. v. Bartlett*, 570 U.S. 472 (2013) and *PLIVA,*

*Inc v. Mensing*, 564 U.S. 604 (2011) and the Fifth Circuit's holding in *Johnson v. Teva Pharmaceuticals USA, Inc.*, 758 F.3d 605 (5ᵗʰ Cir. 2014)*,* rejecting the stop-selling arguments.

        2.     <u>Obstacle Preemption</u>

6.     Because DAVIS's cause of action invoking Texas' statutes banning mifepristone "prevents or frustrates the accomplishment of a federal objective" permitting its lawful use, it is impliedly preempted by the "obstacle" preemption doctrine as well.

        3.     <u>Field Preemption</u>

7.     Given the three-decade-long history of FDA carefully regulating mifepristone, while repeatedly and specifically sanctioned by Congress to do so, field preemption exists as well.

**B.    DUE PROCESS VIOLATION ABSENT APPLICATION OF THE DOCTRINE OF DESUETUDE**

8.     Defendant COOPRIDER pleads the affirmative defense that Plaintiff's invocation of the Comstock Act, 18 U.S.C. §§ 1461–1462, as an example of "wrongful conduct" violates his due process rights, because enforcement of a long-dormant statute, one long not-enforced, results in a judicial abrogation of the statute under **<u>the doctrine of desuetude</u>**.

9.     Defendant COOPRIDER invokes the doctrine of desuetude as an affirmative defense to Paragraph 80 of Plaintiff's complaint.

10.     To enforce the Comstock Act now - despite its long-dormant, long not-enforced, status - would violate Defendant COOPRIDER's **<u>due process rights</u>**.

**C.    FRAUD**

11.     Defendant COOPRIDER pleads the affirmative defense of **<u>fraud</u>**.

12.     Specifically, Defendant COOPRIDER alleges at least two instances of fraud by Plaintiff DAVIS, as follows:

13.     *First*, Defendant COOPRIDER pleads that

(a) Plaintiff DAVIS made a material representation to Defendant COOPRIDER on February 3, 2025, that she was pregnant;

(b) at a time when she knew she was not pregnant, so that Plaintiff DAVIS' statement to Defendant COOPRIDER that she was pregnant was false when made;

(c) When Plaintiff DAVIS told Defendant COOPRIDER on February 3, 2025, that she was pregnant, she either knew it was false or asserted it without knowledge of its truth;

(d) Plaintiff DAVIS intended that it be acted upon by Defendant COOPRIDER, as she asked him to order abortion-inducing drugs for her;

(e) Defendant COOPRIDER acted in reliance upon Plaintiff DAVIS's statement, and ordered such drugs at a time she turned out not to be pregnant at all; and

(f) Defendant COOPRIDER was injured as a result.

14.    *Second*, Defendant COOPRIDER pleads that

3. Plaintiff DAVIS made a material representation to Defendant COOPRIDER, that he should come over to her home for a "night of trust" over hot cocoa and alcohol, when she intended to frame him with false allegations that he poisoned her;

4. at a time when she knew that she had no intention of engaging in a "night of trust," rendering her statement to Defendant COOPRIDER false when made;

(g) in her attempt to lure Defendant COOPRIDER into her home, she knew her statement to him was false when made;

(h) she made this false statement with the intention that it would be acted upon by Defendant COOPRIDER, i.e., that he would come into her home;

(i) Defendant COOPRIDER relied upon this statement that he should come over for a "night of trust," and thereafter acted in reliance on it by coming to her home on April 5, 2025; and

(j) Defendant COOPRIDER was injured as a result, as Plaintiff DAVIS conjured the story of her being poisoned via abortion-inducing pills slipped into her hot chocolate, instigated a criminal investigation, and instituted this suit.

15.    Pursuant to the requirements of Rule 9(b) of the Federal Rules of Civil Procedure, Defendant COOPRIDER pleads in particular, the circumstances constituting fraud by DAVIS are set forth as follows:

1.    ***Intent - Her Modus Operandi - The Prior Poisoning***.

16.    In December 2024, DAVIS was a married woman with three children in the midst of a contentious child custody battle.  Her ex-husband had moved out of their marital home because, unknown to COOPRIDER, DAVIS's husband claimed that DAVIS had tried to poison him.  Her husband made a police report for aggravated assault, alleging that she had poisoned him. DAVIS, of course had her own version of events:[4]

DAVIS:

(16:57) … there somewhere on some sergeant's desk, **there is a police report for aggravated assault with a deadly weapon, and I'm facing twenty years in prison?** (17:09) If I never told you that, that is how fucked my situation is. (17:12) Fortunately, **he tried to claim that I poisoned him and he went and filed a police report on me saying I drugged him**.

(17:20) And then **he stole pills from me**, overdosed himself, drove to work, went to the hospital by ambulance from work, made sure a lot of people saw him before

---

[4] **Exhibit 1** (Audio File 18 and <u>transcript</u>, Bates Stamp CR000796-846).

6

he did this. (17:31) He did it. (17:31) Right? (17:32) And **then filed a police report saying that I poisoned him**, and I could get charged I could like, literally, right now, someone could come to my door and Mirandize me, and I could get charged for aggravated assault with a deadly weapon.

17.     DAVIS'S fantasy in this case -- that she was poisoned -- originated with poisoning within her own failed marriage.

### 2.     *DAVIS's Poor Behavior Leads to a Failing Marriage*

18.     DAVIS's neighbor reported seeing DAVIS drink around her kids, being "*drunk*" while "taking care of the kids," talking "to strange men on the internet," and being "late to pick up kids every day from school." She observed DAVIS as "not a capable mother – can't handle things."

19.     The neighbor reported DAVIS telling her that she had chlamydia, asked for pain medications and was taking ADHD medicines like Vyvanse

### 3.     *DAVIS's & COOPRIDER's Brief Sexual Relationship*.

20.     While DAVIS was still legally married to another man, DAVIS and COOPRIDER began a casual sexual relationship in December 2024, ending in early-March, 2025.

21.     DAVIS became emotionally infatuated with COOPRIDER.  When COOPRIDER did not agree to stay in a relationship with her, DAVIS began an escalating destructive, obsessive and compulsive, pattern of behavior which included: destruction of evidence, multiple faked miscarriages, demands for gifts and attention, blackmail, threats of court martial, and now, a false accusation of murder against COOPRIDER.

### 4.     *DAVIS's False Claim Concerning a "First" Pregnancy*

22.     On or about February 3, 2025, DAVIS told COOPRIDER that she was pregnant, but this was false.

23.     DAVIS was not pregnant on February 3, 2025.

24.     DAVIS knew she was not pregnant on February 3, 2025, when she said she was.

25.      There was never a positive pregnancy test prior to February 3, 2025; DAVIS made it all up.

26.      The week before Valentine's Day, DAVIS asked her neighbor about the Plan B Morning-After drug, and her neighbor offered to help her get them, but DAVIS never followed through.  Rather, DAVIS was instead suggesting to others that she was pregnant, when she was not.

27.      COOPRIDER ordered abortion pills at DAVIS's request under the false impression that DAVIS was pregnant, when she was not.

28.      Over time, and contrary to the statements made in her claim here, DAVIS considered aborting this baby herself.

29.      DAVIS suggested to others that she wanted COOPRIDER to order the pills.

30.      On February 10, 2025, knowing that she was not pregnant, and to cover up her lie, DAVIS ordered ovulation testing strips from Amazon so that she would know when she was at peak fertility and could dupe COOPRIDER into actually impregnating her.

31.      Davis alleges that "[o]n February 18, 2025, COOPRIDER brought the abortion pills to DAVIS's house," *see* Doc. 1, p. 7, ¶ 21, and DAVIS photographed in February the tablet container for Mifepristone. *see* Doc. 1, p. 8, ¶22, Exhibits 9 and 10 thereto, and the bottle of misoprostol, *see* Doc. 1, p. 8, ¶23, Exhibits 11 and 12 thereto. On February 18, 2025, COOPRIDER left three abortion pills with DAVIS - one pill, Mifepristone was in a box in a blister package, and two Misoprostol pills were in a small Ziploc bag delivered to DAVIS, with the remainder later being discarded by COOPRIDER.

32.    On February 20, 2025, DAVIS still had possession of these three pills and asked her neighbor to see if she could break into COOPRIDER'S car so DAVIS could throw these three pills in the car.

33.    DAVIS maintained possession of the three pills.

34.    Knowing that she was not pregnant, on February 21, 2025, DAVIS faked taking the first of the three pills, and on February 23, 2025, DAVIS faked taking the two other pills.

35.    DAVIS demanded that COOPRIDER stay with her the nights of February 21 and 23, 2025 if there was any "medical emergency."

36.    COOPRIDER stayed with Davis.

37.    Because she was not pregnant, DAVIS pretended to be in excruciating pain and faked that she was cramping and  experiencing an abortion.

38.    No tissue was expelled the nights of February 21 and February 23, 2025.

39.    No abortion happened because DAVIS was not pregnant, and she did not take the pills then.

40.    DAVIS later concocted another ridiculous lie - that she might have been pregnant "twice":[5]

---

[5] **Exhibit 2** - Texts from DAVIS to COOPRIDER, March 22, 2025, Bates Stamp CR000065.



5. ***DAVIS's Efforts to End Her "Second"[6] Pregnancy with COOPRIDER***

41.     On February 25, 2025, DAVIS got pregnant.

   a.     Her Declarations Concerning Wanting a Natural Abortion

42.     Plaintiff said she wanted to expel her dead tissue by getting drunk and having rough sex to "help nature take its course" via a miscarriage.[7]  This is a screen shot of earlier text sent prior to February 24 2025 that was deleted by DAVIS, then re-sent on March 21, 2025, at 5:50:48 PM.[8]  DAVIS then berates COOPRIDER on March 21, 2025 5:51:25 PM: "First of all, I did not manipulate anyone, second of all, we just deleted those texts for the second time today. Not sure where you are getting them from, so you can go ahead and explain?"

43.     This unprotected rough sex was to "ensure that the fake pregnancy was ended" occurred on February 24, 2025:[9]

---

[6] A reference to a "second" pregnancy herein means the second time DAVIS told COOPRIDER she was allegedly pregnant by him.  In fact, she also had previously been pregnant in college, one aborted by her; had three children by her husband, and also falsely alleged to have had the prior "pregnancy" supposedly initiated with COOPRIDER.

[7] **Exhibit 3**, Text from DAVIS to COOPRIDER, dated February 24, 2025, Bates Stamp CR 000036 (referencing a "royal railing" or rough sex).

[8] See **Exhibit 4**, Text from DAVIS to COOPRIDER, dated April 4, 2025, Bates Stamp CR 000037, documenting the spoliation.

[9] **Exhibit 3**, Text from DAVIS to COOPRIDER, February 24, 2025, Bates Stamp CR 000036.



      b.      DAVIS's Erratic Behavior Towards COOPRIDER Becomes Stalking

44.      By early-March, COOPRIDER became concerned about DAVIS's erratic behavior.

45.      After announcing to COOPRIDER a "second" pregnancy, she began communicating to him her intention to follow him from his flight training in Corpus Christi to his next military post in North Carolina.

46.      DAVIS spoke with her neighbor at the time concerning her intention to abandon her three children with her husband in Texas and to move to North Carolina with COOPRIDER.

47.    DAVIS began calling and texting COOPRIDER constantly, confiding with her neighbor that she had called him fifty-three (53) times in a single day.

48.    DAVIS's rage against COOPRIDER grew, and during the late night of March 5, 2025,  DAVIS stood outside COOPRIDER'S doorstep loudly screaming at him, threatening that she would charge COOPRIDER with sexual assault if he didn't speak to her.[10]

49.    COOPRIDER told her that he didn't want to speak with her and that she was not welcome on his property.  DAVIS then called COOPRIDER over 40 times, and sent multiple texts.

50.    When the calls and the texts did not cause DAVIS to get her way, DAVIS again faked that she was suffering a miscarriage and was sitting in the bathtub in a pool of blood.

c.    COOPRIDER Calls The Corpus Christi Police Department ("CCPD")

51.    Worried for DAVIS's mental and physical health now that she was yet again claiming that she was bleeding, COOPRIDER called 911 and asked the Corpus Christi Police Department ("CCPD") to conduct a wellness check on DAVIS.

52.    COOPRIDER recorded his conversation with the CCCPD on March 5, 2025.[11] Speaker 2 is COOPRIDER.  The other speakers are law enforcement officers with the CCPD:

Audio #11

Speaker 1
(0:08) Hi, sir. (0:08) Are you Chris?

Speaker 2
(0:09) Yes, sir.

Speaker 2
(0:14) **So my neighbor**, she lives right over there.

Speaker 1

---

[10] See **Exhibit 5** - Video of DAVIS March 5, 2025 uploaded, and Transcript of that Video.
[11] **Exhibit 15** - Audio Recording, March 25, 2025, Bates Stamp CR 000847-859).

13

(0:18) The next steps?

Speaker 2
(0:19) Yeah. (0:20) Okay. (0:20) **She's been harassing me….**

Speaker 2
(0:27) But tonight was an escalation, and **I told her I didn't wanna talk with her and pretty much just told her I just couldn't ignore her and not talk to her. (0:40) Okay. (0:40) And it really upset her. (0:43) And she started throwing out all kinds of threats. (0:46) And I've got a video of her.**

Speaker 2
(0:48) I can show you guys of her. (0:49) She's like, I'm gonna come over there, and I'm not gonna leave until we resolve this. (0:54) And I've got a video. (0:55) I've walked both my front and back doors, and she comes up to the door and just on the door calling me and like, for six, six and a half minutes.

Speaker 1
(1:06) What was she wanting to talk to you about?

Speaker 2
(1:09) She just wants to talk. (1:10) So right now, what's going on with us is so we made a mistake and accidentally got pregnant. (1:19) And **she took abortion pills** and is, like, on the fence. (1:26) And she took them, **but didn't have it didn't actually fully come out. (1:31) But it's still maybe inside of her, but dead, but doesn't know for sure**.

Speaker 2
(1:50) So that's going on, and she's going through a divorce right now with her husband. (1:55) Mhmm. (1:56) And she has three kids right now, so she's going through a lot. (2:01) And, yeah, she's kind of a messy, stressful situation to begin with. (2:05) And she wanted me to talk with her, but **she was saying a bunch of, like, threatening stuff.**

Speaker 2
(2:13) And **the main reason I wanted to talk with you guys tonight**

Speaker 1
(2:17) Mhmm.

Speaker 2
(2:17) **Was because she was implying that she's going to call the CCPD, and she implied that she's going to tell them that I, like, raped or did something sexually abusive to her. (2:31) Mhmm. (2:31) And that is absolutely not the case**.

Speaker 1
(2:33) Yeah.

14

Speaker 2
(2:34**) And I just wanna do everything I can right now to protect myself from her lying and doing stuff like that.**

Speaker 2
(3:16) If this helps at all. (3:17) So **her name is Liana Davis**. (3:19) Mhmm. (3:20) So this is just tonight. (3:22) So it started at 06:12, and there's, what, one.

Speaker 2
(3:29) That's twenty. (3:31) That's another 10, so that's 31. (3:34) That's, like, it's, like, more than 40 calls from her within just a couple hours. (3:40) **And I told her, I don't wanna talk, so I just ignored all the calls. (3:46) And she's it pissed her off, and she's insistent on it.**

**Speaker 2
(3:50) She's insisting. (3:51) And then, yeah, it's the 911 calls, but that, and then I can show you the quick video. (3:57) I don't know if you guys care.**

Speaker 1
(3:59) No. (3:59) No. (3:59) You can show us that. (4:00) Was she threatening to how; was she threatening you? (4:02) To physically harm you?

Speaker 2
(4:03) No. (4:04) Not physically. (4:05) **She's threatening to…**

**Speaker 1
(4:07) Make those allegations?**

Speaker 2
(4:08) To that. (4:09) Uh-huh. (4:09) And **she's also threatening she's saying that I coerced her into taking the abortion pills against her will**, and that's illegal in Texas, which I don't think it is. (4:22) Like, you she's an adult. (4:25) She's older than I am.

Speaker 2
(8:30) I mean, for me, **I literally just want as little to do with her as possible.** (8:35) I mean, **maybe I, in the future, will get, like, a restraining order** or I don't know. (8:41) Was it a gag order to, like, not call me or text me?

Speaker 3
(8:45) Restraining order.

Speaker 1
(8:46) Yeah. (8:46) The restraining orders are the ones. (8:48) But you would also have to apply for that on your own. (8:50) We can only pretty much enforce I mean, **we can enforce restraining orders**, but it's pretty much just to report it at that time.

Speaker 2
(8:59) Yeah. (8:59) I'm not looking to do anything. (9:00) **I just wanna protect myself, and I just wanna make a note of this.** (9:05) And, like, I mean, if I'm not trying to, like, add more shit to the shit policy's already got going on. (9:13) So I just I mean, **anytime a woman makes, like even she didn't come out and just say, like, I'm gonna call and tell them that you raped me.**

Speaker 2
(9:22) **She was implying it, and that's something very serious**. (9:27) And Yeah. (9:29) **I've never called 911 or the cops before, but that's something that I just wanna protect myself.**

Speaker 3
(9:35) So what so my recommendation is like, how you didn't answer the door? (9:41) Don't. (9:42) So everything you've done is right. (9:45) You're recording her coming over here, ringing the doorbell, which doesn't make sense that you're harassing her to come over. (9:51) Anyway, that's beside the point.

Speaker 3
(9:54) So if she comes over and starts ringing the doorbell, record it. (10:00) If you're getting, like, a bunch of phone calls like she had been

Speaker 2
(10:03) She's calling me right now.

Speaker 3
(10:05) I would either block it or I don't know if you have a way to, like, put her specifically on silence.

Speaker 2
(10:13) So there's now there's an ex, I don't know how to say, extraneous circumstance right now. (10:24) **So now she's saying, and she's been saying this for, like, the last thirty minutes that she's so because of the nature of the abortion, it was a missed abortion, meaning that the stuff is dead inside of her, but it didn't come out Mhmm. (10:45) When, like, it was supposed to. (10:47) And so for, like, the last two weeks, she's been waiting for it to just kinda pass naturally. (10:54) And she's texting me now saying that all this stress has caused her to actually, like, do that.**

Speaker 2
(11:02) So now she's telling me that she needs my help, and I need to come over to her house right now because she's actually, like, **in a pile of her blood in the bathtub, and she's, like, expelling the aborted baby right now.** (11:18) And now I I'm texting her. (11:20) I'm like, look. (11:20) Like, you you're threatening legal allegations. (11:22) Like, I need an invite.

Speaker 2

 (11:31) **If she actually is, like, aborting this fetus right now and she's in a tub with, like, blood, it's safe. (11:40) Everything, like, the pills and stuff, everything I've said like, seen online is says that it's safe, but there is always a chance of complications**.

Speaker 2
(13:36) **I'm not looking to press charges or do anything to her**

Speaker 1
(14:00) Alright? (14:01) So I'm gonna give you this as the event number. (14:02) Everything you're telling me, I'm gonna put it down in the comments for the call. (14:05) Okay? (14:05) Okay.

Speaker 1
(14:05) And this is gonna be my information. (14:07) I'm officer Orsak. (14:08) My ID number is 18936.

Speaker 2
(14:25) Sounds good. (14:26) Thank you, guys.

Speaker 3
(14:26) Yes, sir.

53.     Law enforcement checked on DAVIS and she was not sitting in blood.  She said that she was fine.

54.     This was the second time that DAVIS faked that she was having a miscarriage, bleeding and having a medical emergency.

55.     To determine if she was "still" pregnant after pretending to be miscarrying and gushing blood, DAVIS scheduled an ultrasound on March 21, 2025.

56.     The ultrasound conducted on March 21, 2025 concluded that the date of conception was approximately February 25, 2025.

57.     DAVIS insisted that she was 10-11 weeks pregnant, but the physician told her she was wrong.

d.    COOPRIDER Tries to Slow Down the Sexual Relationship

58.    DAVIS's behavior became more and more erratic and unsafe to COOPRIDER.

59.    DAVIS informed COOPRIDER that she probably had a dead baby inside of her that had not yet "dislodged."

60.    She insisted that having sex with him would be an effective method to "shake things" loose.  DAVIS stated that having sex is the method used by "EVERY other female" she knows to induce a miscarriage.  DAVIS told COOPRIDER that she has been doing this for 20 years.  She told Cooprider that he should have sex with her to help her expel the dead baby.  Specifically, she wanted to have unprotected sex because she claimed that his sperm contained prostaglandin, a chemical that would help initiate a miscarriage that she wanted to have.[12]

---

[12] See, **Exhibit 6**, Screen Shots of texts from DAVIS to COOPRIDER, sent on February 24, 2025, and re-sent on March 21, 2025, Bates Stamp CR 000034 and 35 reproduced here.



61.     DAVIS continued sending unwanted sexual messages to COOPRIDER expressing her desire to have boudoir photos taken, complaining about how long she had gone without sex with him and wanting more sex.

62.     For example, on March 22, 2025, DAVIS reminded COOPRIDER to call her "a loaf" for the reason that "all I want is to be bred."[13]:

---

[13] **Exhibit 7**, Text from DAVIS to COOPRIDER, March 22, 2025, Bates Stamp CR000058.



63.     As to this unintended pregnancy, she constantly wrote "if I want" [14] or "if the pregnancy continues in her messages:[15]

[14] **Exhibit 8**, DAVIS texts with "Nick,"  March 22, 2025, Bates Stamp CR 000249 and 250.
[15] **Exhibit 9** , Bates Stamp CR000194 March 25, 2025 ("I'm talking about IF the pregnancy progresses").



64.      Also on March 25, 2025, DAVIS continues to pursue COOPRIDER with promises

of boudoir photos:[16]

---

[16] **Exhibit 10** Text from DAVIS to COOPRIDER, March 25, 2025, Bates Stamp CR000192 ("I'm considering hurrying up and getting that boudoir photo shoot done as a bday gift to myself…").



65.     Again, on March 25, 2025, DAVIS sent COOPRIDER a seductive photo of a woman on a bed, demonstrating that she could "lay on belly and slide leg up"[17]:

---

[17] **Exhibit 11** Text from DAVIS to COOPRIDER, March 25, 2025, Bates Stamp CR 000199.

66.     Again, on March 25, 2025, DAVIS sent COOPRIDER a text containing a provocative stock photo of a woman's legs with her panties down to her ankles, stating "[d]inner was great but dessert's about to be better", and photo suggesting "this doesn't involve the stomach at all."[18]

67.     Next, on March 25, 2024, DAVIS texted COOPRIDER a seductive photo of another woman lying on a bed, with her crossed legs and high heels barely covering her buttocks, with the message, "another forgiving pose that doesn't show stomach, etc."[19]:

68.     Finally, DAVIS lamented to COOPRIDER that they had refrained from sex for as long as they ever had[20]:

---

[18] **Exhibit 12** – Text from DAVIS to COOPRIDER, March 25, 2025, Bates Stamp CR000200 (Sending stock photo of lady with panties around ankles).

[19] **Exhibit 13**, Text from DAVIS to COOPRIDER, March 25, 2025, Bates Stamp CR000201.

[20] **Exhibit 14,** Text from DAVIS to COOPRIDER, March 25, 2025, Bates Stamp CR 000203, ("We are about to surpass the longest time we've gone without banging since we started banging.").



69.    Then, on March 26, 2025, DAVIS communicated to COOPRIDER that she had chosen abortion previously.  DAVIS had gotten pregnant when she was in grad school with a guy named Nick J.  She had no problem aborting *that* unintended pregnancy[21]:



---

[21] **Exhibit 16** – Text from DAVIS to COOPRIDER, forwarding DAVIS texts with "Nick," March 26, 2025, 12:21:28 PM,  Bates Stamp CR 000249 and 250.

70.    A week later, on March 31, 2025, DAVIS told COOPRIDER "goodbye" in her own oblique way, pictographically suggesting sex just one more time[22]:

| Bate 537 | Mar 31, 2025 8:43:51 PM | Liana Davis | And here I thought there was a 1% chance we might be turning a corner and could actually enjoy each other again. 👄 Like how it all started. |
| Bate 537 | Mar 31, 2025 8:48:29 PM | Liana Davis | Would've been nice to have epic goodbye 🍆 before parting ways forever.. |

The eggplant emoji is a symbol of sex.

---

[22] **Exhibit 17** – Excerpt of Text from DAVIS to COOPRIDER, March 31, 2025, Bates Stamp CR000537.

        e.      <u>DAVIS invites COOPRIDER to her Home for "A Night of Trust"</u>

71.    On April 5, 2025, DAVIS invited COOPRIDER to her home for "a night of trust."[23]

72.    DAVIS insisted that the night had to be a "no phone or gadget zone" so that trust could be re-established[24]:

| Bate Stamp | Speaker | Date and Time | Communication |
|---|---|---|---|
| 708 | DAVIS | Apr 4, 2025 10:12:59 PM | Why is a buildup required |
| 708 | COOPRIDER | Apr 4, 2025 10:15:22 PM | As in maybe after a couple of relaxing nights. Trust building nights, then maybe |
| 708 | COOPRIDER | Apr 4, 2025 10:16:25 PM | I'm telling you right now; I don't want sex tomorrow, no sex, I'm uncomfortable with that right now. Got it |

73.    DAVIS frisked COOPRIDER when he came into her house.

74.    DAVIS and COOPRIDER placed their two phones on the dining room table, and turned them off. But, DAVIS had secretly set up a recording device near her purse in the living room to record the evening. This is consistent with DAVIS's prior surreptitious actions of deleting

---

[23] The "trust" was for Davis to prove SHE could be trusted AFTER she had threatened Christopher with false rape charges on March 5, had on March 10 sent to her neighbor "Trophy Pics" of COOPRIDER after sex with him, and on March 29 had used the "box of pills" still in her possession to threaten problems with the "judge advocates."
[24] **<u>Exhibit 18</u>** – Screenshot from Text of DAVIS to COOPRIDER, April 4, 2025, Bates Stamp CR000708.

material from COOPRIDER's phone, and in preparation for initiating a criminal complaint that will be described later, DAVIS also then secretly photographed COOPRIDER's driver's license and social security card.

75.    DAVIS and COOPRIDER prepared hot chocolate in the kitchen together.

76.    With her children sleeping upstairs, DAVIS put alcohol in her drink, again in violation of the family court Orders.

77.    COOPRIDER did not put alcohol in his drink as DAVIS had because he was scheduled for his final flight test to pass the Marine Pilot Training.  COOPRIDER could not have any alcohol withing 12 hours of a training event.

78.    COOPRIDER followed DAVIS from the kitchen to her living room.

79.    DAVIS's secret recording device[25] had been placed by DAVIS to supposedly record the sound of a spoon mixing the "remaining ten pills" of an original twelve-pill package, but

(a)    those pills had long been discarded weeks earlier;

(b)    water solubility data exhibits poor solubility, and its clinical form (Form M) is even worse, demonstrating that ten fictional pills of mifepristone could not possibly have dissolved into an unnoticeable residue in just seconds; noticeably large clumps of undissolved particle would have remained;

(c)    those noticeably large clumps of the fictional mifepristone would have been immediately detected by DAVIS's sense of taste as well, with an unmistakably bitter taste having alerted her.

---

[25] **Exhibit 19** – Audio Recording dated April 5, 2025, sent by DAVIS to COOPRIDER, Bates Stamp CR000004.

80.    COOPRIDER did not drug DAVIS's drink.

81.    DAVIS was getting ready in the bathroom, and stuck her finger in her vagina.

82.    DAVIS was not gushing blood or hemorrhaging.

83.    DAVIS later called this "gushing blood," but no gushing blood was visible.  Of course, mifepristone does not result in vaginal bleeding in mere second or minutes, as alleged by DAVIS.  Instead, the mean lapsed time between ingestion and vaginal bleed is between one and four hours.

84.    COOPRIDER later went home to get sleep before he had to take a military flight early in the morning.

85.    DAVIS had kept the pills from February for another purpose.  DAVIS maintained the three pills, and these are likely the three pills she gave to the Corpus Christi Police Department on April 5, 2025.

86.    After the "night of trust" ended, DAVIS's neighbor drove her to the hospital. During the drive, she wasn't crying.

87.    When they arrived at Bay Area Medical Center, DAVIS immediately began crying performatively.

88.    According to the neighbor who drove her, DAVIS immediately announced to Bay Area Medical Staff, "he drugged me."   She told everyone in the emergency room ("ER"), including the registrar.

89.    As soon as the hospital staff left the room, she stopped crying.

90.    The ultrasound conducted earlier on March 21, 2025 concluded that the date of conception was approximately February 25, 2025, which could cause those present to wonder,

"why do you have abortion pills that arrived on February 18, 2025, when you didn't get pregnant until after that?"

91.    When police officers arrived at the ER, they asked who had drugged her, and DAVIS responded, "I have a picture of his license, ss card."

92.    When the officer asked if she wanted "to press charges," she energetically "lit up" answering in the affirmative.

93.    Before the neighbor and DAVIS left the hospital, DAVIS asked her neighbor, "do you think with these charges, Chris will have to stay?"

94.    DAVIS  was taken to the ER and back home from it by her neighbor.

95.    The neighbor then told COOPRIDER not to go to DAVIS's house again, because "she will accuse you of something."

          f.    <u>After DAVIS Presses Charges, the CCPD Investigates and Declines to Pursue Her Allegations against COOPRIDER</u>

96.    After DAVIS pressed charges against COOPRIDER at the hospital, the CCPD began its investigation.

97.    Officer Michael Manzano interviewed DAVIS's neighbors and others, reviewed the evidence available, and declined to act on her allegations.

98.    Eventually, DAVIS's children were removed from her care as well.

99.    At the ER, DAVIS had already been sending her "evidence" to LCDR Knott and the Corpus Christi Police Department.

100.    DAVIS sent a 29 second audio tape recording that she claimed was the evidence that she had been drugged.[26]

---

[26] **Exhibit 19**, 29-second audio tape recorded by DAVIS on April 5, 2025.

101.    DAVIS began making poisoning allegations – just like her ex-husband did when he accused her of poisoning him[27]:



102.    There also is a video DAVIS coming to her neighbor's door later on April 5, 2025,[28] appearing healthy and then after the doorbell rang, pretending to be writhing in pain.  And because the neighbor no longer trusted her, there is an audio of that neighbor driving DAVIS to the ER.

---

[27] **Exhibit 20**, Bates Stamp CR000784 April 7, 2025 11:12 am ("I'm doing that you can hear YOU quickly stirring my drink").
[28] **Exhibit 21** – Video of DAVIS approaching Neighbor's Door on two occasions. April 5, 2025 (CR000794).

103.   DAVIS did not tell COOPRIDER about the status of the pregnancy.   Here are excerpts of the text exchanges DAVIS sent after April 5, 2025 to COOPRIDER on April 6-7[29]:

| 752 | COOPRIDER | Apr 6, 2025 8:47:34 AM | You took photo of my SSN and driver's license and shared that with the cop |
|---|---|---|---|
| 752 | COOPRIDER | Apr 6, 2025 8:48:14 AM | How did you get access to my SSN? It's buried inside of my wallet |
| 752 | DAVIS | Apr 6, 2025 8:58:24 AM | Chris, why did you abandon me in the middle of a medical emergency? You left me waiting on you when you had no intention of returning and it delayed me getting care. You intentionally stopped responding. |
| 752 | COOPRIDER | Apr 6, 2025 8:58:56 AM | I told you I needed to get ready for my flight.  Told you that |
| 753 | COOPRIDER | Apr 6, 2025 8:59:38 AM | Why are you not acknowledging my questions |
| 753 | DAVIS | Apr 6, 2025 9:02:54 AM | No, the plan was for you to go get my mother and bring her back to my house, then for you to take me to the ER. You agreed to that and understood the urgency. Instead, you pretended to go get my mother, and then stopped responding to calls and texts while I was bleeding at my house. I had to walk bent over at a 90° angle and bang on Jackie's door for her to help me. |
| 753 | COOPRIDER | Apr 6, 2025 9:04:56 AM | I told you that twice |
| 754 | DAVIS | Apr 6, 2025 9:05:52 AM | Why are you not acknowledging mine? I am in shock and disbelief that you intentionally abandoned me in the middle of a real medical emergency. It's like you did not want me to make it to the hospital. |
| 754 | DAVIS | Apr 6, 2025 9:05:53 AM | You left an elderly woman outside in the cold waiting on you for 40 minutes in the middle of the night. This is the same older lady who you were so intent on helping while I was away at my conference earlier this week. |

---

[29] **Exhibit 22** – Excerpts of Text Messages from DAVIS to COOPRIDER from nights of April 6-7, 2025 (CR000752-789).

| 754 | COOPRIDER | Apr 6, 2025 9:06:39 AM | Why did you go through my wallet? And when did you do that? And take photos!! |
| 754 | COOPRIDER | Apr 6, 2025 9:06:52 AM | And you did record everything last night.... |
| 754 | COOPRIDER | Apr 6, 2025 9:12:33 AM | I just wanted to have a relaxing night... and you end up freaking out and pressing charges on me??!! |
| 769 | COOPRIDER | Apr 7, 2025 9:04:37 AM | I never slipped anything into your drinks |
| 769 | COOPRIDER | Apr 7, 2025 9:04:54 AM | Now your current plan: "if he has criminal charges, he'll have to stay and won't be able to move to NC right?" |
| 770 | DAVIS | Apr 7, 2025 9:05:39 AM | I don't have a plan other than taking care of my health and getting justice for what was done to me and our baby. |
| 771 | DAVIS | Apr 7, 2025 9:43:30 AM | My Marine friend with 17 years' experience says what you did is premeditated murder and a felony under the UCMJ. |
| 771 | COOPRIDER | Apr 7, 2025 9:48:10 AM | I never put anything in your drinks Liana |
| 771 | COOPRIDER | Apr 7, 2025 9:49:44 AM | And I would never do something like what you are accusing me of |
| 771 | DAVIS | Apr 7, 2025 10:08:44 AM | Much of everything you've ever told me is a lie. This is me briefly stepping out the back door to call the dog inside, and while I'm doing that you can hear YOU quickly stirring my drink a few times with a spoon and then closing what sounds like a cap to a container. It had to have been my drink because you can hear how close you are to my purse (where the phone was inside recording). I think you actually brush/bump against it. |
| 772 | DAVIS | Apr 7, 2025 10:08:47 AM | Audio Tape of spoon |

| | | | |
|---|---|---|---|
| 772 | DAVIS | Apr 7, 2025 10:09:56 AM | You know what doesn't lie? Spoons. 🥄 This audio has already been COOPRIDER to LCDR Knott, along with the pictures of the abortion pills you ordered (CCPD's CID has some of them in evidence including the box of mifepristone with your name on it + 2 misoprostol that you left behind at my house after drugging me), the case # for the open police investigation, and more. |
| 773 | COOPRIDER | Apr 7, 2025 10:13:17 AM | You've lied and manipulated me every step of this. Not sure why you are so obsessed with me.. |
| 773 | DAVIS | Apr 7, 2025 10:13:18 AM | So, you don't deny that you left behind abortion pills at my house that you had used to drug me. |
| 774 | COOPRIDER | Apr 7, 2025 10:13:29 AM | This lying on your part needs to stop |
| 775 | DAVIS | Apr 7, 2025 10:16:06 AM | You shouldn't touch those pills that you still have. It would be tampering with evidence. |
| 775 | DAVIS | Apr 7, 2025 10:16:12 AM | Destroying evidence |
| 775 | COOPRIDER | Apr 7, 2025 10:16:34 AM | Left pills at your house??? |
| 775 | COOPRIDER | Apr 7, 2025 10:17:08 AM | You mean the pills you didn't take in February? You held onto them |
| 775 | COOPRIDER | Apr 7, 2025 10:17:55 AM | Everything good with the ultrasound? 👍 |
| 776 | DAVIS | Apr 7, 2025 10:22:25 AM | I have never knowingly taken any abortion pills. You know this. You have relentlessly tried pestering, taunting, harassing, and bullying me into taking them, and when that didn't work, you put an unknown amount of the misoprostol into my drink on Saturday, causing me to have to go to the ER. |
| 776 | COOPRIDER | Apr 7, 2025 10:23:14 AM | Ahh now I get how you're spinning things |

Case 2:25-cv-00220    Document 7    Filed on 09/03/25 in TXSD    Page 38 of 99

| | | Apr 7, 2025 | |
|---|---|---|---|
| 776 | COOPRIDER | 10:23:38 AM | You took abortion pills right in front of me |
| 776 | DAVIS | Apr 7, 2025 10:23:48 AM | You abandoning my mother and me and intentionally delaying my medical care is inexcusable. Right now, the only thing I need to know from you is how much misoprostol you put in my drink so I can tell my doctor. |
| 777 | COOPRIDER | Apr 7, 2025 10:23:51 AM | After you agreed to taking them |
| 777 | COOPRIDER | Apr 7, 2025 10:24:08 AM | ZERO |
| 777 | COOPRIDER | Apr 7, 2025 10:24:22 AM | I gave you chocolate milk |
| 777 | COOPRIDER | Apr 7, 2025 10:24:40 AM | You were the only person with abortion pills in the house |
| 777 | COOPRIDER | Apr 7, 2025 10:24:58 AM | Hot cocoa* not chocolate milk |
| 777 | DAVIS | Apr 7, 2025 10:30:09 AM | I never agreed, and I never took them. You have brought them in and out of my house various times trying to get me to take them ever since you ordered them. They are in evidence with CCPD. |
| 778 | DAVIS | Apr 7, 2025 10:32:14 AM | I missed work today because of what you've done. I should be teaching class right now. I might have to miss more work depending on what my doctor says. |
| 778 | COOPRIDER | Apr 7, 2025 10:35:06 AM | Ahh so you did lie to me this whole time... |
| 778 | COOPRIDER | Apr 7, 2025 10:35:47 AM | And you knowingly were not pregnant. Yet convinced me that you were AND said it's impossible to get more pregnant. Therefore, you planned to trap me this whole time |
| 778 | DAVIS | Apr 7, 2025 10:36:21 AM | I never consented to abortion pills, I was never knowingly not pregnant, and I never trapped you. We cannot discuss this right now bc I'm in the middle of an ongoing medical emergency. |

|     |           | Apr 7, 2025 10:36:21 AM | Imagine telling that story to this LO... |
|-----|-----------|-------------------------|------------------------------------------|
| 779 | DAVIS     | Apr 7, 2025 10:36:32 AM | How many pills did you give me, Chris? Was it all 10? |
| 779 | COOPRIDER | Apr 7, 2025 10:36:37 AM | You consented multiple times |
| 779 | DAVIS     | Apr 7, 2025 10:36:50 AM | They already took my weight and blood pressure and I'm gonna get called back soon. |
| 779 | DAVIS     | Apr 7, 2025 10:36:59 AM | How many was it? You could have killed me. |
| 780 | DAVIS     | Apr 7, 2025 10:37:24 AM | There were 10 missing from the bottle. You only left behind 2. |
| 780 | COOPRIDER | Apr 7, 2025 10:37:28 AM | Hey Mom, how was I born?? Well junior, I lied and manipulate and cheated some guy into impregnating me... |
| 780 | DAVIS     | Apr 7, 2025 10:37:39 AM | Questioned "How many was it? You could have killed me." |
| 780 | COOPRIDER | Apr 7, 2025 10:37:49 AM | wtf are you talking about |
| 780 | DAVIS     | Apr 7, 2025 10:37:59 AM | Questioned "I never consented to abortion pills, I was never knowingly not pregnant, and I never trapped you. We cannot discuss this right now because I'm in the middle of an ongoing medical emergency." |
| 780 | DAVIS     | Apr 7, 2025 10:38:02 AM | Emphasized "I never consented to abortion pills, I was never knowingly not pregnant, and I never trapped you. We cannot discuss this right now because I'm in the middle of an ongoing medical emergency." |
| 780 | DAVIS     | Apr 7, 2025 10:39:41 AM | I handed over one (what appeared to be) one Mifepristone and 2 Misoprostol to the police. |

| | | | |
|---|---|---|---|
| 780 | DAVIS | Apr 7, 2025 10:40:23 AM | The nurse in the ER said that the pill that appeared to be a Mifepristone might be a Xanax. Did you give me Xanax? Did you plan to knock me out while I unknowingly and unwillingly aborted our baby?? |
| 781 | COOPRIDER | Apr 7, 2025 10:41:40 AM | Omg you have spun the most evil story.. omg... |
| 781 | DAVIS | Apr 7, 2025 10:42:29 AM | I don't have a prescription for Xanax. If it was Xanax, where the heck did you get this? Was it while on your trip to Mexico? Did you have your gf get it? |
| 781 | DAVIS | Apr 7, 2025 10:43:15 AM | And how many Xanax did you give me? I NEED to know NOW before they call me back so that I can tell my doctor and make sure I am safe. That is all. |
| 782 | COOPRIDER | Apr 7, 2025 10:43:28 AM | Liana, you are knowingly lying about multiple things here... |
| 784 | COOPRIDER | Apr 7, 2025 11:12:01 AM | I did not mix anything |
| 786 | COOPRIDER | Apr 7, 2025 11:24:49 AM | I did not mix anything into your drinks |
| 787 | DAVIS | Apr 7, 2025 11:32:55 AM | You have a lot to answer for. I am going to talk to the neighbors whose houses your truck was closest to and ask for their camera footage of you idling instead of going to get my mother so I could get medical care. Your actions are inexcusable. |
| 788 | DAVIS | Apr 7, 2025 11:37:56 AM | Do you see where this is going? You planned to murder our baby, and you didn't care what happened to me in the process. It seems that you were surprised by how quickly the pills you drugged me with kicked in (hence why you almost fell asleep) and you didn't want me to get treatment too quickly because you wanted the pills to work. So, then you tried to run out the clock and left me in pain and suffering longer than necessary. I should have gotten to the ER by ~12:35 if you had done what you said you would do (picked up my mom, brought her here, and taken me). I didn't get to the ER until after 1am. All of these things are logged or timestamped. |

| 789 | DAVIS | Apr 7, 2025 11:39:03 AM | You will be held accountable. 100%. Saturday night was pure evil. |
| 789 | COOPRIDER | Apr 7, 2025 11:47:56 AM | Murder? Are you saying the pregnancy is no longer viable? |

104.    Defendant COOPRIDER alleges that DAVIS's poisoning story is false, and is a fraud.

### D. SPOLIATION

105.    Defendant COOPRIDER pleads as an affirmative defense of **spoliation**.  DAVIS has intentionally destroyed evidence key to COOPRIDER's defenses herein.  Specifically, COOPRIDER pleads that (1) while DAVIS had control over such evidence, she destroyed it at a time when she had a duty to preserve it; (2) she intentionally destroyed the evidence; (3) the evidence she destroyed was relevant to her claim and to COOPRIDER's defenses thereto.

106.    On February 3, 2025, the same day that DAVIS lied to COOPRIDER about being pregnant, DAVIS told COOPRIDER that she had been served with written discovery from her ex-husband asking for evidence.

107.    DAVIS received written discovery from her ex-husband that she had to answer under penalty of perjury.

108.    DAVIS was under Court Orders not to drink around her children.  DAVIS ignored these Court Orders and got inebriated repeatedly with alcohol when she and COOPRIDER had sex.

109.    On February 3, 2025, DAVIS decided to destroy evidence of her alcohol abuse, the incriminating photos she sent to COOPRIDER, and the casual sexual relationship she was having with COOPRIDER.

110.    DAVIS wanted to make sure the compromising evidence had been destroyed.  She took COOPRIDER'S TELEPHONE and deleted evidence of their sexual relationship[30]:

**DAVIS**:

(9:41) Like, **our little situation, I need you to pretend for the time being that's not even happening at all.** (9:48) Like, try to go there and answer everything I'm about to ask you, please, without that being in the picture. (9:55) Is that, like, is that possible? (9:58) Can you, like, conceivably do that?

(10:02) Okay. (10:03) Alright. (10:05) Would you be willing where's your phone?

(10:10) I'm not being nosy showing your phone. (10:12) **I wanna make sure you're not recording**. (10:13) I'm used to someone following me around recording Like, I'm jade I'm not joking. (10:16) He would follow me around. (10:17) You don't know the shit that's gone down in this house.

(10:19) **He'd follow me around like this when I'm, like, crying and begging him to stop, like, recording me. (10:23) Like, it's a one-party state. (10:25) It's a one-party consent state.** (10:26) Like, you don't know what I've been through. (10:28) I'm on high alert.  (10:31) No. (10:32) Okay. (10:33) Where's your, like…


**COOPRIDER**:

(10:34) There's all my apps. (10:36) Nothing is on. (10:37) Here's everything I have.

**DAVIS**:

(10:39) Okay. (10:41) So we only have to do this once. (10:42) Go to your like, I itemized it. (10:44) **Go to your text, please. (10:46) I don't wanna sound commanding. (10:51) Okay. (10:52) Where am I? (10:54) Delete me. (10:55) Delete it. (10:55) Delete the whole thing, the whole thread. (10:58) Swipe. (11:01) I don't exist. (11:02) Delete it. (11:03) Delete the whole thing.**

(12:13**) The pictures I took of myself, go to your photos.** (12:16) I wanna see I don't care if you have dick pics in there. (12:18) I'm not here to judge. (12:18) I

---

[30] See **Exhibit 23** - February 3, 2025 recording of DAVIS's request of COOPRIDER that he clean his phone.  Bates Stamp CR 000001, and **Exhibit 24,** the corresponding transcript.

wanna see from January 9 to January 24. (12:20) **I wanna make sure they're not in there.**

(16:14) Okay. (16:16) The next one is one sec. (16:20) Let me show you what I was looking for. (16:21) Tell me if any of these ring a bell. (16:23) **This this is what I need, wiped off this planet.**

(21:40) Less is better. (21:41) **Sorry to wipe it clean like that if there was anything you had wanted to save.** (21:46) I assume nothing is sentimental. (21:48) Okay. (21:48) Check.

111.    Not only did DAVIS physically destroy her compromising photos and texts, but she also bullied COOPRIDER and demanded that he lie for her to cover up her sexual affairs and, more importantly, evidence of her chronic alcohol abuse in violation Court Orders in her divorce case:

(44:57) And I was like, Chris, I **just got served with Discovery. (45:04) Like, they could find out about you. (45:06) They could find out what we've done.** (45:07) You know, I'm technically still married. (45:10) In that situation, ignore everything that has happened the past few days.

(45:14) **Would you be willing to lie under oath? (45:16) You're a good liar. (45:17) That's actually gonna serve us really well. (45:20) But do you think you could do that or no? (45:22) It's fine.**

**(52:38) And you do know that is a huge ask to ask somebody to purposely lie on your oath.**

**(52:43) I know. (52:44) That's why I asked you if you'd be willing.**

112.    DAVIS bragged to COOPRIDER that she had violated Court Orders and had gotten away with it:

(49:27) Does that make sense? **(49:30) Like, the fact that I actually broke two standing orders, by the way, which I don't care. (49:35) But I'm not allowed to drink within twelve hours of being in possession of the children, which is stupid for me.**

113.    In addition to seeking the destruction of information in COOPRIDER's possession, DAVIS also asked her other neighbor to delete digital evidence on "numerous occasions." She

asked the neighbor to delete videos, photos and recordings, instructing her "how to delete" this evidence, and telling her "I can help you delete."

114.    Following DAVIS's tirade at COOPRIDER's front door on March 5, 2025, DAVIS was furious that COOPRIDER had later called the police and demanded to know what he had told law enforcement.

115.    DAVIS claimed that she had audio recorded DAVIS and COOPRIDER having sex, and she threatened to post the audio on Facebook, unless COOPRIDER withdrew his complaint against DAVIS[31]:



116.    The ultrasound conducted on March 21, 2025 concluded that the date of conception was February 25, 2025.

117.    DAVIS insisted that she was 10-11 weeks pregnant, but the physician told her she was wrong.

118.    While waiting for the ultrasound appointment, DAVIS took COOPRIDER's phone again and destroyed incriminating photographs and texts.

---

[31] **Exhibit 25** – Screenshot of DAVIS telling her neighbor she had recorded their sex.  Bates Stamp CR000795.

119.    Specifically, DAVIS deleted all of the texts she sent COOPRIDER where she lied that she was sitting in the bathtub in a pool of blood and having a medical emergency.

### E.    CONTRIBUTORY NEGLIGENCE

120.    Defendant COOPRIDER pleads the affirmative defense of **contributory negligence**.

121.    Defendant COOPRIDER pleads that Plaintiff DAVIS's actions during her pregnancy constituted negligence, and that such negligence was a proximate cause of the death of her unborn baby, and the damages claimed herein.

122.    Initially, while in no way negligent in and of itself, the fact is that DAVIS was considered 37 years old at the time of her pregnancy, classified as a "geriatric pregnancy," for which her age alone put her at a higher risk of miscarriage.

123.    Additionally, there is indication that DAVIS had been diagnosed with chlamydia, a sexually transmitted disease ("STD") spread through unprotected vaginal, oral and anal sex. Published data reveals a doubling of the risk of miscarriage amongst women generally, though results conflict.

124.    While evidently confusing chlamydia (which she had), with gonorrhea or "the clap" (which she did not have), DAVIS nonetheless sarcastically named her unborn baby "Clappy."[32]

---

[32] **Exhibit 26**, Text from DAVIS to COOPRIDER, March 26, 2025, Bates Stamp CR000327.



125.    Nonetheless, when a pregnant woman is in a geriatric age bracket and has a chlamydia infection, she is exposed to two independent risk factors for miscarriage. The combined effect of these factors is likely higher than either risk alone.

126.    Given the increased risk of miscarriage caused by her age, and her STD, her own volitional conduct during her pregnancy - in at least the eight (8) ways discussed below - constituted negligence, which negligence was a proximate cause of her miscarriage, and the damages she claims therefrom.

127.    Specifically, Defendant COOPRIDER alleges that Plaintiff DAVIS negligently:

(a)  Drank Alcohol Heavily While Pregnant;

(b)  Failed to Take Progesterone, as Prescribed;

(c)  Failure to Appropriately Treat her Sexually Transmitted Disease ("STD") and Other Pathogens in her Body, Which Led to Prolonged Fever During Her Pregnancy;

(d)  Took Medications Contraindicated During Pregnancy;

(e)  Consumed Large Quantities of Red Bull and other Caffeinated Substances;

(f)  Engaged in High-Impact Activities;

(g)  When Heavy Cramping Indicated a Miscarriage Had Begun on April 4, 2025, Refusing to Go to the ER, and Instead Exposed Herself to the Outdoor Heat and Humidity for Four Hours; and

(h)  Generally, Took Repeated Actions to try to Induce a Spontaneous Abortion of her Unborn Child.

Individually, and collectively, these eight (8) acts of negligence were a proximate cause of the loss of her unborn child, and the of the damages she now claims.

1.    DAVIS Drank Heavily While Pregnant

128.    As stated before, DAVIS was under Court orders not to drink around her children. DAVIS ignored these Court orders and got repeatedly inebriated with alcohol before she and COOPRIDER had sex.

129.    In addition to DAVIS's neighbor reportedly seeing DAVIS drink around her kids and being "*drunk*" while "taking care of the kids," (*infra,*, para. 18), DAVIS unfortunately chose to continue her heavy drinking *while pregnant.*

130.    She texted COOPRIDER about wanting to "booze" before we get busy.[33]



―――――――――――――――――
[33]    **Exhibit 3,**   Text from DAVIS to COOPRIDER, February 24, 2025, Bates Stamp No. CR 000036.

45

131.    On April 5, 2025, with her children sleeping upstairs, DAVIS put alcohol in her drink, again in violation of the family court Orders.

132.    Public health guidance is unequivocal that there exists "NO KNOWN SAFE AMOUNT OF ALCOHOL DURING PREGNANCY: ABSTINENCE RECOMMENDED." Instead, DAVIS engaged in heavy alcohol consumption, behavior that persisted for months prior to April 5, 2025.  Studies show that each week of alcohol use in gestational weeks 5-10 increases the prevalence of miscarriage by approximately 8%. If she miscarried around the first week of April of 2025, DAVIS's miscarriage occurred at gestational week 8. It is reasonable to expect that her alcohol ingestion alone increased DAVIS's risks of miscarriage by greater than fifty percent.

133.    DAVIS's choice to consume alcohol during her pregnancy, given her other risk factors already present, constituted negligence, which negligence was a proximate cause of the death of her unborn baby.

2.    Failing to Take Progesterone, as Prescribed

134.    On March 21, 2025, DAVIS received distressing news from her ultrasound.

(a)    The unborn child was five weeks, three days old, revealing a conception date of February 25, 2025.

(b)    The baby's embryonic heart rate (EHR) was only 98 bpm, and classic first-trimester data indicate the *lower limit of normal* EHR is ~100 bpm up to 6.2 weeks, and 120 bpm at 6.3–7.0 weeks. Thus, 98 bpm at ~5.3 weeks is borderline low.

(c)     Observed outcomes when the EHR is below 100 bpm up to 6.1 weeks show a survival rate of only 56% through the first trimester.  As of March 21,

2025, DAVIS had only a 55–60% chance of an expected ongoing viable pregnancy by the end of her first trimester.

> (d)    To help the baby survive, her doctor prescribed progesterone.

135.    DAVIS was proscribed progesterone because the fetal heartrate was low.    The embryonic heartrate at the time of the ultrasound was measured at only 98. Normal heartrate for an embryo at this age should be 160. Progesterone supplementation is intended to improve embryonic viability in women with threatened miscarriage, as in this case.

136.    DAVIS picked up her prescription for progesterone on March 21, 2025 after the ultrasound. She began taking the supplements and had blood testing performed on March 24, 2025 and March 26, 2025. The initial progesterone test indicated DAVIS's levels at 14.7 ng/ml. The test on March 24, 2025 indicated a level of 13.9 ng/ml, and the test on March 26, 2025 indicated a level of 31.9 ng/ml. While supplementation of progesterone appeared to be having the desired effect, Davis mysteriously chose to discontinue the supplements on March 28, 2025.

137.    The National Institutes of Health ("NIH") has published numerous meta-analyses showing the consequence of a pregnant woman's decision to discontinue progesterone in these circumstances.

138.    Just last year, the NIH published an article, Bataa, M., et al, "Exploring Progesterone Deficiency in First-Trimester Miscarriage and the Impact of Hormone Therapy on Foetal Development: A Scoping Review," CHILDREN (BASEL). 2024 Apr 2; 11(4):422. https://pmc.ncbi.nlm.nih.gov/articles/PMC11049201/, which revealed that   "[f]ourteen [studies] showed that there is an association between progesterone level and pregnancy loss," and "seven studies showed a clear positive association between progesterone deficiency and first-trimester miscarriage." *Id.*

139.   The Bataa article cited those seven studies revealing this miscarriage risk:

1.    Ku C.W., Allen J.C., Jr., Lek S.M., Chia M.L., Tan N.S., Tan T.C. Serum progesterone distribution in normal pregnancies compared to pregnancies complicated by threatened miscarriage from 5 to 13 weeks' gestation: A prospective cohort study. BMC Pregnancy Childbirth. 2018;18:360. doi: 10.1186/s12884-018-2002-z. [footnote 8];

2.    Su M.T., Lee I.W., Chen Y.C., Kuo P.L. Association of progesterone receptor polymorphism with idiopathic recurrent pregnancy loss in Taiwanese Han population. J. Assist. Reprod. Genet. 2011;28:239–243. doi: 10.1007/s10815-010-9510-8. [footnote 11];

3.    Wang F., Zhu H., Li B., Liu M., Liu D., Deng M., Wang Y., Xia X., Jiang Q., Chen D. Effects of human chorionic gonadotropin, estradiol, and progesterone on interleukin-18 expression in human decidual tissues. Gynecol. Endocrinol. 2017;33:265–269. doi: 10.1080/09513590.2016.1212829. [footnote 15];

4.    Hanita O., Hanisah A.H. Potential use of single measurement of serum progesterone in detecting early pregnancy failure. Malays. J. Pathol. 2012;34:41–46. [footnote 30];

5.    .Ku C.W., Zhang X., Zhang V.R., Allen J.C., Tan N.S., Ostbye T., Tan T.C. Gestational age-specific normative values and determinants of serum progesterone through the first trimester of pregnancy. Sci. Rep. 2021;11:4161. doi: 10.1038/s41598-021-83805-w. [footnote 31];

6.    Lek S.M., Ku C.W., Allen J.C., Jr., Malhotra R., Tan N.S., Ostbye T., Tan T.C. Validation of serum progesterone <35nmol/L as a predictor of miscarriage among women with threatened miscarriage. BMC Pregnancy Childbirth. 2017;17:78. doi: 10.1186/s12884-017-1261-4. [footnote 32];

7.    Tan T.C., Ku C.W., Kwek L.K., Lee K.W., Zhang X., Allen J.C., Jr., Zhang V.R., Tan N.S. Novel approach using serum progesterone as a triage to guide management of patients with threatened miscarriage: A prospective cohort study. Sci. Rep. 2020;10:9153. doi: 10.1038/s41598-020-66155-x. [footnote 33].

140.    DAVIS did not take the progesterone as prescribed because she didn't want to insert suppositories to treat her STD and the progesterone at the same time.[34]



DAVIS also expressed concerned to COOPRIDER that the progesterone made her hungry and would make her fat.

---

[34] See **Exhibit 27**, Text from DAVIS to COOPRIDER, April 4, 2025, Bates Stamp CR000046 and 47.

141.     Much more importantly, however, her failure to continue progesterone supplements while knowing the embryo was suffering low heartrate threatening the pregnancy, produced a high likelihood of causing her eventual miscarriage.

142.     On April 4, 2025, at 4:10 p.m., DAVIS admitted to COOPRIDER that "I actually stopped taking the progesterone a week ago" and asked him at 4:12 p.m., "now that you know I haven't been taking that, do you think I should be worried?"[35]



---

[35] **Exhibit 28**, Text Messages from DAVIS to COOPRIDER, dated April 4, 2025, Bates Stamp CR000683.

143.    DAVIS's failure to take progesterone as prescribed and her abrupt discontinuation of progesterone supplements constituted negligence, which negligence was a proximate cause of her miscarriage, the death of her unborn baby, and the damages she seeks herein.

3.    Failure to Appropriately Treat Sexually Transmitted Disease ("STD") and Other Pathogens, Which Led to Prolonged Fever During Her Pregnancy

144.    As referenced earlier, DAVIS was pregnant with a sexually transmitted disease or "STD." Her failure to appropriately treat the same caused repeated and prolonged intervals of fever.

145.    Moreover, on March 29, 2025, DAVIS tested positive for *salmonella typhi*, a bacterial pathogen that causes *typhoid fever*. DAVIS immediately understood the consequence of this, sending COOPRIDER a text, "I wonder how typhoid affects pregnancy and a developing fetus. Just looked it up. It can definitely lead to fetal death and miscarriage."[36]

---

[36] **Exhibit 29** – Texts from DAVIS to COOPRIDER, March 29, 2025, Bates Stamp CR000416.



Dude. Typhoid fever? What is this, the Oregon trail?!?

It's 1850, let me put on my hoop skirt.

That would certainly explain why I was sick as a dog for over a week...sweet Jesus

This poor baby

Not that you ever feel bad about tormenting me, but how does it feel knowing that you tormented a pregnant woman with typhoid fever and YOUR chlamydia? Lol

I wonder how typhoid affects pregnancy and a developing fetus

Just looked it up. It can definitely lead to fetal death and miscarriage.

Go ahead and do your happy dance.

Question, what was th   ame of the place you looked up where   ad wanted me to get an ultrasound? Was it the

146.    *Salmonella typhi* can cross the placenta causing miscarriage. Ravneet, K., "A Case of *Salmonella typhie* Infection Leading to Miscarriage," J. LAB PHYSICIANS. 2011 Jan-Jun; 3(1): 61-62. https://pmc.ncbi.nlm.nih.gov/articles/PMC3118064/.

147.    *Typhoid fever* in pregnancy was a well-known and dreaded disease, associated with a 60-80% risk of abortion and premature labor and a maternal mortality of 15%. Kaistha N. ,1 Singla N. ,2 Bansal N. ,3 and Chander J .(2013). Salmonella Typhi Isolation in a Pregnant Woman: Determining the Importance. J Clin Diagn. Res. 7(9): 2100 2101.

 https://pmc.ncbi.nlm.nih.gov/articles/PMC3809696/.

148.    DAVIS was diagnosed with Chlamydia on, or about, March 24, 2025. Later, on March 29, 2025, DAVIS tested positive for *Salmonella Typhi*, the pathogen causing *Typhoid*. Davis thereafter reported 100-degree fevers for at least 10 days prior to April 5, 2025. DAVIS took only a single was prescribed "megadose" of **azithromycin** on March 27, 2025. DAVIS later claimed the antibiotic was taken to treat the STI Chlamydia, but that it was the same antibiotic treatment for Typhoid. Of the pathogens infecting DAVIS, typhoid with sustained fever is the most credible proximate contributor to her miscarriage. Contrary to DAVIS'S belief, for suspected/confirmed typhoid in pregnancy, it is necessary to use multi-day therapy (e.g., azithromycin 5–7 days or ceftriaxone), track defervescence, and ensure microbiologic clearance, per CDC guidance. A single 1-g dose (for chlamydia) does **not** constitute typhoid treatment. Active *Typhoid* infection with 10 days of fever is plausibly the principal driver to DAVIS's miscarriage, given vertical-transmission potential and her untreated/undertreated course, as suggested by her persistent fever.

149.    Moreover, the use of azithromycin during early pregnancy causes spontaneous abortion.  The seminal study revealed a 65% increase in risk of miscarriage brought by the use of

azithromycin during early pregnancy. Muanda FT, Sheehy O, Bèrard A. Use of antibiotics during pregnancy and risk of spontaneous abortion. CMAJ. 2017;189:E625–E633. doi: 10.1503/cmaj.161020. https://pubmed.ncbi.nlm.nih.gov/28461374/ ("Use of azithromycin during early pregnancy was associated with a RR of 65% for spontaneous abortion (adjusted odds ratio (OR), 1.65; 95% CI, 1.34–2.02).

150.    As a result of her infection, DAVIS had 100+-degree fevers nightly for weeks.   For example, on March 21, 2025, DAVIS sent COOPRIDER a text, "I just took my temp and it is 100.1. This is day freaking 4. This poor baby."[37]:



---

[37] **Exhibit 30**, Text from DAVIS to COOPRIDER, March 21, 2025, Bates Stamp CR000033/34.

151.    The NIH has published studies for forty years demonstrating that women reporting fevers had a prevalence of spontaneous abortion almost three times higher than women presenting without a history of maternal fever. *See* Kline, J., et al., "Fever during pregnancy and spontaneous abortion., AM. J. EPIDEMIOL. 1985 Jun; 121(6): 832-42. https://pubmed.ncbi.nlm.nih.gov/4014176/

152.    DAVIS's prolonged exposure to fever during her pregnancy also was likely a cause of the spontaneous abortion of her unborn child.

153.    DAVIS's prolonged exposure to fever during her pregnancy was the result of healthcare choices and failures by her which collectively constitute negligence, which negligence was a proximate cause of her miscarriage, the death of her unborn baby, and the damages she seeks herein.

4.    Taking Medications Contraindicated During Pregnancy

154.    In addition to taking medication for her STD, DAVIS also was ingesting pain medications with codeine, benzodiazepines, Zoloft with alcohol, and Red Bulls.

a.    ***Codeine***

156.    "Codeine use may increase the risk of miscarriage, premature delivery and low birth weight." https://c2coast.org.au/wp-content/uploads/ADIS_Codeine_Fact_Sheet.pdf.

157.    Moreover, one generally should not take Xanax and codeine together.  Indeed, the FDA has a **Black Box Warning** against mixing benzodiazepines like Xanax with opioids like codeine, but that is what DAVIS did during her pregnancy.

158.    DAVIS' choice to take both codeine and other medications listed below during her pregnancy, given her other risk factors present, constituted negligence, which negligence was a proximate cause of the death of her unborn baby.

b.    ***Benzodiazepines***

159.    Benzodiazepines cause miscarriages.  Massachusetts General Hospital's MGH Center for Women's Mental Health published a report on June 11, 2019, concerning a study entitled "Benzodiazepine During Early Pregnancy and Risk of Miscarriage," https://womensmentalhealth.org/posts/benzodiazepine-during-early-pregnancy-and-risk-of-miscarriage-2/, revealing that maternal use of benzodiazepines was reported more than twice as often amongst women with pregnancies ending in spontaneous abortion than amongst matched control pregnancies which did not end in miscarriage, a statistically significant finding (crude OR, 2.39, 95% CI, 2.10-2.73).

160.    For this reason, when benzodiazepines are sold in this country, the United States Food & Drug Administration requires that its product label include the following warning: Benzodiazepines "can potentially cause fetal harm when administered to pregnant women." If benzodiazepines are "used during pregnancy, or if the patient becomes pregnant while taking this drug, the patient should be apprised of the potential hazard to the fetus."

161.    DAVIS' choice to take benzodiazepines during her pregnancy, given her other risk factors present, constituted negligence, which negligence was a proximate cause of the death of her unborn baby.

c.    ***Zoloft***

162.    Zoloft is an antidepressant medication of the selective serotonin reuptake inhibitor ("SSRI") class.

163.    "Antidepressant use in the first trimester is associated with an increased risk of miscarriage when compared with either nondepressed or depressed unexposed women, even after accounting for induced abortions." Almeida, N., "Risk of Miscarriage in Women Receiving Antidepressants in Early Pregnancy, Correcting for Induced Abortions, " EPIDEMIOLOGY. 2016 Jul; 27(4): 538-46. https://pubmed.ncbi.nlm.nih.gov/27031036/.

164.    Women who had a spontaneous abortion filled at least one prescription for an antidepressant more than twice as often than matched controls did, a statistically significant finding. (odds ratio [OR] 2.09, 95% confidence interval [CI] 1.83–2.38). Nakhai-Pour, H., et al., "Use of antidepressants during pregnancy and the risk of spontaneous abortion," CMAJ. 2010 Jul 13; 182(10): 1031-1037. https://pmc.ncbi.nlm.nih.gov/articles/PMC2900326/.

165.    DAVIS' choice to take Zoloft during her pregnancy, given her other risk factors present, constituted negligence, which negligence was a proximate cause of the death of her unborn baby.

d.    ***Red Bull***

166.    DAVIS consumed large amounts of ***Red Bull*** each day.

167.    ***Red Bull*** is an energy drink which contain high levels of caffeine, which can cross the placenta and affect the developing baby.

168.    Each 8.4 fluid ounce can of ***Red Bull*** Energy Drink contains 80 mg of caffeine.        https://www.redbull.com/us-en/energydrink/products/red-bull-energy-drink-ingredients-list. Yet drinking Red Bull in the quantities consumed by DAVIS during her pregnancy

result dramatically increased her risk of spontaneous abortion. One study by Kaiser Permanente revealed a daily consumption of caffeine of 200 or more mg per day resulted in a statistically significant hazard ratio for miscarriage of 2.23, more than a doubling of the risk. https://divisionofresearch.kaiserpermanente.org/publications/maternal-caffeine-consumption-during-pregnancy-and-the-risk-of-miscarriage-a-prospective-cohort-study/

169.     As such, it is standard advice not to drink **Red Bull** during pregnancy. In fact, it is preferable to avoid consuming **Red Bull** or other energy drinks during pregnancy due to their high caffeine content.

170.     DAVIS' choice to ingest **Red Bull** during her pregnancy, given her other risk factors present, constituted negligence, which negligence was a proximate cause of the death of her unborn baby.

5.     Davis Repeatedly Engaged in High-Impact Activities During Her Pregnancy

171.     One night, DAVIS went to an indoor playground with her kids, and was seen jumping on a trampoline, landing on her stomach. On April 4, 2025, DAVIS went to a carnival and was observed riding its attractions.

172.     High impact activities for an average of 10-40 minutes a day was associated with an increased risk of miscarriage showing statistically significant hazard ratios of up to 4.7 (95% CI 3.3–5.3). Madsen, M., "Leisure time physical exercise during pregnancy and the risk of miscarriage: a study within the Danish National Birth Cohort," BJOG. 2007 Sep 18; 114(11): 1419-1426. https://pmc.ncbi.nlm.nih.gov/articles/PMC2366024/.

173.     DAVIS's habit of engaging in high-impact activities while pregnant was negligent, and such negligence was a proximate cause of the death of her unborn child, and of the damages she now claims herein.

6.     <u>When Heavy Cramping Indicated a Miscarriage Had Begun on April 4, 205, Refusing to Go to the ER, and Instead Exposed Herself to the Outdoor Heat and Humidity for Four Hours</u>

174.    On April 4, 2025, Davis experienced severe cramping in both her lower back and in the front, and was told to go the emergency room.  Instead, she chose to attend an outdoor carnival outside Windsor Park Elementary School, exposing herself to the Corpus Christi outdoor heat and humidity for four hours.

175.    DAVIS's cramping is a classic symptom of an imminent miscarriage just hours away.  The cramping was so severe she texted COOPRIDER on April 4, 2025, at 3:53 that "I'm having a bad, bad cramping day, both in my lower back and in the front" at 4:05 p.m., "I'm scared from miscarrying public."[38]

176.    When DAVIS described her cramping to her sister, By 4:50 p.m.. on April 4, she texted COOPRIDER, "my sister thinks I need to take the kids and go to the E.R.  I'm trying not to panic."  Her sister told DAVIS that her kids "will much prefer a baby bro/sis over a carnival.  Priorities."  Instead,  DAVIS ignored her sister's advice, and went to the outdoor carnival – in her own words to COOPRIDER - "on her feet and in the heat for four hours."[39]

177.    One of this nation's finest hospitals, the Mayo Clinic, recommends that in such a circumstance where one is experiencing "cramping in the pelvic area or lower back," a woman should "[c]all [her] pregnancy care team right away…"  https://www.mayoclinic.org/diseases-conditions/pregnancy-loss-miscarriage/symptoms-causes/syc-20354298.

---

[38] **Exhibit 31** – Text from DAVIS to COOPRIDER, April 4, 2025, 3:53 p.m., Bates Stamp CR000680.
[39] **Exhibit 31** - Text from DAVIS to COOPRIDER, April 4, 2025, 4:50 p.m., Bates Stamp CR000680.

178.    DAVIS's decision to expose herself to outdoor heat increased her risk of miscarriage even further.  Research studies have demonstrated that the prevalence of miscarriage in North America increased by 44 percent in higher heat months than during the colder winter months.  Wesselink, A., "A Prospective Cohort Study of Seasonal Variation in Spontaneous Abortion," EPIDEMIOLOGY 33(3), May 2022, pp. 441-48. https://pubmed.ncbi.nlm.nih.gov/35213511/.  Similar studies have reached the same conclusion. Xu, "Association between high ambient temperature and spontaneous abortion: A systematic review and meta-analysis," ECOTOX. & ENV. SAF., Vol. 297, 1 June 2025, 118234. https://www.sciencedirect.com/science/article/pii/S0147651325005706 ("maternal exposure to ambient high temperature significantly increased the risk of spontaneous abortion.").  Finally, risk of miscarriage goes up linearly with the level of heat exposure.  Das, S., "The risk of miscarriage is associated with ambient temperature:  evidence from coastal Bangladesh," FRONT PUBLIC HEALTH. 2023 Nov 3; 11:1238275. https://pmc.ncbi.nlm.nih.gov/articles/PMC10656765/ ("For women exposed to temperatures between 28°C and 32°C, the risk of miscarriage was 25% greater (adjusted OR 1.25, 95% CI 1.07–1.47) compared to those exposed to temperatures from 16°C to 21°C.").

179.    Maternal hyperthermia is chiefly linked to teratogenicity at high temperatures, but here it most likely exacerbated physiologic stress/dehydration in the context of ongoing infection and cramping, rather than acting as a primary cause.

180.    Once she knew on April 4, 2025 that she was experiencing severe cramping, DAVIS's choice to not go into an air-conditioned hospital, but instead to expose herself to Corpus Christi's outdoor heat and humidity, was negligence, which negligence was a proximate cause of the death of her unborn baby, and the damages claimed herein.

       7.    <u>DAVIS Repeatedly Took Actions to Try to Induce a Spontaneous Abortion of Her Unborn Child</u>

181.    DAVIS repeatedly told COOPRIDER that she probably had a dead baby inside of her that had not yet "dislodged."

182.    She mistakenly insisted that having sex was an effective method "shake things" loose.  DAVIS stated that having sex is the method of "EVERY other female" she knows, to induce a miscarriage.  DAVIS told COOPRIDER that she has been doing this for 20 years.  She told COOPRIDER that he should have sex with her to help her expel the dead baby. Specifically, DAVIS wanted to have unprotected sex because she claimed that sperm contained prostaglandin, a chemical that would help initiate a miscarriage that she wanted to have.[40]

---

[40] See **<u>Exhibit 32</u>**, Screen Shots of texts on February 24, 2025, at Bates Stamp No. CR 000034 and 35 reproduced here.  This is a screen shot of a texts sent in prior to Feb. 25, 2025, and re-sent on March 21, 2025.



183.    DAVIS did not follow her physician's instructions to ensure that she had a viable baby.  In fact, she hoped for a miscarriage as her method of spontaneous abortion.[41] [42] [43]



[41] See **Exhibit 33**, Text from DAVIS to COOPRIDER, March 22, 2025,  Bates Stamp CR000065 ("If the hcg and progesterone levels don't change by Monday, then it's likely the baby we think we conceived in Jan that may have stopped growing and my body has not let go of it yet.").

[42] **Exhibit 34**, Text from DAVIS to COOPRIDER dated March 22, 2025, Bates Stamp CR000078 ("What you don't "like" is that I'm undecided as to what to do with our baby.")

[43] **Exhibit 35**,  Text from DAVIS to COOPRIDER dated March 24, 2025, Bates Stamp CR000135/136 ("If the hcg and progesterone levels don't change by Monday, then it's likely the baby we think we conceived in Jan that may have stopped growing and my body has not let go of it yet.  This is all our best guess.  We many never know what happened to our baby/babies..").

184.    DAVIS believed that the embryo may have stopped growing or was already dead[44]:



185.    Her physicians also were not sure if the pregnancy was still viable[45]:

---

[44] See **Exhibit 36**, Text Message from DAVIS to COOPRIDER dated March 24, 2025, Bates Stamp CR000132 ("Um we went over this yesterday.  Either the baby stopped growing at a certain point and I am going to miscarry (hence the low heart rate").

[45] See **Exhibit 37**, Text from DAVIS to COOPRIDER dated March 25, 2025, Bates Stamp CR000187 ("So I'm trying not to read into the fact that they didn't have my schedule my next OB appt yet because they aren't sure this pregnancy is 'viable.' ").



186.    DAVIS scheduled another ultrasound to take place in April, 2025.  DAVIS believed

that she might see a dead baby[46]:

<hr />

[46] **Exhibit 38**, Text from DAVIS to COOPRIDER dated March 26, 2025, Bates Stamp CR0000328
("And I do want you there. I do not want to see an unmoving baby by myself. I feel even less
optimistic about its chances after what I learned this evening.").



187.    DAVIS continued to express that she was concerned whether the baby would survive, and **IF she decided to keep it[47]**:



---

[47] See **<u>Exhibit 39,</u>** Text from DAVIS to COOPRIDER dated March 28, 2025, Bates Stamp CR 000405 ("It's a big IF.  It's if baby continues to survive and if I decide to keep it.").

188.    On April 4, 2025, DAVIS stated that she was "indifferent to expelling" but stated "I just don't want to expel in public."[48]:



48 See **Exhibit 31**, Text from DAVIS to COOPRIDER, April 4, 2025, 5:10 p.m., Bates Stamp CR 000680-685.

68



189.    Starting in early April DAVIS invited COOPRIDER over to watch a movie the night of April 5, 2025.

190.    DAVIS took actions that were negligent, if not intentional, that were a proximate cause of the death of her unborn baby, and the damages she now claims herein.  As COOPRIDER characterized it on April 7, 2025 after realizing she had set him up:  "And you knowingly were not pregnant. Yet convinced me that you were AND said it's impossible to get more pregnant."[49]



────────────────────

[49] **Exhibit 40**, Text from DAVIS to COOPRIDER dated April 7, 2025, Bates Stamp CR 000778.

70

### III.    <u>RULE 8(b)(1)(A) DEFENSES</u>

Pursuant to Rule 8(b)(1)(A) of the Federal Rules of Civil Procedure, Defendant COOPRIDER provides the following defense to each claim asserted against him:

1.    Defendant COOPRIDER defends against the cause of action alleged against him under the Texas Wrongful Death Act on the basis that:

    (c)    COOPRIDER committed ***<u>no wrongful act</u>***.

    (b)    COOPRIDER committed no act that ***<u>caused</u>*** the death of DAVIS's unborn child.

    (c)    COOPRIDER committed no wrongful act that ***<u>caused</u>*** the death of DAVIS's unborn child.

2.    COOPRIDER did not violate Section 171.063(a)(1) of the THSC because DAVIS, in fact, was not pregnant on February 19, 2025, when she received abortion-inducing drugs from COOPRIDER.

3.    COOPRIDER did not violate Section 171.063(a)(1) of the THSC because COOPRIDER did not thereafter provide her with abortion-inducing drugs on April 5, 2025.

4.    COOPRIDER did not violate Section 171.063(a)(2) of the THSC because DAVIS, in fact, was not pregnant on February 19, 2025, when she received abortion-inducing drugs from COOPRIDER.

5.    COOPRIDER did not violate Section 171.063(a)(2) of the THSC because COOPRIDER did not thereafter provide her with abortion-inducing drugs on April 5, 2025.

6.    COOPRIDER did not violate Section 171.063 of the THSC because DAVIS, in fact, was not pregnant on February 19, 2025, when she received abortion-inducing drugs from COOPRIDER.

7.      COOPRIDER did not violate Section 171.061 of the THSC because COOPRIDER did not thereafter provide her with abortion-inducing drugs on April 5, 2025.

8.      COOPRIDER did not violate Section 171.003 of the THSC because COOPRIDER did not perform an abortion as a non-physician on April 5, 2025, because he did not lace Ms. Davis's drink with abortion pills.

9.      COOPRIDER did not violate Section 171.011 of the THSC because COOPRIDER did not perform an abortion without an ultrasound on April 5, 2025, because he did not lace Ms. Davis's drink with abortion pills.

10.      COOPRIDER did not violate Chapter 245 of the THSC because COOPRIDER did not perform an abortion outside an abortion facility on April 5, 2025, because he did not lace Ms. Davis's drink with abortion pills.

11.      COOPRIDER did not violate Chapter 245 of the THSC because COOPRIDER did not establish or operate an abortion facility in this state without an appropriate license issued under this chapter.

12.      COOPRIDER did not violate 18 U.S.C. §1461 because he did not "deliver[] by mail" any substance "for producing abortion."

13.      COOPRIDER did not violate 18 U.S.C. §1462 because DAVIS was not pregnant when he received abortion-producing drugs on February 18, 2025.

14.      COOPRIDER did not commit a "wrongful act" under either 18 U.S.C. §1461 or 18 U.S.C. §1462, collectively, the so-called "Comstock Act," because such law has not been enforced for three quarters of a century since its enactment.  This wholesale non-enforcement of the Comstock Act means any ostensible violation of it in 2025 cannot be a "wrongful act" under the law.

15.    COOPRIDER did not violate Articles 4512.1–4512.6 of the Texas Revised Civil Statutes, as alleged in Paragraph 81 of Plaintiffs' complaint, because he did not provide her with abortion-inducing drugs on April 5, 2025.

16.    COOPRIDER did not violate Article 4512.1 of the Texas Revised Civil Statutes, as alleged in Paragraph 81 of Plaintiffs' complaint, because he did not "administer to a pregnant woman…any drug… and thereby procure an abortion" on April 5, 2025.

17.    COOPRIDER did not violate Article 4512.2 of the Texas Revised Civil Statutes, as alleged in Paragraph 81 of Plaintiffs' complaint, because he did not "furnish the means for procuring an abortion on April 5, 2025.

18.    COOPRIDER did not violate Article 4512.3 of the Texas Revised Civil Statutes, as alleged in Paragraph 81 of Plaintiffs' complaint, because he did not "furnish the means" that "produced an abortion on April 5, 2025.

19.    COOPRIDER did not violate Article 4512.4 of the Texas Revised Civil Statutes, as alleged in Paragraph 81 of Plaintiffs' complaint, because DAVIS is still alive, so "the death of the mother [was not] occasioned by an abortion."

20.    COOPRIDER did not violate Article 4512.5 of the Texas Revised Civil Statutes, as alleged in Paragraph 81 of Plaintiffs' complaint, because he did not "destroy the vitality or life in a child in a state of being  born and before actual birth."

21.    COOPRIDER did not violate Article 4512.5 of the Texas Revised Civil Statutes, as alleged in Paragraph 81 of Plaintiffs' complaint, because he did not "destroy the vitality or life in a child in a state of being  born and before actual birth" "during *parturition* of the mother" because DAVIS was never in the act of childbirth in April of 2025.

22.     COOPRIDER did not violate Section 170A.002 of the THSC because COOPRIDER did not perform an abortion outside an abortion facility on April 5, 2025, because he did not lace Ms. Davis's drink with abortion pills.

23.     COOPRIDER did not commit murder under Section 19.02(b)(1) of the Texas Penal Code because he did intentionally or knowingly causes the death of an individual on April 5, 2025.

24.     COOPRIDER did not commit murder under Section 19.02(b)(1) of the Texas Penal Code because by April 5, 2025, it is more likely than not that DAVIS's unborn child was not a human being "who is alive."

25.     COOPRIDER did not commit murder under Section 19.02(b)(2) of the Texas Penal Code because he did not commit an act clearly dangerous to human life that caused the death" of DAVIS's unborn child on April 5, 2025.

26.     COOPRIDER did not commit murder under Section 19.02(b)(2) of the Texas Penal Code because by April 5, 2025, it is more likely than not that DAVIS's unborn child was not a human being "who is alive."

27.     COOPRIDER did not commit felony murder under Section 19.02(b)(3) of the Texas Penal Code, as alleged in Paragraph 84 of Plaintiff's Complaint, because

    i.   COOPRIDER did not cause the "shipment and delivery of abortion pills";

    ii.  There is nothing about the alleged "shipment and delivery of abortion pills" by COOPRIDER that is "clearly dangerous to human life."

    iii. At the time of the "shipment and delivery of abortion pills," DAVIS was not pregnant.

## IV.     RULE 8(b)(1)(B) RESPONSES TO ALLEGATIONS

Pursuant to Rule 8(b)(1)(B) of the Federal Rules of Civil Procedure, Defendant COOPRIDER provides the following defense to each claim asserted against him:

1.     Defendant COOPRIDER admits the allegation in paragraph 1 of the Complaint.

2.     With respect to paragraph 2 of the Complaint, Defendant COOPRIDER admits this Court has personal jurisdiction over him, but denies that he murdered DAVIS's unborn child. Defendant COOPRIDER is without sufficient information to admit or deny the allegation in paragraph 2 of the Complaint that this Court has personal jurisdiction over Aid Access GmbH ("AID ACCESS") and Rebecca Gomperts ("GOMPERTS"), and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof.

3.     Defendant COOPRIDER admits the allegation in paragraph 3 of the Complaint as to venue, but deny that the alleged murder of DAVIS' unborn child that gives rise to her claim ever occurred.

4.     Defendant COOPRIDER admits the allegation in paragraph 4 of the Complaint.

5.     Defendant COOPRIDER admits the allegation in paragraph 5 of the Complaint.

6.     Defendant COOPRIDER is without sufficient information to admit or deny the allegation in paragraph 6 of the Complaint as to AID ACCESS, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof.

7.     Defendant COOPRIDER is without sufficient information to admit or deny the allegation in paragraph 7 of the Complaint as to GOMPERTS, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof.

8.     Defendant COOPRIDER admits the allegation in paragraph 8 of the Complaint.

9.      Defendant COOPRIDER admits the allegation in paragraph 9 of the Complaint.

10.     Defendant COOPRIDER denies the characterization of the allegations in paragraph 10.

11.     Defendant COOPRIDER admits the allegation in the first sentence of paragraph 11 of the Complaint. As to the second sentence of paragraph 11 of the Complaint, Defendant COOPRIDER is without sufficient information to admit or deny the allegation, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof

12.     Defendant COOPRIDER denies the allegations in paragraph 12 of the Complaint.

13.     Defendant COOPRIDER denies the allegation in the first sentence of paragraph 13 of the Complaint, but admits the allegation in the second sentence of paragraph 13 of the Complaint that the texts referenced in Exhibit 2 were exchanged.

14.     Defendant COOPRIDER denies the allegation in the first sentence of paragraph 14 of the Complaint, but admits that the texts referenced in Exhibit 3 were exchanged.

15.     Defendant COOPRIDER denies the allegation in the first sentence of paragraph 15 of the Complaint, but admits that the texts referenced in Exhibit 4 were exchanged.

16.     Defendant COOPRIDER denies the allegation in the first sentence of paragraph 16 of the Complaint, specifically COOPRIDER denies that DAVIS was pregnant on February 5, 2025 As to the second sentence of paragraph 16 of the Complaint, Defendant COOPRIDER is without sufficient information to admit or deny the allegation, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof.  Nonetheless, Defendant COOPRIDER admits that the texts referenced in Exhibit 5 were exchanged.

17.    Defendant COOPRIDER denies the allegation in the first half of the first sentence of paragraph 17 of the Complaint, admits he ordered the drugs, and admits the texts referenced in Exhibit 6 were exchanged.

18.    Defendant COOPRIDER denies the allegation in the first sentence of paragraph 18 of the Complaint, but admits the texts referenced in Exhibit 7 were exchanged.

19.    Defendant COOPRIDER admits the allegation in paragraph 19 of the Complaint.

20.    Defendant COOPRIDER admits the allegation in the first paragraph 20 of the Complaint, is without sufficient information to admit or deny the allegation in the second sentence of paragraph 20 of the Complaint, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof.  Defendant COOPRIDER admits the allegations in the third, fourth and fifth sentences of paragraph 20 of the Complaint

21.    Defendant COOPRIDER admits the allegation in the first half of the first sentence of paragraph 21 of the Complaint, denies the second half of the first sentence of paragraph 21 of the Complaint, denies the allegation in the second sentence of paragraph 21 of the Complaint, denies the allegation in the third sentence of paragraph 21 of the Complaint, denies the allegation in the fourth sentence of paragraph 21 of the Complaint as he brought three pills back once after originally bringing her the containers once she asked for them, denies the allegation in the fifth sentence of paragraph 21 of the Complaint, admits the allegation in the sixth sentence of paragraph 21 of the Complaint as he did so only once, and is without sufficient information to admit or deny the allegation in the seventh sentence of paragraph 21 of the Complaint, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof.

22.     Defendant COOPRIDER admits the allegation in paragraph 22 of the Complaint, and Defendant COOPRIDER admits the photographs referenced as Exhibits 9 and 10 accurately reflect the Mifepristone tablets obtained.

23.     Defendant COOPRIDER admits the allegation in paragraph 23 of the Complaint, and Defendant COOPRIDER admits the photographs referenced as Exhibits 11 and 12 accurately reflect the Misoprostol pills obtained.

24.     Defendant COOPRIDER denies the allegation in the first sentence of paragraph 24 of the Complaint.  As to the second sentence of paragraph 24 of the Complaint, Defendant COOPRIDER admits the texts referenced in Exhibit 13 were exchanged.

25.     Defendant COOPRIDER denies the characterizations in the allegation in paragraph 25 of the Complaint, but Defendant COOPRIDER admits the texts referenced in Exhibit 14 were exchanged.

26.     Defendant COOPRIDER denies the characterizations in the allegation in the first sentence of paragraph 26 of the Complaint, is without sufficient information to admit or deny the allegation in the second sentence of paragraph 26 of the Complaint, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof, and admits the third sentence of paragraph 26 of the Complaint, and admits that the texts referenced in Exhibit 15 were exchanged.

27.     Defendant COOPRIDER denies the characterizations in the allegation in the first sentence of paragraph 27 of the Complaint, but admits that the texts referenced in Exhibit 16 were exchanged.

28.    Defendant COOPRIDER denies the characterizations in the allegation in the first sentence of paragraph 28 of the Complaint, but admits that the texts referenced in Exhibit 17 were exchanged.

29.    Defendant COOPRIDER admits the allegation in the first sentence of paragraph 29 of the Complaint, and admits that the texts referenced in Exhibit 18 were exchanged.

30.    Defendant COOPRIDER denies the characterizations in the allegation in the first sentence of paragraph 30 of the Complaint, admits that the texts referenced in Exhibit 19 were exchanged, but denies the characterizations in the allegation in the second sentence of paragraph 30 of the Complaint which omitted the phrase "of a situation."

31.    Defendant COOPRIDER denies the characterizations in the allegation in paragraph 31 of the Complaint, but admits that the texts referenced in Exhibit 20 were exchanged.

32.    Defendant COOPRIDER denies the characterizations in the allegation in paragraph 32 of the Complaint, but admits that the texts referenced in Exhibit 21 were exchanged.

33.    Defendant COOPRIDER denies the characterizations in the allegation in paragraph 33 of the Complaint, but admits that the texts referenced in Exhibit 22 were exchanged.

34.    Defendant COOPRIDER denies the characterizations in the allegation in paragraph 34 of the Complaint, but admits that the texts referenced in Exhibit 23 were exchanged.

35.    Defendant COOPRIDER denies the characterizations in the allegation in paragraph 35 of the Complaint as the text did not call Davis "delusional," but admits that the texts referenced in in Exhibit 24 were exchanged.

36.    Defendant COOPRIDER denies the characterizations in the allegation in paragraph 36 of the Complaint, but admits that the texts referenced in Exhibit 25 were exchanged.

37.      Defendant COOPRIDER denies the characterizations in the allegation in paragraph 37 of the Complaint, but admits that the texts referenced in Exhibit 26 were exchanged.

38.      Defendant COOPRIDER denies the characterizations in the allegation in paragraph 38 of the Complaint, but admits that the texts referenced in Exhibit 27 were exchanged.

39.      Defendant COOPRIDER denies the allegation in the first sentence of paragraph 39 of the Complaint, admits the second sentence of paragraph 39 of the Complaint, and admits that the texts referenced in Exhibit 28 and Exhibit 29 were exchanged.

40.      Defendant COOPRIDER denies the characterizations in the allegation in the first sentence of paragraph 40 of the Complaint, but admits that the texts referenced in Exhibit 30 were exchanged, admits the allegation in the second sentence of paragraph 40 of the Complaint, admits the allegation in the third sentence of paragraph 40 of the Complaint, admits the first half of the fourth sentence of paragraph 40 of the Complaint, but is without sufficient information to admit or deny the allegation in the second half of the fourth sentence of paragraph 40 of the Complaint, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof.

41.      Defendant COOPRIDER admits the first half of the first sentence of paragraph 41 of the Complaint, denies the characterization in the second half of the first sentence of paragraph 41 of the Complaint, but admits that the texts referenced in Exhibit 31 were exchanged.  Moreover, Defendant COOPRIDER denies the allegation in the heading between paragraph 41 and 42 of the Complaint.

42.      Defendant COOPRIDER denies the characterizations in the allegation in the first half of the sentence of paragraph 42 of the Complaint, denies the characterization in the second half of the first sentence of paragraph 42 of the Complaint, denies the second sentence of paragraph

42 of the Complaint, is without sufficient information to admit or deny the allegation in the third sentence of paragraph 42 of the Complaint, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof, is without sufficient information to admit or deny the allegation in the first part of the fourth sentence of paragraph 42 of the Complaint, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof, and denies the allegation in the second part of the fourth sentence of paragraph 42 of the Complaint.

43.    Defendant COOPRIDER denies the allegations in paragraph 43 of the Complaint.

44.    Defendant COOPRIDER denies the characterization in the first sentence of paragraph 44 of the Complaint, and admits that the texts referenced in Exhibit 32 were exchanged.

45.    Defendant COOPRIDER admits the allegation in the first part of the first sentence of paragraph 45 of the Complaint, denies the characterization as to the second part of the first sentence of paragraph 45 of the Complaint, and is without sufficient information to admit or deny the allegation in the second sentence of paragraph 45 of the Complaint, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof.

46.    While COOPRIDER admits he first coined the phrase "trust-building" several days before April 5, 2025 on April 1, 2025, Defendant COOPRIDER denies the allegation in the first part of the first sentence of paragraph 46 of the Complaint that he proposed their meeting on April 5, 2025, as DAVIS proposed it, denies the last part of the first sentence of paragraph 46 of the Complaint as he dies that DAVIS knew she was having a daughter.  Defendant COOPRIDER denies the allegation in the second sentence of paragraph 46 of the Complaint, and admits the allegation in the third sentence of paragraph 46 of the Complaint.

47.     COOPRIDER admits the allegation in the first sentence of Paragraph 47, admits the allegations in the second sentence, except that he denies he came "from his apartment" as he lived in a house, and admits the allegation in the third sentence of paragraph 47 of the Complaint that he made the hot chocolate, but denies that it was his as DAVIS supplied the hot chocolate after requesting that they use her chocolate instead of his.

48.     Defendant COOPRIDER denies the allegation in the first sentence of paragraph 48 of the Complaint., Defendant COOPRIDER denies the allegation in the second sentence of paragraph 48 of the Complaint.

49.     Defendant COOPRIDER admits the allegation in paragraph 49 of the Complaint, but denies the allegation in the heading between paragraph 49 and 50 of the Complaint.

50.     Defendant COOPRIDER denies the allegation in paragraph 50 of the Complaint.

51.     Defendant COOPRIDER denies the allegations in paragraph 51 of the Complaint.

52.     Defendant COOPRIDER without sufficient information to admit or deny the allegation in the first sentence of paragraph 52 of the Complaint, yet Defendant COOPRIDER denies the allegations in the second sentence of paragraph 52 of the Complaint.

53.     Defendant COOPRIDER without sufficient information to admit or deny the allegation in the first sentence of paragraph 53 of the Complaint, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof, and admits that Exhibits 33 and 34 purport to show driving times between the two addresses input thereto.

54.     Defendant COOPRIDER is without sufficient information to admit or deny the allegation in paragraph 54 of the Complaint, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof, and is without sufficient information to

admit or deny the authenticity of Exhibit 35 referenced therein, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof.

55.     Defendant COOPRIDER admits that he received a text from DAVIS sent at 12:12 p.m., denies that he saw it the, is without sufficient information to admit or deny the allegation in paragraph 55 of the Complaint, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof, and is without sufficient information to admit or deny the authenticity of Exhibit 36 referenced therein, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof.  Moreover, Defendant COOPRIDER denies in the allegation in the heading between paragraph 55 and 56 of the Complaint.

56.     Defendant COOPRIDER denies the characterization of the allegation in the first sentence of paragraph 56 of the Complaint, denies the characterization of the allegation in the second sentence of paragraph 56 of the Complaint, and admits the allegation of the third sentence of paragraph 56 of the Complaint.

57.     Defendant COOPRIDER is without sufficient information to admit or deny the allegations in paragraph 57 of the Complaint, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof, and is without sufficient information to admit or deny the authenticity of Exhibits 37-41 referenced therein, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof.

58.     Defendant COOPRIDER denies the characterization of the allegation in the first sentence of paragraph 58 of the Complaint, is without sufficient information to admit or deny the first blacked-out text referenced in Exhibit 36 referenced therein, but admits that the texts referenced thereafter in Exhibit 36 were sent by DAVIS between 12:22 AM and 12:34 AM.

59.     Defendant COOPRIDER is without sufficient information to admit or deny the allegations in paragraph 59 of the Complaint, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof, is without sufficient information to admit or deny the authenticity of Exhibit 41 referenced therein.

60.     Defendant COOPRIDER denies the characterization of the allegation in the first sentence of paragraph 60 of the Complaint, but admits that the texts referenced in Exhibit 36 were exchanged.

61.     Defendant COOPRIDER admits the allegation in paragraph 61 of the Complaint, and admits that the texts referenced in Exhibit 37 were exchanged.

62.     Defendant COOPRIDER denies the characterization of the allegation in the first sentence of paragraph 62 of the Complaint, but admits that the text referenced in Exhibit 43 was exchanged.

63.     Defendant COOPRIDER denies the characterization of the allegations in paragraph 63 of the Complaint, but admits that the text referenced in Exhibit 43 was exchanged.

64.     Defendant COOPRIDER denies the allegations in paragraph 64 of the Complaint.

65.     Defendant COOPRIDER is without sufficient information to admit or deny the allegations in paragraph 65 of the Complaint, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof.

66.     Defendant COOPRIDER is without sufficient information to admit or deny the allegations in paragraph 66 of the Complaint, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof.  As to the fact that COOPRIDER's silver truck was not parked in his driveway next door, Defendant COOPRIDER admits the portion of this last sentence as it was parked inside his garage.

67.    Defendant COOPRIDER is without sufficient information to admit or deny the allegation in the first sentence of paragraph 67 of the Complaint, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof, but admits that the text referenced in Exhibit 43 was exchanged.

68.    Defendant COOPRIDER is without sufficient information to admit or deny the allegation in the first sentence of paragraph 68 of the Complaint, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof, is without sufficient information to admit or deny the allegation in the first part of the second sentence of paragraph 68 of the Complaint because DAVIS had never used the name "Baby Joy" to COOPRIDER, the sex of the baby was unknown, and the date of the baby's death was unknown, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof, and denies the last part of the second sentence of paragraph 67 of the Complaint. Moreover, Defendant COOPRIDER denies the allegation in the heading between paragraph 68 and paragraph 69.

69.    Defendant COOPRIDER is without sufficient information to admit or deny the allegations in paragraph 69 of the Complaint, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof.  However, COOPRODER specifically denies that DAVIS "discovered the box of mifepristone" as she had had possession of it since February 18, 2025.

70.    Defendant COOPRIDER is without sufficient information to admit or deny the allegations in the first sentence of paragraph 70 of the Complaint, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof, is without sufficient information to admit or deny the allegations in the second sentence of paragraph 70 of

the Complaint, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof, denies the allegations in the third sentence of paragraph 70 of the Complaint, and denies the allegations in the fourth sentence of paragraph 70 of the Complaint.

71.    Defendant COOPRIDER is without sufficient information to admit or deny the allegations in paragraph 71 of the Complaint, and as a result Defendant COOPRIDER denies the same and remits Plaintiff DAVIS to strict proof thereof

72.    The allegations in paragraph 72 of the Complain are legal conclusions, so Defendant COOPRIDER is without sufficient information to admit or deny the allegations in paragraph 72 of the Complaint.

73.    Defendant COOPRIDER denies the allegation in paragraph 73 of the Complaint.

74.    The allegations in paragraph 74 of the Complain are legal conclusions, so Defendant COOPRIDER is without sufficient information to admit or deny the legal allegations in paragraph 74 of the Complaint, but Defendant COOPRIDER denies the allegation made against him referencing Section 171.063(a)(1) of the Texas Health & Safety Code, contained in paragraph 74 of the Complaint.

75.    The allegations in paragraph 75 of the Complain are legal conclusions, so Defendant COOPRIDER is without sufficient information to admit or deny the legal allegations in paragraph 75 of the Complaint, but Defendant COOPRIDER denies the allegation made against him referencing Section 171.063(a)(2) of the Texas Health & Safety Code, contained in paragraph 75 of the Complaint.

76.    The allegations in paragraph 76 of the Complain are legal conclusions, so Defendant COOPRIDER is without sufficient information to admit or deny the legal allegations in paragraph 76 of the Complaint, but Defendant COOPRIDER denies the allegation made against

him referencing Section 171.0631 of the Texas Health & Safety Code, contained in paragraph 76 of the Complaint.

77.    The allegations in paragraph 77 of the Complain are legal conclusions, so Defendant COOPRIDER is without sufficient information to admit or deny the legal allegations in paragraph 77 of the Complaint, but Defendant COOPRIDER denies the allegation made against him referencing Section 171.003 of the Texas Health & Safety Code, contained in paragraph 77 of the Complaint.

78.    The allegations in paragraph 78 of the Complain are legal conclusions, so Defendant COOPRIDER is without sufficient information to admit or deny the legal allegations in paragraph 78 of the Complaint, but Defendant COOPRIDER denies the allegation made against him referencing Section 171.011 of the Texas Health & Safety Code, contained in paragraph 78 of the Complaint.

79.    The allegations in paragraph 79 of the Complain are legal conclusions, so Defendant COOPRIDER is without sufficient information to admit or deny the legal allegations in paragraph 79 of the Complaint, but Defendant COOPRIDER denies the allegation made against him referencing Chapter 245 of the Texas Health & Safety Code, contained in paragraph 79 of the Complaint.

80.    The allegations in paragraph 80 of the Complain are legal conclusions, so Defendant COOPRIDER is without sufficient information to admit or deny the legal allegations in paragraph 80 of the Complaint, but Defendant COOPRIDER denies the allegation made against him referencing 18 U.S.C. §§ 1461-62 contained in paragraph 80 of the Complaint.

81.    The allegations in paragraph 81 of the Complain are legal conclusions, so Defendant COOPRIDER is without sufficient information to admit or deny the legal allegations

in paragraph 81 of the Complaint, but Defendant COOPRIDER denies the allegation made against him referencing Articles 4512/1-4512.6 of the Texas Revised Civil Statutes contained in paragraph 81 of the Complaint.

82.     The allegations in paragraph 82 of the Complain are legal conclusions, so Defendant COOPRIDER is without sufficient information to admit or deny the legal allegations in paragraph 82 of the Complaint, but Defendant COOPRIDER denies the allegation made against him referencing Chapter 170A.002 of the Texas Health & Safety Code and Section 12.32 of the Texas Penal Code, contained in paragraph 82 of the Complaint.

83.     The allegations in paragraph 83 of the Complain are legal conclusions, so Defendant COOPRIDER is without sufficient information to admit or deny the legal allegations in paragraph 83 of the Complaint, but Defendant COOPRIDER denies the allegation made against him referencing Sections 1.07, 19.02, and 19.06 of the Texas Penal Code, contained in paragraph 83 of the Complaint.

84.     The allegations in paragraph 84 of the Complain are legal conclusions, so Defendant COOPRIDER is without sufficient information to admit or deny the legal allegations in paragraph 84 of the Complaint, but Defendant COOPRIDER denies the allegation made against him referencing Section 19.02(b)(3) of the Texas Penal Code, Sections 171.063(a) and 171.065(a) of the Texas Health & Safety Code, and  18 U.S.C. §§ 1461-62, contained in paragraph 84 of the Complaint.

85.     The allegations in paragraph 85 of the Complain are legal conclusions, so Defendant COOPRIDER is without sufficient information to admit or deny the legal allegations in paragraph 85 of the Complaint, but Defendant COOPRIDER denies the allegation made against him referencing Sections 71.003(c)(2) and (c)(4) of the Texas Civil Practice and Remedies Code

specifically contained in paragraph 85 of the Complaint, and Defendant COOPRIDER also generally denies the allegations concerning the inapplicability of any statutory protection to which he may otherwise be entitled under the law.

86.    Defendant COOPRIDER denies that he is legally responsible "to pay nominal, compensatory, and punitive damages for the wrongful death of Ms. Davis's unborn child," nor to pay for any "other relief that the Court may deem just, proper, or equitable."

## V.    COUNTERCLAIMS

1.    Pursuant to Rule 13 of the Federal Rules of Civil Procedure, COOPRIDER states the following counterclaims against DAVIS arising out of the occurrence that is the subject matter of DAVIS' claim.

### A.    MALICIOUS PROSECUTION

2.    Under Texas law, the tort of malicious prosecution is the malicious institution of a civil suit without probable cause, and Counter-Plaintiff COOPRIDER pleads as follows:

(a)    a criminal investigation and a civil lawsuit was commenced against Counter-Plaintiff COOPRIDER;

(b)    the criminal investigation and a civil lawsuit was initiated or procured by Counter-Defendant DAVIS;

(c)    the criminal investigation and this civil lawsuit will terminate in favor of Counter-Plaintiff COOPRIDER[50];

---

[50] Counter-Plaintiff COOPRIDER files this Malicious Prosecution now to prevent DAVIS from merely voluntarily dismissing her claim, and to preserve his right to bring this Counterclaim under the compulsory counterclaim rule within FRCP 13(a)(1)(A), yet acknowledges that it is premature until the underlying case filed against him is adjudicated in his favor. *See Izen v. Catalina*, 256 F.3d 324, 328 (5th Cir. 2001) (termination of underlying proceeding required before malicious prosecution case may be brought); *Kjellvander v. Citicorp*, 156 F.R.D. 138, 143 (S.D. Tex. 1994) (favorable outcome in underlying case required); *Stanley v. Sawh*, Civ. No. H-13-3284, 2014 WL

(d)     Counter-Plaintiff COOPRIDER was innocent;

(e)     Counter-Defendant DAVIS lacked probable cause to bring about the criminal investigation and the civil lawsuit she initiated;

(f)     Counter-Defendant DAVIS acted with malice in initiating, procuring and bringing about the criminal investigation and this civil lawsuit; and

(g)     Counter-Plaintiff COOPRIDER suffered damages as a result.

3.     With respect to malice as alleged in Paragraph 2(f) above, Counter-Plaintiff COOPRIDER specifically pleads the follows:

(a)     The March 21, 2025 ultrasound shows a conception of February 25, 2025, ***after*** the date when DAVIS alleges the abortion-inducing pills were first delivered to her on February 18, 2025, Doc. 1, ¶ 18, a date on which she was not pregnant;

(b)     Science tells us that Counter-Defendant DAVIS could not have taken the abortion-inducing pills delivered to her on February 18, 2025, prior to her conception date of February 25, 2025, because after taking an abortion-inducing medication, Counter-Defendant DAVIS could not have begun to ovulate until 8-36 days had lapsed after mifepristone and misoprostol administration. Schreiber, C., et al., "Ovulation resumption after medical absorption with mifepristone and misoprostol, CONTRACEPTION. 2011 Sep; 84(3); 230-3. This is because eight (8) days prior to February 25, 2025 – her date of conception – would be February 17, 2025, ***a day before*** the abortion-inducing medications were alleged to have been first delivered to her at her home.

_____

4659476, at *2 (S.D. Tex. Sept. 17, 2014) ("Defendant cannot show he is entitled to relief for malicious prosecution because this case is still pending."). For this reason, Counter-Plaintiff COOPRIDER will not oppose an abatement of this Counterclaim until the underlying lawsuit against him is finalized.

(c)     Moreover, Counter-Defendant DAVIS caused her own spontaneous abortion via her contributorily neglect conduct described above, causing the front and back cramping and bleeding she experienced on April 4, 2025, which are tell-tale symptoms of a miscarriage during a time when she was not even with Counter-Plaintiff COOPRIDER.

(d)     Having already miscarried on April 4, 2025, Counter-Defendant DAVIS set up Counter-Plaintiff COOPRIDER by inviting him to her home – "the scene of the crime that wasn't" – for a daily later on April 5, 2025, the day after she had already likely miscarried her unborn child.

(e)     The charade orchestrated by DAVIS on April 5, 2025 – and sloppily recorded by her in a manner that demonstrates its impossibility - was all done so she could initiate this travesty of a lawsuit with malice deep in her heart.

3.     The damages suffered by Counter-Plaintiff COOPRIDER from DAVIS' malicious prosecution include monetary damages, mental anguish and reputational damage.

4.     For the reasons outlined in the previous footnote, Counter-Plaintiff COOPRIDER agrees his counterclaim should be abated until this proceeding terminates in his favor.

**B.     INTENTIONAL INFLICTION OF EMOTION DISTRESS**

5.     Under Texas law, the tort of intentional infliction of emotion distress is actionable.

6.     In this regard, Counter-Plaintiff COOPRIDER pleads as follows:

(a)     Counter-Defendant DAVIS acted intentionally or recklessly,

(b)     the  conduct of Counter-Defendant DAVIS was extreme and outrageous,

(c)     the  outrageous  conduct  caused  the  Counter-Plaintiff  COOPRIDER emotional distress, and

(d)    the emotional distress suffered by Counter-Plaintiff COOPRIDER was severe.

7.    The damages suffered by Counter-Plaintiff COOPRIDER from DAVIS' intentional infliction of emotional distress include monetary damages, mental anguish and reputational damage.

## C.    FRAUD

8.    Counter-Plaintiff COOPRIDER incorporates by reference herein the specifically allegations of fraud pleaded herein against Counter-Defendant DAVIS, see *infra*, §II(C) - "Fraud.", ¶¶ 11-105, and hereby counter-sues Counter-Defendant DAVIS for fraud.

9.    The damages suffered by Counter-Plaintiff COOPRIDER from DAVIS' fraud include monetary damages, mental anguish and reputational damage.

## D.    MALICE

9.    Counter-Plaintiff COOPRIDER incorporates by reference herein the specifically allegations of fraud pleaded herein against Counter-Defendant DAVIS, see *infra*, §II(C) - "Fraud.", ¶¶ 11-105, and hereby counter-sues Counter-Defendant DAVIS for malice as well.

## E.    PUNITIVE DAMAGES

10.    Pursuant to Sections 41.003(1)(1 & 2), Counter-Plaintiff COOPRIDER sues Counter-Defendant DAVIS for punitive damages, as the evidence herein concerning fraud and malice will be proven by clear and convincing evidence.

## F.    EXCEPTIONS TO TEXAS' LIMITATIONS ON EXEMPLARY DAMAGES

11.    Counter-Plaintiff COOPRIDER alleges that Counter-Defendant DAVIS, through her incredibly malicious and mendacious behavior during her pregnancy, knowingly and intentionally committed injury to a child – her unborn baby - in violation of Section 22.04 of the

Texas Penal Code. As such, under Section 41.008(c)(7) of the Texas Civil Practice & Remedies Code, Texas' normal limitations on the amount of exemplary damages that may be assessed do not apply.

12.     Counter-Plaintiff COOPRIDER further alleges that Counter-Defendant DAVIS knowingly and intentionally violated Section 32.347 of the Texas Penal Code by fraudulently destroying, removing or concealing writings that would have revealed her scheme. As such, under Section 41.008(c)(12) of the Texas Civil Practice & Remedies Code, Texas' normal limitations on the amount of exemplary damages that may be assessed do not apply.

## F.     AMOUNT OF DAMAGES SOUGHT

13.     Counter-Plaintiff COOPRIDER has suffered in excess of $100,000,000 in actual damages, and seeks recovery thereof from Counter-Defendant DAVIS.

14.     Counter-Plaintiff COOPRIDER alleges Counter-Defendant DAVIS should have exemplary damages assessed against her in the amount of $1,000,000,000.

15.     The undersigned counsel is working free of charge on a *pro bono* basis on behalf of a Counter-Plaintiff COOPRIDER, an honorable United States Marine who did not deserve the reputational flaying resulting from the actions of Counter-Defendant DAVIS distributed by her political collaborators.

16.     Counter-Plaintiff COOPRIDER hereby pledges to and hereby assigns to the Wounded Warrior Project, any and all recoveries

    (a)     in this case for his counterclaim damages recovered from against Counter-Defendant DAVIS; and

    (b)     later in his subsequent malicious prosecution case, against Counter-Defendant DAVIS.

17.     Pursuant to 11 U.S.C. 523(a)(4) any debt incurred under this counterclaim is not dischargeable in bankruptcy because it arose out of fraud.

## **PRAYER**

Based upon the foregoing, Defendant COOPRIDER requests entry of judgment providing the following relief:

1. Dismissing with prejudice DAVIS's cause of action under the Texas Wrongful Death Act, which alleges wrongful acts by COOPRIDER;

2. Awarding COOPRIDER his actual damages as sought in COOPRIDER's Counterclaim;

3. Assessing exemplary damages against DAVIS as sought in COOPRIDER's Counterclaim

4. Granting Defendant COOPRIDER his costs and disbursements; and

5. Awarding Defendant COOPRIDER all other relief deemed just and equitable by the Court.

Dated this 3rd day of September, 2025.

Respectfully submitted,

WATTS LAW FIRM LLP

By:    /s/ *Mikal C. Watts*
Mikal C. Watts

WATTS LAW FIRM LLP
Texas State Bar No. 20981820
Federal Bar ID # 12419
mikal@wattsllp.com
811 Barton Springs #725
Austin, Texas 78704
Telephone: (512) 479-0500
Facsimile: (512) 479-0501

ATTORNEY-IN-CHARGE FOR
CHRISTOPHER COOPRIDER

James "Rick" Holstein
LAW OFFICE OF RICK HOLSTEIN, PLLC
Texas State Bar No. 09915150
Federal I.D. No.  426800
rickholstein@mac.com
P.O. Box 331655
Corpus Christi, TX 78463
Telephone: (361) 883-8649
Facsimile: (361) 717-7233

Beth Klein
BETH KLEIN, P.C.
Colorado Bar No. 17477
S.D. Tex. I.D. No. ___ (application pending)
beth@bethklein.com
350 Market Street, Suite 310
Basalt, Colorado 81621
Telephone: (303) 448-8884

ATTORNEYS FOR
CHRISTOPHER COOPRIDER

## CERTIFICATE OF SERVICE

I certify that on September 3, 2025 I electronically filed the foregoing document(s) and that they are available for viewing and downloading from the Court's CM/ECF system, and that the participants in the case that are registered CM/ECF users will be served electronically by the CM/ECF system. I further certify that a copy of the foregoing document(s) was served via email on all counsel of record.

*/s/ Mikal Watts*
Mikal Watts