1

(REAL-TIME) UNEDITED TRANSCRIPTION DISCLAIMER

The following transcript of proceedings, or any portion thereof, is UNEDITED and UNCERTIFIED by the certified court reporter, at the request of counsel for the plaintiff.

The purchaser/user agrees not to disclose this (real-time) unedited transcription in any form (written or electronic) to anyone who has no connection to this case. This is an unofficial transcription which should NOT be relied upon for purposes of verbatim citation of testimony.

This transcription has not been checked, proofread or corrected. It is a draft transcript, NOT a certified transcript. As such, it may contain computer-generated mistranslations of stenotype code or electronic transmission errors, resulting in inaccurate or nonsensical word combinations, or untranslated stenotype symbols which cannot be deciphered by non-stenotypists. Corrections will be made in the preparation of the certified transcription, resulting in differences in content, page and line numbers, punctuation, and formatting.

This (real-time) unedited transcript contains no appearance page, certificate page, index, or certification.

2

THE VIDEOGRAPHER:  Today's date is Thursday, May 28, 2026.  The time is 9:07 a.m., we're on the record.  Would the attorneys please identify themselves for the record, please.

MR. MITCHELL:  Jonathan Mitchell for plaintiff Liana Davis.

MS. KLEIN:  Beth Klein for defendant Cooprider.

MR. MOSCOWITZ:  Barry Moscowitz on behalf of defendant Cooprider.

LIANA DAVIS,

having been first duly sworn, testified as follows:

EXAMINATION

BY MS. KLEIN:

Q.  Please state your name.

A.  Liana Davis.

Q.  Liana, you've had a lot of different last names.  Can you tell us the names that you've used through your lifetime.

A.  I disagree that I've had a lot of last names. I've had one last name, Webster.

Q.  And can you tell us, was that your father's last name?

A.  Long story, but it turns out it's not my father's last name but that's what my mother believed it

4

Q.  Great.

A.  It's (412) 316-7257.

Q.  And does she have an email address?

A.  I would have to dig for it.  I don't email her.

Q.  Do you tend to text people rather than email them?

A.  It depends on who it is.

Q.  Okay.  Do you tend to text with your mother?

A.  Sometimes.

Q.  Do you call her?

A.  Sometimes.

Q.  Do you Facebook with her?

A.  I don't know what you mean by Facebook.

Q.  Do you message her on Facebook?

A.  Not really.  She sends me things, but I don't reply.

Q.  Are you her only friend on Facebook?

A.  Yes.  That's her choice.

Q.  And do you have siblings?

A.  It's a complicated answer.  I have a half sibling, Amy.

Q.  Amoroso?

A.  Yes.

Q.  What's Amy's full name?

A.  Amy Amoroso.

10

MR. MITCHELL: She signed the engagement letter on May 28, 2025, but the attorney-client relationship predates that.

MS. KLEIN: That's what I'm trying to make sure that I'm clear about.

MR. MITCHELL: Why don't I find out when she first communicated with me.

MS. KLEIN: All right. Do you want to just check in with me later?

MR. MITCHELL: I can do that. I've got to check my phone records, depending on records, but it was a few days before that, I'm sure. Because I know we talked before she signed the engagement letter.

MS. KLEIN: Okay. Great. Thank you. I appreciate that.

Q. (By Ms. Klein) Ms. Davis, how many telephones do you have?

A. I have this cell phone.

Q. Do you have another phone?

A. Not one that's functioning or useful as a cell phone.

Q. Where is the phone that's not functioning?

A. I might have a few old cell phones at my house.

Q. Where are they in your house?

A. What was that?

11

Q. Where are they in your house?

A. Currently, probably in a drawer somewhere in the master suite.

Q. All right. One of these phones, did you use it in 2025?

A. Possibly.

Q. What have you done to preserve the evidence on this phone?

A. Anything that was of importance on there, I've probably forwarded it to this phone or it's been transferred, handed over in discovery.

Q. What kind of phone is it?

A. I don't know. An iPhone, but I'm not sure which model.

Q. Okay. Do you know when you got this iPhone?

A. No, because there are a few of them. I upgrade every few years.

Q. Have you connected that phone to the Internet --

A. I have no idea.

Q. -- in the past year? You don't know? One of the things about depositions is it's a little different than normal conversation because our court reporter is taking down everything we say. So when we talk over one another, it gets messed up. She can't take two people

18

it.

Q. Because there was a lot of stuff, right?

A. And it was just a matter of hours before this began.

Q. Got it. When you were going through Mr. Cooprider's phone on the two occasions and deleting text messages, what were you hoping to accomplish?

A. I believe I already answered that, but I believe it signified some kind of fresh start or trust building between us. And I'm not sure if it was -- exactly how many of those sessions there were. I'm guessing about two.

Q. Was one at a doctor's office?

MR. MITCHELL: Objection, form.

A. I don't recall.

Q. Just so I understand your testimony today, you're saying that there's no way that you were trying to hide text messages from being discovered in your family law matter; is that right?

MR. MITCHELL: Objection, form.

A. Could you rephrase that or repeat it?

Q. Sure. I want to make sure that I understand your testimony completely that when during these sessions when you were deleting text messages from Mr. Cooprider's phone, you did not intend to hide that evidence from the

20

THE REPORTER:  Question:  "Why would you ask somebody in a hypothetical to lie for you in a divorce proceeding?"

A.  I've asked him many hypothetical questions, he's asked me many hypothetical questions over the course of dozens of hours of conversation.

Q.  But my question is why?

MR. MITCHELL:  Objection, form.

Q.  (By Ms. Klein)  Why would you do that?

MR. MITCHELL:  Objection, form.

A.  I couldn't tell you why that specific topic came up.

Q.  Did you ask Mr. Cooprider to lie for you because you wanted to gain the upper hand in your child custody dispute?

MR. MITCHELL:  Objection, form.

A.  No.

Q.  Were you just playing a game with him?

MR. MITCHELL:  Objection, form.

A.  I disagree that I was playing a game.

Q.  What were you doing?

MR. MITCHELL:  Objection, form.

A.  As I said before, it was just part of an hours long conversation.  Many various topics came up.  We talked about a wide variety of things.

21

Q. So with other people, does the topic of lying for you in court proceedings, is that something normal that you do in your life?

A. No.

MR. MITCHELL: Objection, form.

A. No.

Q. Was this an unusual circumstance to ask Mr. Cooprider to lie for you?

MR. MITCHELL: Objection, form.

A. I wouldn't describe it as unusual. It's just something that happened to come up. And I don't attribute any specific meaning to it. I never intended for anyone to lie for me at any point.

Q. Do you want me to call you Professor Davis? Ms. Davis? What would you prefer how I address you?

A. I don't really go by my married name. I'm used to either Liana or Dr. Davis. You don't have to call me Professor Davis.

Q. What do you prefer?

A. I can't recall what you've been calling me, but whatever it is is fine.

Q. Dr. Davis?

A. Sure.

Q. Dr. Davis, have you asked the United States military to prosecute Chris Cooprider for agreeing to lie

48

racking.

MR. MITCHELL:  Exhibit 3, I got it.

Q.  (By Ms. Klein)  Do you recognize this, ma'am?

MR. MITCHELL:  Objection, form.  Would you say that again?

Q.  (By Ms. Klein)  Sure.  Do you recognize Exhibit 3, Dr. Davis?

A.  It looks familiar.  I've seen many documents that look similar.

Q.  Do you know when you received a copy of this?

A.  I can't recall the exact date I received a copy of it.

Q.  I'm going to just put -- to be clear on the record, this was served on your counsel on September 8th, 2025.  And this is Defendant Christopher Cooprider's First Set of Request for Production to Plaintiff Liana Davis.  Do you see where that says that?

A.  That's what it says.

Q.  All right.  When you received a copy of this, did you start gathering all of the information that was responsive?

A.  I can't recall exactly when I started gathering the information, but I'm sure I consulted with Mr. Mitchell on what to do and responded with the correct timeline.

50

B, C, D.  What did you do to go out and find all of the communications between you and a third-party, third person on all of those topics?

MR. MITCHELL:  Objection, form.

A.  I can't recall what my exact process was, but I probably went by type of documents.  So for instance, I might have started with all emails that I felt were relevant or all paper copies of things, which are relatively few.  Or I might have gone by person.  It just depends on what was being asked for.

Q.  Okay.  Let's go on to the next page, number 8 in Exhibit 3.  And there's a request for production number 2.  Can you see that?  And it says, "All communications between you and the following individuals between November 1st, 2024 and the present."  Do you see that?

A.  Yes.

Q.  Did you find any texts between you and Amy Amoroso between November 1st, 2024 and the present?

A.  I did not --

MR. MITCHELL:  Objection, form.

A.  I'm not a professional, I'm not an attorney, but based on my understanding of the task, I did my best to include all relevant communications with each of those people, if I had any, in my possession and control.

51

Q.   Did you find any communications between you and Amy Amoroso between November 1st, 2024 and the present?

MR. MITCHELL:  Objection to form.

A.   I believe we've handed over all of the discovery we have in our possession or control, so that would include Amy Amoroso.

Q.   Dr. Davis, did you find communications between you and Amy Amoroso between the time frame of November 1st, 2024 and the present?  Did you find those?

A.   There are volumes of documents and text messages, emails between a lot of people.  I can't recall what exactly was found for each person.  I know that I've turned over everything that I believe is relevant and that I had.

MR. MITCHELL:  She's asked -- ask the question one more time.

MS. KLEIN:  Why don't you help her.

MR. MITCHELL:  She's not asking you -- she's asking whether you have any text messages with your sister, not just whether they're responsive.  Is that right, that's your question?

MS. KLEIN:  That's right.  Thank you for helping.

MR. MITCHELL:  Yeah.

A.   I didn't think I was supposed to turn over all

52

communications.

MR. MITCHELL:  You weren't, but she's just asking whether you had any texts at all with your sister. That's what she's asking.

A.  Oh, yes, I did have text messages with my sister, but they weren't relative -- relevant, I don't believe.

MS. KLEIN:  Thank you.  I appreciate this.

Q.  (By Ms. Klein)  Ms. Davis, when you were answering this question, did you find texts with Amy Amoroso between November 1st, 2024 and the present?

MR. MITCHELL:  Objection, form.  You mean 2025, right?

MS. KLEIN:  No, November 2024 and the present.

MR. MITCHELL:  I'm sorry, you're right.

A.  So I think this is what I was thinking you were asking before for any of those individuals, including Amy.

Q.  Ma'am, I'm just -- we're focusing on your sister, Amy Amoroso.  And I'm asking you if you had on your phone text messages dating from November 1st, 2024 to the present when you started answering these questions.

MR. MITCHELL:  Regardless of whether they

53

were relevant or responsive. Any kind of text messages is what she's asking.

A. My recollection is that -- I don't know how to answer that without getting into attorney-client privilege, but the task ultimately ended up not being to turn over all text messages, including those that have nothing to do with the case. The task was to turn over those that were relevant.

MR. MITCHELL: What she wants to know is do you have any text messages with your sister, relevant or not. That's all she's asking.

A. I do have text messages with my sister, yes.

Q. Where are they?

A. Where I text from, on my phone or I might have various copies from this program called Decipher on my laptop.

Q. Dr. Davis, can you explain why every single text message between you and Amy Amoroso has been scrubbed from your phone that you turned over to the defense under court order?

MR. MITCHELL: Objection, form.

A. I don't know what you mean by scrubbed.

Q. Where are they on your phone?

A. Text messages with my sister?

Q. Yes.

55

be on lookout for an email, and any emails that I received I passed them along.

Q. Why did you change your sister's name from Amy Amoroso to the letter A in your contacts on your phone the night before Mr. Vasiliou took your phone?

MR. MITCHELL: Objection, form.

A. I'm not familiar with what you're talking about.

Q. Did you change the contact information for Amy Amoroso on your phone?

MR. MITCHELL: Objection, form.

A. It appears as Amy Amoroso to me.

Q. Did you change the contact information for Amy Amoroso on your phone?

MR. MITCHELL: Objection to form.

A. It appears as Amy Amoroso to me, so I would have to say no.

Q. Okay. Did you find any communications between you and Marshall Boling on your cell phone dated between November 1st, 2024 and the present? Did you find any communications between you and Marshall Boling on your phone?

A. Yes, we text each other and call each other.

Q. Did you delete all those text messages before you turned the phone over to our expert?

56

MR. MITCHELL:  Objection, form.

A.  No, I did not.

Q.  So all of your text messages with Mr. Boling should be on that phone, correct?

A.  Or retrievable through the Decipher app.  No evidence, nothing of relevance has been destroyed or scrubbed, as you've said.

Q.  Do you have access to your text messages on the cloud at this time?

A.  I don't know.  I never log into the cloud really.  I just use my phone on a daily basis.

Q.  Do you move text messages from your phone to the cloud?

MR. MITCHELL:  Objection, form.

A.  I don't know how to do that, so I would have to say no. I don't do it by hand.  I don't know if my phone automatically does such a thing.

Q.  Did you access the cloud at any time to answer and provide documents responsive to request for production number 2?

MR. MITCHELL:  Objection, form.

A.  I don't know what counts as accessing the cloud. I went by mostly the contents of my phone.  I know my phone does some routine automatic updates perhaps.

62

health and how that would affect her at her age.

Q.  Did you turn over all of your text messages between you and your mom the night of April 5th to the morning of April 6th?

MR. MITCHELL:  Objection, form.  Can we go off the record for a minute?

MS. KLEIN:  Sure.

THE VIDEOGRAPHER:  The time is 10:42 a.m., we're off the record.

(A recess was taken.)

THE VIDEOGRAPHER:  The time is 10:44 a.m., we are back on the record.

Q.  (By Ms. Klein)  Dr. Davis, the texts between you and your mother the night of January 5th to the morning of January 6th, they would all deal with you going to the emergency room, correct?

MR. MITCHELL:  Objection, form.

A.  No, not all of them had to do with me going to the emergency room.

Q.  Some of them?

A.  Some of them, but she was not aware of why I was going.

Q.  Do you still have those texts?

A.  I don't know if I still have those texts because they weren't -- they did not seem to me to be

63

responsive documents because she knows nothing of the

pregnancy, Cooprider, the murder, none of it.

Q.　So when you determine something is not
relevant, what do you do?

　　MR. MITCHELL:　Objection, form.

A.　I simply don't produce it.

Q.　Do you delete it?

A.　No, not necessarily.

Q.　So I asked you the question:　Do you still have
your text communications between you and your mother the
night of April 5th through the morning of April 6th?　Do
you still have those?

A.　I don't know whether I still have those.

　　MS. KLEIN:　Let's scroll down to -- so we
can see number 3.　Thank you.

Q.　(By Ms. Klein)　Janet Pinson, she became a
friend of yours, correct?

　　MR. MITCHELL:　Objection, form.

A.　I never thought of that, but yes, I guess you
could say she's been something of a friend.　She's been
very kind to me.

Q.　When did you first meet Jana Pinson?

A.　Define meet.

Q.　Meet, m-e-e-t.

A.　I know how to spell it.　Do you mean in person

112

A.  I don't recall whether I personally put it on the dining room table or if he did, but it was on the dining room table at one point.

Q.  For the whole night, that phone was on the dining room table, correct?

MR. MITCHELL:  Objection, form.

A.  I can't tell you one way or another whether it was on the table for the whole night or what counts as the whole night.

Q.  Do you have a second recording device, didn't you?

MR. MITCHELL:  Objection, form.

A.  There are various pieces of technology in a home that have recording capability.

Q.  What recording capability do you have in your home?

MR. MITCHELL:  Objection, form.

A.  I couldn't fully itemize it because I'm sure some of my children's toys are even capable of recording, some stuffed animals are.  But I have some old cell phones that aren't in use that I used in years prior and then I would upgrade and keep the old one.

Q.  Did you -- did you use one of your old cell phones to record the evening with Mr. Cooprider on April 5th, 2025 to the morning of April 6th, 2025?

113

MR. MITCHELL:  Objection, form.

A.   Not the morning of April 6th.  I recorded portions of our get-together on the evening of April 5th, not the entire thing.

Q.   How did you -- how did you do that, Liana?  How did you record that night?

MR. MITCHELL:  Objection, form.

Q.   (By Ms. Klein)  I'm sorry.  Dr. Davis, how did you set up the recording devices in your home to record the evening?

MR. MITCHELL:  Objection, form.

A.   I didn't set up recording devices, plural.  I had an old phone that had recording capability, and it was in my purse, which I kept next to me on my left, either on the floor or on the bottom shelf of a -- did I have a side table?  I think it was on the floor next to me, to my left.

Q.   Did you take your phone that you were recording on into the kitchen?

MR. MITCHELL:  Objection, form.

A.   I can't recall taking my phone into the kitchen.  I'm not sure.

Q.   Did you tell Mr. Cooprider that you were recording the evening?

MR. MITCHELL:  Objection, form.