UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

**Liana Davis**,

Plaintiff,

v.

**Christopher Cooprider**; **Aid Access GmbH**; **Rebecca Gomperts**,

Defendants.

Case No. 2:25-cv-220

## REPLY BRIEF IN SUPPORT OF NONPARTY MARY ANNA ZIARKO'S MOTION TO QUASH SUBPOENA

In determining whether this subpoena unduly burdens Ms. Ziarko, the Court must "balance the interests served by demanding compliance with the subpoena against the interests furthered by quashing it." *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 377 (5th Cir. 2004) (citation and internal quotation marks omitted)); *see also id.* ("Whether a subpoena subjects a witness to undue burden generally raises a question of the subpoena's reasonableness, which 'requires a court to balance the interests served by demanding compliance with the subpoena against the interests furthered by quashing it.' 9A Charles Alan Wright & Arthur R. Miller, Federal Practice And Procedure § 2463 (2d ed. 1995)"). The Fifth Circuit has also held that "[t]his balance of the subpoena's benefits and burdens calls upon the court to consider whether the information is necessary and unavailable from any other source." *Id.* (citation and internal quotation marks omitted). The balance of benefits and burdens leans heavily in favor of quashing the subpoena.

## I. Requiring Ms. Ziarko To Comply With The Subpoena Will Produce Few If Any Benefits

A deposition of Ms. Ziarko will produce few if any benefits because the matters that Cooprider's lawyers want to question Ms. Ziarko about are not in dispute, are outside Ms. Ziarko's knowledge, or are unimportant.

Cooprider's lawyers say that they want to question Ms. Ziarko about each of the following issues:

1. Ms. Davis's physical condition before her trip to the emergency room;[1]

2. Ms. Davis's activities and condition in the months preceding and following April 5–6, 2025;[2]

3. The location of items in Ms. Davis's residence in the early morning of April 6, 2026, such as "hot chocolate mugs, medication, medication packaging [and] . . . bloody towels";[3]

4. What Ms. Davis said to Ms. Ziarko during their calls shortly after midnight on April 6, 2025, and how she explained her need to go to the emergency room;[4]

5. How and when "the idea of taking an Uber instead of being picked up by Mr. Cooprider first arise"[5];

6. Whether Ms. Davis "really" sent Ms. Ziarko money in advance to pay for an Uber ride and how much she sent and through what service;[6]

7. The time at which Davis asked Ms. Ziarko for the copy of the Uber receipt attached to her complaint and the reason she provided for needing it.[7]

---

1. *See* Response, ECF No. 113, at 1, 3.
2. *See* Response, ECF No. 113, at 1, 3.
3. Response, ECF No. 113, at 3.
4. *See* Response, ECF No. 113, at 3.
5. Response, ECF No. 113, at 4.
6. *See* Response, ECF No. 113, at 4.
7. *See* Response, ECF No. 113, at 4.

**Issue (1)**: Ms. Davis's physical condition during the morning of April 6, 2025, is not in dispute. She was hemorrhaging and in the process of losing her unborn child. Cooprider does not deny that Ms. Davis was bleeding when he left her house at 12:12 A.M. on April 6, 2026. *See* Request for Admission No. 38 ("You were aware that Liana Davis was bleeding when you left her house at approximately 12:12 A.M. on April 6, 2025. RESPONSE: ADMIT.") (attached as Exhibit 1). And it is undisputed that Ms. Davis lost her unborn child shortly after arriving at the emergency room that morning.

Deposing Ms. Ziarko about Ms. Davis's physical condition on April 6, 2025, will not provide any new or useful information. Indeed, Ms. Ziarko is likely to be unaware of how dire Ms. Davis's medical situation was on April 6, 2026, because Ms. Davis had concealed the pregnancy and the alleged murder from her elderly mother for the sake of her health and well-being. *See* Davis Dep. Tr., ECF No. 86, at 62:8–24, 63:11–24; *see also id.* at 64:23–25 ("[S]he knows nothing of the pregnancy, Cooprider, the murder, none of it."). Ms. Ziarko has a highly incomplete picture of the situation given Ms. Davis's determination to shield her from the truth. So Ms. Ziarko's deposition testimony will not produce useful or even truthful information about Ms. Davis's medical condition on the morning of April 6, 2026.

**Issue (2)**: Ms. Ziarko did not even know that Ms. Davis was pregnant with Cooprider's child. *See id.* So she will not have useful or relevant information about Ms. Davis's "activities" that predated the alleged murder, as Ms. Davis had concealed the pregnancy from her mom and hid any activities that might alert her mother to the pregnancy. *See* Davis Dep. Tr., ECF No. 86, at 62:8–24, 63:11–24; 64:23–25.

**Issue (3)**: Cooprider's lawyers want to quiz Ms. Ziarko about the location of the "hot chocolate mugs," the abortion drugs and their packaging, and the "bloody towels" in Ms. Davis's house on the morning of April 6, 2025. But it is not apparent how this has any relevance to the parties' claims or defenses, and Cooprider's lawyers make

no attempt to explain its relevance. It is undisputed that Davis and Cooprider drank hot chocolate on the night of April 5, 2026,[8] so testimony about the location of the hot-chocolate mugs adds nothing to the case. It is equally undisputed that Ms. Davis was hemorrhaging in the early morning of April 6, 2026, which caused her to lose her baby when she arrived at the hospital. So how can the location or condition of "bloody towels" have any effect on Ms. Davis's claim that she was poisoned or Mr. Cooprider's defense that she miscarried? And Ms. Davis discovered the abortion-inducing drugs *before* she left for the emergency room and brought them with her to the hospital, where she turned them over to the Corpus Christi police. *See* Complaint, ECF No. 1, ¶¶ 69–71. So the drugs were obviously in the house that night, and Ms. Ziarko would not have seen them or noticed their location given that Ms. Davis took them with her to the hospital as soon as Ms. Ziarko arrived at her house.

**Issues (4) – (7)**: These issues have no relevance to Ms. Davis's claims or Mr. Cooprider's defenses. It is undisputed that Cooprider failed to pick up Ms. Ziarko after midnight on April 6, 2026, after leaving Ms. Davis's house. *See* Request for Admission No. 41 ("You never picked up Liana Davis's mother on April 6, 2025. RESPONSE: ADMIT.") (attached as Exhibit 1); Request for Admission No. 42 ("You never drove to Liana Davis's mother's residence on April 6, 2025. RESPONSE: ADMIT.") (attached as Exhibit 1). How and when Ms. Davis arranged for Ms. Ziarko to travel to her house by Uber after Mr. Cooprider abandoned them has no bearing on whether Cooprider poisoned Ms. Davis or whether she suffered a natural miscarriage. Cooprider's lawyers are also determined to find out what exactly Ms. Davis told her mother given that she was trying to conceal the pregnancy and the alleged murder to the sake of her mother's health and well-being. *See* Davis Dep. Tr., ECF No. 86, at

8. *See* Request for Admission No. 32 ("Alcohol was mixed into the hot chocolate that Liana Davis drank on the evening of April 5, 2025. RESPONSE: ADMIT.") (attached as Exhibit 1).

62:8–24, 63:11–24; *see also id.* at 64:23–25 ("[S]he knows nothing of the pregnancy, Cooprider, the murder, none of it."). But they do not explain how this has any relevance to a party's claim or defense. Whatever Ms. Davis told her mom will not in any way support her claim that she was poisoned, or Mr. Cooprider's defense that she miscarried.

The benefits of forcing Ms. Ziarko to sit for a deposition are practically nil. And so are the benefits of forcing Ms. Ziarko to produce text messages and communications that can easily be obtained from Ms. Davis's cell phone. All of the text messages that Ms. Davis exchanged with Ms. Ziarko on April 5–6, 2026, are retrievable from Ms. Davis's cell phone. *See* Liana Davis Decl. ¶ 6 (attached as Exhibit 2). Their insistence on obtaining these text messages from Ms. Ziarko is nothing short of harassment.

## II. The Burdens That Will Be Imposed On Ms. Ziarko Heavily Outweigh The Benefits Of Forcing Compliance With The Subpoena

Cooprider does not deny that Ms. Ziarko is suffering from any of the medical conditions described in Ms. Davis's declaration. *See* Liana Davis Decl., ECF No. 109-2, at ¶¶ 4–9. But he attempts to downplay the burdens that would be imposed on Ms. Ziarko by relying on a false declaration submitted by Devin Davis. *See* Response, ECF No. 113, at 4–5; Devin Davis Decl., ECF No. 114.

Devin Davis did not carry out a custody exchange on June 25, 2026, as he falsely asserts in his declaration. *See* Devin Davis Decl., ECF No. 114. at ¶ 4. He had custody of the children for five more days after June 25, 2026, and no exchange of custody occurred on that date. *See* Liana Davis Decl. ¶ 4 (attached as Exhibit 2).

Devin Davis's claim that Liana Davis placed the "sole care" of their three children with Ms. Ziarko when she was hospitalized on July 15, 2026, is equally false. *See* Devin Davis Decl., ECF No. 114. at ¶ 5 ("On July 15, 2026 approximately two hours

before a scheduled custody exchange, Liana Davis informed me that she had been admitted to the hospital for the delivery of her twins. During her hospitalization, she placed the sole care of our three young children with her mother, Mary Anna Ziarko, who successfully served as their primary caregiver."). When Ms. Davis was hospitalized and giving birth to her twins, she left her children in the care of no fewer than *three* adults: Marshall Bowling (the father of her twins), Mr. Bowling's mother, and Ms. Ziarko. *See* Davis Decl. ¶ 5 (attached as Exhibit 2). Mr. Bowling's father also stopped by the house during this time to assist. *See id.* At no time during this hospitalization did Ms. Davis leave her children in the "sole care" of Ms. Ziarko. *See id.*

Finally, Devin Davis mispresents the video that Mr. Cooprider submitted to the Court. And Ms. Ziarko's only appearances on the video show her sitting on a couch holding a newborn infant in her lap while Ms. Davis speaks with her other three children. That does not in any show that Ms. Ziarko can be "entrusted with significant childcare responsibilities," or that she is capable of "supervising multiple young children and providing care for a newborn infant." Even the most frail and elderly invalids in a nursing home can sit with a newborn infant on their lap. That does not make them (or Ms. Ziarko) primed to sit for a seven-hour deposition that will reveal devastating information about a murdered grandchild that they previously knew nothing about.

* * *

The burdens imposed on Ms. Ziarko far outweigh the benefits (if any) from forcing an elderly, frail, and disabled woman who knew nothing about the pregnancy or alleged murder to sit for a deposition. The Coutt should quash the subpoena.

## CONCLUSION

Ms. Ziarko's motion to quash the subpoena should be granted.

Respectfully submitted.

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Attorney-in-Charge*
Texas Bar No. 24075463
S.D. Tex. Bar No. 1133287
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Dated: August 24, 2026

*Counsel for Nonparty Mary Anna Ziarko*

## CERTIFICATE OF SERVICE

I certify that on August 24, 2026, I served this document through CM/ECF upon:

MIKAL C. WATTS
Watts Law Firm LLP
811 Barton Springs #725
Austin, Texas 78704
(512) 479-0500 (phone)
(512) 479-0501 (fax)
mikal@wattsllp.com

BETH KLEIN
Beth Klein, P.C.
350 Market Street, Suite 310
Basalt, Colorado 81621
(303) 448-8884 (phone)
beth@bethklein.com

BARRY MOSCOWITZ
VICTORIA JIMENEZ
OLIVER HAMBY
Thompson Coe LLP
700 North Pearl Street, 25th Floor
Dallas, Texas 75201
(214) 871-8200 (phone)
(214) 871-8209 (fax)
bmoscowitz@thompsoncoe.com
vjimenez@thompsoncoe.com
ohamby@thompsoncoe.com

*Counsel for Defendant Christopher Cooprider*

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Nonparty Mary Anna Ziarko*