UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| **Liana Davis**,<br><br>Plaintiff,<br><br>v.<br><br>**Christopher Cooprider**; **Aid Access GmbH**; **Aid Access B.V.**; **Access and More B.V.**; **Rebecca Gomperts**,<br><br>Defendants. | Case No. 2:25-cv-220 |

## FIRST AMENDED COMPLAINT

Christopher Cooprider murdered Liana Davis's unborn child by secretly dissolving abortion pills into a hot beverage that he had prepared and tricking Davis into drinking it. Cooprider obtained these drugs from Aid Access, a criminal organization that illegally ships abortion pills into Texas and other jurisdictions where abortion has been outlawed. Ms. Davis sues to recover damages from Cooprider and Aid Access for the wrongful death of her unborn child. *See* Tex. Civ. Prac. & Rem. Code § 71.001 *et seq.*

Ms. Davis also seeks an injunction as a qui tam relator to stop the Aid Access defendants from distributing abortion-inducing drugs in violation of Texas law, as well as statutory damages for Aid Access's violations of Texas's HB 7. *See* Tex. Health & Safety Code § 171A.101(a); Tex. Health & Safety Code § 171A.104(a)(1)–(3).

## JURISDICTION AND VENUE

1. The Court has subject-matter jurisdiction under 28 U.S.C. § 1332, as the parties are completely diverse and the amount in controversy exceeds $75,000.00.

2. The Court has personal jurisdiction over defendant Cooprider because he murdered Ms. Davis's unborn child in Texas, and the plaintiff's claims arise out of those minimum contacts with the forum state. The Court has personal jurisdiction over Aid Access and Rebecca Gomperts because they purposefully and knowingly mailed abortion-inducing drugs into Texas in violation of state and federal law, and the plaintiff's claims arise out of those minimum contacts with the forum state.

3. Venue is proper in this district and division because a substantial part of the events giving rise to the claims occurred in Nueces County. *See* 28 U.S.C. § 1391(b)(2).

## PARTIES

4. Plaintiff Liana Davis is a citizen of Texas.

5. Defendant Christopher Cooprider is a citizen of Arizona.

6. Defendant Aid Access GmbH is a Gesellshaft mit beshränkter Haftung (GmbH) incorporated under the laws of Austria. Its principal place of business is in Austria.

7. Defendant Aid Access B.V. is a Besloten Vennootschap (B.V.) (similar to a private limited liability company) incorporated under the laws of the Netherlands. Its principal place of business is in the Netherlands. Its sole shareholder is defendant Access and More B.V.

8. Defendant Access and More B.V. is a Besloten Vennootschap (B.V.). incorporated under the laws of the Netherlands. Its principal place of business is in the Netherlands. Its sole shareholder is Rebecca Gomperts.

9. For simplicity and ease of exposition, the complaint will refer to Aid Access GmbH, Aid Access B.V., and Access and More B.V. collectively as "Aid Access."

10. Defendant Rebecca Gomperts is a citizen of the Netherlands. She is the founder and director of Aid Access, and the sole shareholder of defendant Access and More B.V., which in turn is the sole shareholder of defendant Aid Access B.V.

11. For simplicity and ease of exposition, the complaint will refer to Aid Access GmbH, Aid Access B.V., Access and More B.V., and Rebecca Gomperts collectively as "the Aid Access defendants."

## STATEMENT OF FACTS

12. Defendant Christopher Cooprider is a Marine pilot in training who is temporarily stationed in Corpus Christi. Cooprider remains a domiciliary and citizen of Arizona. *See* Exhibit 1.

13. Cooprider resides next door to plaintiff Liana Davis in Corpus Christi.

14. In early 2025, Ms. Davis became pregnant with Cooprider's child.

15. Ms. Davis learned that the baby would be a girl and named her Joy. She looked forward to giving birth and raising her daughter alongside her three children from a previous marriage.

16. Cooprider had different plans. He wanted the baby dead—and he made that clear to Ms. Davis in no uncertain terms. This became a daily source of contention between Cooprider and Davis, as Cooprider would constantly pressure Davis to kill their unborn child, while Davis consistently rebuffed his requests and made clear that she intended to give birth.

17. Cooprider told Davis that he wanted to kill her unborn child even before Davis had taken a test to confirm her pregnancy. On January 31, 2025, Davis and Cooprider exchanged the following text messages:




*See* Exhibit 2.

18. On February 3, 2025, Cooprider expressed similar sentiments over text messages, again before Davis had taken any test to confirm the pregnancy:






*See* Exhibit 3.

19. When Cooprider learned of the positive pregnancy test on February 4, 2025, he reiterated his desire for an abortion, but Ms. Davis rebuked him:



*See* Exhibit 4.

20. On February 5, 2025, the day after the positive pregnancy test, Cooprider texted Davis and announced that he was going to order abortion drugs for her to take. Ms. Davis was appalled and told him not to do it:




*See* Exhibit 5.

21. Cooprider ignored Ms. Davis's objections and ordered the drugs anyway. On February 6, 2025, at 3:38 P.M., Cooprider texted Ms. Davis and said:




*See* Exhibit 6.

22. Ms. Davis reprimanded Cooprider for purchasing those drugs without her consent and against her explicit instructions. She texted:




*See* Exhibit 7.

23. On February 11, 2025, at 7:52 A.M. central time, Cooprider texted Davis to inform her that the abortion drugs had arrived. Ms. Davis responded to his text with a thumbs-down emoji:




*See* Exhibit 8.

24. Cooprider showed Davis the receipt for his purchase on his cell phone. When Ms. Davis looked at the receipt on Cooprider's phone, she saw that he had purchased the drugs from Aid Access. Aid Access is listed on the "plan C" website

that Cooprider mentioned in his earlier text as one of its "US-Based Online Clinics" that sends abortion-inducing drugs into Texas. *See* https://www.plancpills.org/abortion-pill/texas#ways-people-get-pills [https://perma.cc/76XM-KZU2]. The Plan C website lists the price for pills obtained through Aid Access as "$150 or less," and promises delivery to Texas for pills ordered from Aid Access in "2–5 days." *Id.* Cooprider ordered the pills on Thursday, February 6, 2025, and they arrived on Tuesday, February 11, 2025—exactly five days later, and within the 2–5 day delivery window described on the Plan C pills website.

25. On February 18, 2025, Cooprider brought the abortion pills to Davis's house and asked her to kill the baby with the drugs that he had purchased. Davis refused and made clear to Cooprider that she had no intention of aborting. But Cooprider was undeterred, and he repeatedly brought the drugs to Davis's house when he came to visit. Sometimes Cooprider would leave the drugs behind at her house after he left, in the apparent hope that Davis might change her mind and ingest the pills on her own initiative. Other times Cooprider would take the drugs with him when he returned to his house. And sometimes Cooprider split the difference, leaving the mifepristone with Davis while taking the misoprostol pills with him.[1] All of this disturbed Ms. Davis, who disliked having Cooprider's abortion pills in her home.

26. Ms. Davis took pictures of the abortion drugs that Cooprider had purchased from Aid Access. The box containing the mifepristone contains a label indicating that the drugs were prescribed to "Chris Cooprider" by someone described as "L.M. MD":

1. The abortion-pill regimen requires a pregnant woman to ingest two pills approximately 24–48 hours apart. Mifepristone (or mifeprex) is the first of the two drugs that must be taken, which blocks the hormone progesterone. Misoprostol is the second drug taken 24–48 hours after the mifepristone, which expels the unborn child from the uterus.







*See* Exhibits 9 and 10.

27. The bottle containing the misoprostol also contains a label indicating that the drugs were prescribed to "Chris Cooprider" by the same "L.M. MD":







*See* Exhibits 11–12. There were 12 misoprostol pills included in this bottle.

28. For over a month Cooprider tried to browbeat Ms. Davis into killing her unborn child with the abortion pills that he had obtained, but his efforts went nowhere. On February 18, 2025, at 9:07 A.M., Cooprider texted Davis in one of his early attempts to persuade her to ingest the "M&M's" (Cooprider's shorthand for mifepristone and misoprostol):




*See* Exhibit 13.

29. The next day, on February 19, 2025, Cooprider and Davis exchanged text messages in which Cooprider repeated his desire for an abortion, while Davis rebuked him for his selfish attitude:



*See* Exhibit 14.

30. On March 5, 2025, Davis pleaded with Cooprider to accompany her to an ultrasound appointment that she had scheduled for March 21, 2025. (Davis wanted Cooprider to attend the appointment because she held out hope that seeing the sonogram images of the baby might change his mind.) Cooprider said he would come only if Davis promised to abort her unborn child:




*See* Exhibit 15.

31. A few minutes later, Cooprider repeated his demands for an abortion before agreeing to accompany Davis to the ultrasound appointment:






*See* Exhibit 16.

32. A few minutes later, after he had agreed to attend the ultrasound appointment, Cooprider again demanded an abortion without regard to Davis's wishes:



*See* Exhibit 17.

33. The next day, on March 6, 2025, at 8:50 P.M., Cooprider called the baby a "thing" and claimed that its birth would be "a failure on multiple levels":




*See* Exhibit 18.

34. The ultrasound appointment of March 21, 2025, and the sonogram pictures did nothing to change Cooprider's mind, and he only doubled down on his insistence that the baby be killed. On March 26, 2025, at 12:46 P.M., Cooprider texted that he wanted to "abort this monstrosity":



*See* Exhibit 19.

35. Later that day, after Davis rebuked Cooprider for calling the baby a "mistake," Cooprider complained that he was "trapped" by Davis's unwillingness to abort:




*See* Exhibit 20.

36. More texts were exchanged on March 26, 2025, in which Cooprider continued to harangue Davis for refusing to abort:




*See* Exhibit 21.

37. On March 28, 2025, Ms. Davis sent Cooprider a series of text messages that gently encouraged him to reconsider his desire for an abortion. *See* Exhibit 22. But Cooprider would have none of it:




*See* Exhibit 22.

38. Davis tried again on March 28, 2025, asking to Cooprider regard their baby as a blessing rather than a parasite. But Cooprider was rude and dismissive:




*See* Exhibit 23.

39. A few minutes later, Cooprider called Davis "delusional" for describing her pregnancy this way:




*See* Exhibit 24.

40. Davis tried again but was met with yet another derisive response:




*See* Exhibit 25.

41. On March 31, 2025, Cooprider texted Davis and made yet another attempt to convince her to abort, this time claiming that the baby would be better off dead and that giving birth would harm Ms. Davis and her other three children:






*See* Exhibit 26.

42. Later that day, Cooprider made yet another pitch for an abortion, this time by trying to convince Davis that killing her baby would be the "right" thing to do. Once again, Davis refused to go along, insisting that she loved her baby and reiterating her determination to give birth:






*See* Exhibit 27.

43. Cooprider became abusive and menacing toward Davis when she would not give in to his demands to abort. On March 6, 2025, Cooprider texted the following:






*See* Exhibits 28–29.

44. Cooprider even threatened to testify against Ms. Davis in her ongoing and bitterly contested divorce proceeding, in which she was battling her abusive and soon-to-be-ex-husband for custody of her three children:




*See* Exhibit 30. Devin Paul Davis is the name of Liana Davis's soon-to-be-ex-husband. Davis had confided in Cooprider on a number of occasions that she was terrified of Devin and told Cooprider the ways in which Devin had physically and emotionally abused her and her children. Cooprider also knew that Ms. Davis and her children were clients at a local domestic-violence agency because of Devin's history of abuse.

45. Finally, on April 1, 2025, Cooprider texted Davis and called her “the worst person” for refusing to accommodate his demands for an abortion:




*See* Exhibit 31.

## I. Cooprider Plots To Murder Ms. Davis's Unborn Child By Slipping Abortion Pills Into Her Drink

46. By April of 2025, Cooprider had come to the realization that Ms. Davis was determined to give birth and would not budge in response to his badgering and bullying tactics. Cooprider also knew that he was running out of time for Davis to abort with the drugs that he had purchased. The FDA has approved the use of mifepristone and misoprostol for abortions through only the first 10 weeks of pregnancy, as measured from the pregnant woman's last menstrual period. Ms. Davis was by now eight weeks pregnant, and Cooprider knew that he had no chance of persuading Davis to travel out of state for a surgical abortion if the pregnancy lasted beyond the available time for a drug-induced abortion.

47. Cooprider's only hope for an abortion was to trick Davis into ingesting the drugs that he had purchased from Aid Access. So Cooprider decided to murder the baby by mixing the abortion pills into a drink and giving it to Davis. He planned the murder and carried out his plot on the night of April 5, 2025.

48. On April 2, 2025, at 12:15 P.M., Cooprider texted Davis and proposed to have a "trust building night" where he would "make us some warm relaxing tea":




*See* Exhibit 32.

49. Cooprider billed this "trust building night" as an opportunity to repair the damage caused by his reaction to the pregnancy and his demands for an abortion. This led Davis to believe that Cooprider was now resigned to her decision to give birth to their daughter.

50. Davis agreed to Cooprider's proposal for this trust-building night, as she knew that she would have to co-parent with Cooprider for the next two decades and viewed this as a last-ditch opportunity to get on reasonable terms with the father of her daughter. She also understood that Cooprider might abandon their daughter entirely given his unhappiness with the pregnancy and his military responsibilities, which were likely to place him in locations far from Corpus Christi. Ms. Davis thought that the proposed "trust building night" could salvage something from a bad situation and

increase the likelihood that her soon-to-be-born daughter would have at least some semblance of a relationship with her biological father.

51. Cooprider came to Davis's house on the night of April 5, 2025, for the "trust building" session. Cooprider told Davis that he wanted to make her a hot drink, and that hot drinks were helping him relax at night and improving his sleep, and that he had brought his own hot chocolate from his apartment. Ms. Davis agreed to this and allowed Cooprider to make hot chocolate for her.

52. While Cooprider was preparing the hot chocolate, Ms. Davis stepped outside to let her dog in. Unbeknownst to Ms. Davis, Cooprider was lacing her drink with the abortion pills that he had obtained from Aid Access.

53. When Cooprider finished preparing the hot chocolate, they drank it together while watching TV. This is how Cooprider and Davis normally spent time together.

## II. Davis Begins Hemorrhaging And Cramping Within 30 Minutes After Drinking The Contaminated Hot Chocolate

54. Shortly before midnight, and within 30 minutes of consuming the tainted drink, Ms. Davis began hemorrhaging and cramping.

55. Davis immediately sought help from Cooprider. Cooprider said that he would get Davis's mother and drive her to Davis's house so that she could stay with Ms. Davis's three children (who were sleeping upstairs) while they went to the emergency room. Cooprider also promised to drive Ms. Davis to the emergency room after bringing her mother to her house.

56. Ms. Davis's mother was 77 years old at the time, disabled, and unable to drive, so she could not drive herself to Davis's house, nor could she drive Davis to the emergency room. Cooprider knew all of this.

57. Ms. Davis's mother lives only 10 minutes away from Ms. Davis. Exhibits 33 and 34 contain Google maps showing the estimated driving time from Ms. Davis's

house to her mother's house. Exhibit 33 shows that it would take 7–10 minutes for someone to drive from Ms. Davis's house to her mother's house at 12:00 A.M. on April 6, 2025. Exhibit 34 shows that it would take 8–10 minutes to return to Ms. Davis's house from Ms. Davis's mother's house at 12:00 A.M. on April 6, 2025.[2]

58. At 12:10 A.M. on April 6, 2025, Davis called her mother to tell her that Cooprider was coming to pick her up. *See* Exhibit 35. The call lasted for two minutes. *See id.*

59. After ending this call, Davis texted her mom's address to Cooprider at 12:12 A.M. Cooprider left the house immediately thereafter, on the pretense that he would pick up Davis's mother and return to take Ms. Davis to the emergency room. *See* Exhibit 36.[3]

## III. Cooprider Abandons Davis And Disappears After Promising To Pick Up Her Mother And Drive Ms. Davis To The Emergency Room

60. After Cooprider left Ms. Davis's house at 12:12 A.M., he vamoosed and stopped answering his phone or texts, leaving Davis to fend for herself. He never picked up Ms. Davis's mom, who stood waiting for him outside her condominium. And he never returned to Ms. Davis's house.

61. At 12:21 A.M., Ms. Davis began calling Cooprider in a desperate attempt to find out where he was and when he might pick up her mother. But Davis's calls went unanswered. She called Cooprider at 12:21 A.M., at 12:22 A.M., at 12:26 A.M., at 12:39 A.M., and at 12:45 A.M. Cooprider refused to answer or return any of these calls. *See* Exhibits 37–41.

---

2. The addresses have been redacted from the exhibits.
3. The address of Ms. Davis's mother is redacted from the string of texts that appears in Exhibit 36, but it was sent to Cooprider in the redacted text message next to the 12:12 A.M. timestamp.

62. Davis also sent a barrage of increasingly desperate text messages to Cooprider when he failed to arrive at her mother's house by 12:22 A.M.:




*See* Exhibit 36.[4]

63. When Cooprider did not respond to these phone calls or texts, Ms. Davis sent her mother $50.00 through PayPal to pay for an Uber ride to her house. Ms. Davis's mom ordered an Uber, which picked her up at 12:49 A.M. and dropped her off at Ms. Davis's house at 12:58 A.M. The receipt for this Uber ride is attached as Exhibit 41.

---

4. The redacted text message sent at 12:12 A.M. is the address for Ms. Davis's mom, which Davis texted to Cooprider as he left her house for the ostensible purpose of picking up her mother, who lived only 10 minutes away. When Cooprider failed to arrive at her mother's house within 10 minutes of leaving the house at 12:12 A.M., Ms. Davis began calling and texting him.

64. At 12:44 A.M.—more than 30 minutes after he had left the house to pick up Ms. Davis's mother who lived only 10 minutes away—Cooprider finally texted Ms. Davis and wrote:




*See* Exhibit 36.

65. Davis immediately texted back and instructed Cooprider to return to her house and take her to the emergency room:






*See* Exhibits 42–43.

66. Five minutes later, Cooprider texted back and curtly told Ms. Davis that he would not return or help her:




*See* Exhibit 43.

67. Ms. Davis was incredulous at this response, as Cooprider was not at home (he lived next door to Ms. Davis). Davis asked Cooprider to reveal his whereabouts and explain what he had been doing since he left Ms. Davis's house at 12:12 A.M.:




*See* Exhibit 43. Cooprider never responded to or answered this text message.

68. By now Davis realized that Cooprider had poisoned her (and her baby) with the abortion pills that he had bought, and that he had abandoned her and lied to delay Davis from obtaining medical care that might save her unborn daughter.

69. Davis was desperate to find a ride to the hospital, as her mother is unable to drive and Cooprider, who had promised to return to her house and drive her to the emergency room, had deserted her. So Davis hobbled to a neighbor's house and banged on her door to ask for a ride to the emergency room. The neighbor graciously

agreed to give Ms. Davis a ride to the emergency room at the Corpus Christi Medical Center Bay Area.

70. When Ms. Davis left the house to seek help from her neighbor, she noticed a silver truck idling outside across the street and a few houses down that looked similar to the Toyota Tacoma silver truck owned by Cooprider. The truck quickly drove off when Davis stepped outside, in a direction away from Davis and her house. Ms. Davis also noticed that Cooprider's silver truck was not parked in his driveway next door.

71. At 1:24 a.m., Ms. Davis arrived at the emergency room and texted Cooprider to let him know:




*See* Exhibit 43. Cooprider did not acknowledge or respond to this text message.

72. When Ms. Davis arrived at the Bay Area hospital emergency room, the doctors were unable to save her baby. Baby Joy died at eight weeks LMP, murdered by her own father.

## IV. Cooprider Leaves Behind Evidence Of The Murder At Ms. Davis's House

73. After Cooprider had left the house at 12:12 A.M., but before Ms. Davis left her house for the emergency room, Ms. Davis discovered the box of mifepristone that Cooprider had purchased from Aid Access, which still had the label with Cooprider's name on it. The box was opened and the mifepristone pill was missing from its blister pack.

74. Ms. Davis also discovered an orange pill bottle with the label peeled off containing one mifepristone pill and two of the 12 misoprostol pills that Cooprider had purchased from Aid Access. The orange pill bottle was slightly larger than the misoprostol bottle that Cooprider had obtained from Aid Access. For some reason Cooprider had put the mifepristone and misoprostol pills into this larger bottle, either

to consolidate or disguise the drugs. Cooprider mixed the remaining 10 misoprostol pills into the hot chocolate that he had prepared for Ms. Davis that night.

75. Ms. Davis brought this evidence with her to the emergency room and turned it over to the Corpus Christi police.

## CLAIM FOR RELIEF NO. 1 — WRONGFUL DEATH

76. The wrongful-death statute allows surviving parents to sue those who cause the death of an unborn child by a wrongful act, neglect, carelessness, unskillfulness, or default. *See* Tex. Civ. Prac. & Rem. Code § 71.002(b) ("A person is liable for damages arising from an injury that causes an individual's death if the injury was caused by the person's or his agent's or servant's wrongful act, neglect, carelessness, unskillfulness, or default."); Tex. Civ. Prac. & Rem. Code § 71.001(4) ("'Individual' includes an unborn child at every stage of gestation from fertilization until birth.").

77. Each of the defendants caused the death of Ms. Davis's unborn child through their wrongful acts, which violated the law in each the following respects:

78. Section 171.063(a)(1) of the Texas Health and Safety Code prohibits anyone other than a Texas-licensed physician from providing abortion-inducing drugs to a pregnant woman for the purpose of inducing an abortion. *See* Tex. Health & Safety Code § 171.063(a) ("A person may not knowingly provide an abortion-inducing drug to a pregnant woman for the purpose of inducing an abortion in the pregnant woman or enabling another person to induce an abortion in the pregnant woman unless: (1) the person who provides the abortion-inducing drug is a physician"). A violation of section 171.063(a)(1) is a state jail felony. *See* Tex. Health & Safety Code § 171.065(a). Defendant Cooprider, as a non-physician, violated section 171.063(a)(1) by knowingly providing abortion-inducing drugs to Liana Davis for the purpose of inducing the abortion of her unborn child. Defendants Aid Access and Rebecca Gomperts are criminally responsible for Cooprider's violations of section

171.063(a)(1) because they knowingly aided Cooprider's provision of abortion-inducing drugs to a pregnant woman. *See* Tex. Penal Code § 7.02.

79. Section 171.063(a)(2) of the Texas Health and Safety Code prohibits individuals from providing abortion-inducing drugs to a pregnant woman for the purpose of abortion unless they comply with the protocols in subchapter D of chapter 171 of the Texas Health and Safety Code. *See* Tex. Health & Safety Code § 171.063(a) ("A person may not knowingly provide an abortion-inducing drug to a pregnant woman for the purpose of inducing an abortion in the pregnant woman or enabling another person to induce an abortion in the pregnant woman unless: . . . (2) the provision of the abortion-inducing drug satisfies the protocol authorized by this subchapter"). A violation of section 171.063(a)(2) is a state jail felony. *See* Tex. Health & Safety Code § 171.065(a). Defendant Cooprider violated section 171.063(a)(2) by knowingly providing abortion-inducing drugs to Liana Davis for the purpose of inducing an abortion of Ms. Davis's unborn child without complying with the required protocols. Defendants Aid Access and Rebecca Gomperts violated section 171.063(a)(2) by knowingly sending abortion-inducing drugs into Texas, which they knew would be provided to a pregnant woman for the purpose of inducing an abortion. Defendants Aid Access and Rebecca Gomperts are also criminally responsible for Cooprider's violations of section 171.063(a)(2) because they knowingly aided his provision of abortion-inducing drugs to a pregnant woman. *See* Tex. Penal Code § 7.02.

80. Section 171.0631 of the Texas Health and Safety Code prohibits any person from providing abortion-inducing drugs to a pregnant woman without complying with the informed-consent requirements of subchapter B of chapter 171 of the Texas Health and Safety Code, which include a mandatory ultrasound. *See* Tex. Health & Safety Code § 171.0631 ("A person may not provide an abortion-inducing drug to a pregnant woman without satisfying the applicable informed consent requirements of Subchapter B."). A violation of section 171.0631 is a state jail felony. *See* Tex. Health

& Safety Code § 171.065(a). Defendant Cooprider violated section 171.0631 by providing abortion-inducing drugs to Liana Davis without complying with the mandatory ultrasound and other statutory informed-consent requirements. Defendants Aid Access and Rebecca Gomperts violated section 171.0631 by knowingly sending abortion-inducing drugs into Texas, which they knew would be provided to a pregnant woman for the purpose of inducing an abortion. Defendants Aid Access and Rebecca Gomperts are also criminally responsible for Cooprider's violations of section 171.0631 because they knowingly aided his provision of abortion-inducing drugs to a pregnant woman. *See* Tex. Penal Code § 7.02.

81. Section 171.003 of the Texas Health and Safety Code prohibits anyone other than a Texas-licensed physician to perform abortions. *See* Tex. Health & Safety Code § 171.003 ("An abortion may be performed only by a physician licensed to practice medicine in this state."). Cooprider is not a Texas-licensed physician, and he performed an abortion in violation of section 171.003 by lacing Ms. Davis's drink with abortion pills. Defendants Aid Access and Rebecca Gomperts also violated section 171.003 by knowingly aiding an illegal self-managed abortion in Texas. *See* Tex. Penal Code § 7.02.

82. Section 171.011 of the Texas Health and Safety Code prohibits any person from performing an abortion without complying with the informed-consent requirements of subchapter B of chapter 171 of the Texas Health and Safety Code, which include a mandatory ultrasound. *See* Tex. Health & Safety Code § 171.011 ("A person may not perform an abortion without the voluntary and informed consent of the woman on whom the abortion is to be performed."). Defendant Cooprider performed an abortion in violation of section 171.011 because he did not conduct the mandatory ultrasound or comply with the other statutory informed-consent requirements before spiking Ms. Davis's drink with abortion pills. Defendants Aid Access and Rebecca Gomperts also violated section 171.011 by aiding an illegal self-managed

abortion in Texas that did not comply with the mandatory ultrasound and other statutory informed-consent requirements.

83. Chapter 245 of the Texas Health and Safety Code requires abortions in Texas to be performed in licensed abortion facilities (subject to exceptions not applicable here). *See* Tex. Health & Safety Code § 245.002(2) ("'Abortion facility' means a place where abortions are performed."); *id.* at § 245.003(a) ("Except as provided by Section 245.004, a person may not establish or operate an abortion facility in this state without an appropriate license issued under this chapter."). Defendant Cooprider violated chapter 245 of the Texas Health and Safety Code by performing an abortion that took place outside a licensed abortion facility. Defendants Aid Access and Rebecca Gomperts also violated chapter 245 by aiding an illegal self-managed abortion in Texas that took place outside a licensed abortion facility.

84. Federal law imposes criminal liability on any person who:

a. Knowingly uses the mails for the mailing, carriage, or delivery of abortion-inducing drugs;

b. Knowingly uses any express company, common carrier, or interactive computer service for carriage of abortion-inducing drugs in interstate or foreign commerce; or

c. Knowingly takes or receives abortion-inducing drugs from an express company, a common carrier, or an interactive computer service.

18 U.S.C. §§ 1461–1462. Defendants Cooprider, Aid Access, and Rebecca Gomperts violated these federal criminal laws by using the mails, an express company, a common carrier, or an interactive computer service to mail, carry or deliver abortion-inducing drugs.

85. Articles 4512.1–4512.6 of the Texas Revised Civil Statutes make abortion a felony criminal offense unless the life of the mother is endangered. Violations of articles 4512.1–4512.6 are punishable by two to five years imprisonment. Defendant

Cooprider violated articles 4512.1–4512.6 by performing an abortion in Texas that was not needed to save the life of the mother. Defendants Aid Access and Rebecca Gomperts also violated articles 4512.1–4512.6 by aiding an abortion in Texas that was not needed to save the life of the mother.

86. Section 170A.002 of the Texas Health and Safety Code also makes abortion a felony criminal offense unless the abortion is performed to avert the risk of death or a serious risk of substantial impairment of a major bodily function. *See* Tex. Health & Safety Code § 170A.002. Violations of section 170A.002 are punishable by five to 99 years imprisonment. *See* Tex. Penal Code § 12.32. Defendant Cooprider violated section 170A.002 by performing an abortion in Texas that was not needed to avert the risk of death or a serious risk of substantial impairment of a major bodily function. Defendants Aid Access and Rebecca Gomperts also violated section 170A.002 by aiding an abortion in Texas that was not needed to avert the risk of death or a serious risk of substantial impairment of a major bodily function.

87. Performing or assisting an illegal abortion in Texas is an act of murder. *See* Texas Penal Code § 1.07; *id.* at § 19.02; *id.* at § 19.06 (murder statute). Defendants Cooprider, Aid Access, and Rebecca Gomperts committed murder under section 19.02(b)(1) because they "intentionally and knowingly caused the death" of Ms. Davis's unborn child. *See* Tex. Penal Code § 19.02(b) ("A person commits an offense if he: (1) intentionally or knowingly causes the death of an individual"). Defendants Cooprider, Aid Access, and Rebecca Gomperts also committed murder under section 19.02(b)(2) because they "intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused the death" of Ms. Davis's unborn child. *See* Tex. Penal Code § 19.02(b) ("A person commits an offense if he: . . . (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual").

88. Defendants Cooprider, Aid Access, and Rebecca Gomperts are also guilty of felony murder. *See* Tex. Penal Code § 19.02(b)(3). Their shipment and delivery of abortion pills was a felony. *See* Tex. Health & Safety Code § 171.063(a); Tex. Health & Safety Code § 171.065(a); 18 U.S.C. §§ 1461–1462. And these felonious acts were "clearly dangerous to human life" and "cause[d] the death of an individual." Tex. Penal Code § 19.02(b)(3); Texas Penal Code § 1.07 ("individual" includes "an unborn child at every stage of gestation from fertilization until birth.").

89. None of the exceptions in Texas's wrongful-death statute shield the defendants from liability. Sections 71.003(c)(2) and (c)(4) of the Texas Civil Practice and Remedies Code are inapplicable because Cooprider was not performing a "lawful medical procedure" or a "lawful medical or health care practice or procedure." And section 71.003(c)(3) is inapplicable because the abortion pills were not dispensed or administered "in accordance with law."

## CLAIM FOR RELIEF NO. 2 — INJUNCTION UNDER HB 7

90. The Aid Access defendants continue to mail abortion-inducing drugs into Texas in violation of Texas law, and they intend to continue mailing abortion-inducing drugs into Texas unless a federal court restrains them from doing so.

91. Texas's HB 7, which took effect on December 4, 2025, authorizes Ms. Davis to sue as a qui tam relator and seek an injunction against the Aid Access defendants or anyone else who intends to mail, transport, deliver, prescribe, or provide an abortion-inducing drug to any person or location in Texas. *See* Tex. Health & Safety Code § 171A.051(a)(2); *id.* at § 171A.101(a)(2); *id.* at 171A.104(a)(1).

92. Aid Access has mailed abortion pills into Texas many times since HB 7 took effect on December 4, 2025.

93. Ms. Davis has Article III standing to sue the Aid Access defendants as an assignee of the state's claim for relief, regardless of whether Ms. Davis is suffering

injury in fact on account of the Aid Access defendants' actions or intended actions. *See Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000); Tex. Health & Safety Code § 171A.101.

94. Ms. Davis is entitled to recover at least $100,000.00 for each of the Aid Access defendants' violations of HB 7, plus court costs and reasonable attorneys' fees. *See* Tex. Health & Safety Code § 171A.104(a)(2)–(3).

## DEMAND FOR RELIEF

95. Ms. Davis requests that the court:

a. order the defendants to pay nominal, compensatory, and punitive damages for the wrongful death of Ms. Davis's unborn child;

b. order the Aid Access defendants to pay at least $100,000.00 for each of their violations of HB 7;

c. permanently enjoin the Aid Access defendants from distributing, mailing, transporting, delivering, prescribing, or providing abortion-inducing drugs in any manner to or from any person or location in Texas;

d. order the Aid Access defendants to pay Ms. Davis's court costs and reasonable attorneys' fees under Tex. Health & Safety Code § 171A.104(a)(3);

e. grant all other relief that the Court deems just, proper, or equitable.

Respectfully submitted.

/s/ Jonathan F. Mitchell

JONATHAN F. MITCHELL
Texas Bar No. 24075463
S.D. Tex. Bar No. 1133287
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Dated: August 25, 2026

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on August 25, 2026, I served this document through CM/ECF upon:

MIKAL C. WATTS
Watts Law Firm LLP
811 Barton Springs #725
Austin, Texas 78704
(512) 479-0500 (phone)
(512) 479-0501 (fax)
mikal@wattsllp.com

BETH KLEIN
Beth Klein, P.C.
350 Market Street, Suite 310
Basalt, Colorado 81621
(303) 448-8884 (phone)
beth@bethklein.com

BARRY MOSCOWITZ
VICTORIA JIMENEZ
OLIVER HAMBY
Thompson Coe LLP
700 North Pearl Street, 25th Floor
Dallas, Texas 75201
(214) 871-8200 (phone)
(214) 871-8209 (fax)
bmoscowitz@thompsoncoe.com
vjimenez@thompsoncoe.com
ohamby@thompsoncoe.com

*Counsel for Defendant Christopher Cooprider*

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiff*