# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| LIANA DAVIS,<br>Plaintiff<br><br>VS.<br><br>CHRISTOPHER COOPRIDER,<br>AID ACCESS GmbH &<br>REBECCA GOMPERTS,<br>Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 2:25-cv-220 |

* * * * * * * * * * * * * * * * * * * * * *

ORAL AND VIDEOTAPED DEPOSITION OF

LIANA DAVIS

TAKEN ON MAY 28, 2026

* * * * * * * * * * * * * * * * * * * * * *

ORAL AND VIDEOTAPED DEPOSITION of LIANA DAVIS, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 28th day of May, 2026, from 9:07 a.m. to 3:35 p.m., before SYLVIA KERR, CSR, RPR, CRR, in and for the State of Texas, reported by machine shorthand, at the offices of Hartline Barger, LLP, 800 N. Shoreline Boulevard, Suite 2000 North Tower, Corpus Christi, Nueces County, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions attached hereto.

# LIANA DAVIS - May 28, 2026



APPEARANCES

COUNSEL FOR THE PLAINTIFF:
MR. JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue,
Suite 400
Austin Texas 78701
(512) 686-3940
jonathan@mitchell.law

COUNSEL FOR THE DEFENDANT CHRISTOPHER COOPRIDER:
MS. BETH KLEIN
Attorney At Law
350 Market Street, Suite 310
Basalt, Colorado 81621
303-448-8884
beth@bethklein.com

MR. BARRY A. MOSCOWITZ
MR. OLIVER HAMBY (via Zoom)
Thompson, Coe, Cousins & Irons, L.L.P.
700 North Pearl Street
25th Floor
Dallas, Texas 75201-2832
214-871-8200
Bmoscowitz@thompsoncoe.com

ALSO PRESENT:
MR. KEITH REILLY (via Zoom)
MR. G. VASILIOU (via Zoom)
MR. JOSHUA TOLIN (via Zoom)
MS. CAROLINE KITCHENER, New York Times
MR. DAVID MARROQUIN, Videographer



INDEX

| | PAGE |
|---|---|
| Appearances...................................... | 2 |
| LIANA DAVIS | |
| Examination by Ms. Klein..................... | 4 |
| Signature and Changes............................ | 238 |
| Reporter's Certificate........................... | 240 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | -- Incident/Investigation Report................ | 88 |
| 3 | -- Defendant's Set of Requests for Production... | 49 |
| 5 | -- Lab Report 3/26/25........................... | 70 |
| 13 | - Women's Clinic Patient File.................. | 73 |
| 29 | - Messages Exported from iPhone with Yvonne.... | 209 |
| 34 | - Email to Captain McAlister from Mr. Mitchell. | 72 |
| 40 | - Forensic Examination Report.................. | 229 |
| 49 | - Handwritten Diagram of Family Room........... | 187 |



THE VIDEOGRAPHER: Today's date is Thursday, May 28, 2026. The time is 9:07 a.m., we're on the record. Would the attorneys please identify themselves for the record, please.

MR. MITCHELL: Jonathan Mitchell for plaintiff Liana Davis.

MS. KLEIN: Beth Klein for defendant Cooprider.

MR. MOSCOWITZ: Barry Moscowitz on behalf of defendant Cooprider.

LIANA DAVIS,
having been first duly sworn, testified as follows:

EXAMINATION

BY MS. KLEIN:

Q. Please state your name.

**A. Liana Davis.**

Q. Liana, you've had a lot of different last names. Can you tell us the names that you've used through your lifetime.

**A. I disagree that I've had a lot of last names. I've had one last name, Webster.**

Q. And can you tell us, was that your father's last name?

**A. Long story, but it turns out it's not my father's last name but that's what my mother believed it**



**was.**

Q. Oh, that's interesting. And you also used the name Orsini?

**A. That's one of my middle names. It's my mother's maiden name.**

Q. Okay. And that's O-r-s-i-n-i?

**A. Yes. I don't use that as a last name, it's just a name I go by on Facebook to hide from my students.**

Q. Got it. Tell me the name of your father.

**A. Mark Weber.**

Q. And where does he live?

**A. I'm told he lives in Pennsylvania. I've never met him.**

Q. Okay. And your mother's name is?

**A. Mary Anna Ziarko.**

Q. And does she live in Corpus Christi?

**A. She does now.**

Q. And she -- how old is she?

**A. 78.**

Q. And does Mary Anna live close to you?

**A. Less than ten minutes away, yes.**

Q. Okay. And do you know her phone number?

**A. I don't have it memorized.**

Q. Do you have it on your cell phone?

**A. I can look it up.**

# LIANA DAVIS - May 28, 2026

Page 126

**A. I can't recall. But I'd like to stress that, again, I did not want my children taken away under any circumstances. And that was completely out of my control. And I was probably just saying that in order to stay calm, stay focused, and take whatever steps were needed in order to get them back and hopefully get justice in this evolving situation.**

Q. You don't remember who you -- who you might have said that to --

MR. MITCHELL: Objection.

Q. -- in April of 2025?

**A. I don't recall. I don't recall exactly.**

Q. Do you recall generally?

MR. MITCHELL: Objection, form.

**A. I don't recall who I said that to because it's not a very meaningful statement to me. I reflect on that time as one of the most traumatic injustices -- the most traumatic injustice in my life.**

Q. Did you ever talk to your -- Dr. Canterbury about why she thought your pregnancy with Cooprider ended?

MR. MITCHELL: Objection, form.

**A. I can't recall specifically asking her. I don't think she would have had a for sure answer on something like that. We may have discussed her medical opinions on various things.**

Page 127

Q. What was her opinion on why this pregnancy ended?

MR. MITCHELL: Objection, form.

**A. It could have been the abortion pills that he covertly put into my drink that night. It could have been something else. We can't say for sure because there is no lab test to test for this substance, but it's absolutely within the realm of possibility that -- that's what I believe it is, which is that he drugged me against my will.**

Q. Is that what Dr. Canterbury told you or is that what you think?

MR. MITCHELL: Objection, form.

**A. That is what we discussed. I mean, even to this day, my medical care operates on that. When I had, for example, my one and only known miscarriage around September of 2025, she did not treat me at that time. And I specifically asked for, you know, I guess, repeat miscarriages because we are operating on the belief that that was -- what happened in April of 2025 was an involuntary abortion. So as far as she's concerned, my one and only true known miscarriage is around September of 2025.**

Q. What did Dr. Canterbury tell you was the probable cause of the end of your pregnancy in April 2025?

Page 128

**A. I don't --**

MR. MITCHELL: Objection, form.

**A. I don't believe that she used the words probable cause or told me a probable cause, but it was absolutely within the realm of possibility that it was due to this abortion medication that I never wanted to ingest.**

Q. So it's your testimony that Dr. Canterbury told you that ingesting abortion medication was a possibility of why your pregnancy was ended in April 2025?

**A. I don't know that she -- that she used the word possibility, but yes, our conversation, to summarize it, it was a possibility.**

Q. What time did you drink the hot chocolate on the night of April 5th, 2025?

MR. MITCHELL: Objection, form.

**A. I can't recall offhand the exact start and end time. I had more than one. He made me a total of two drinks. I'm not sure that I even fully finished the second one. But they were consumed some time, you know -- it probably would have started close -- closer to 10 p.m. that night, and I would have been finished with as much as I was going to drink of the second drink by 11:00 something.**

Page 129

Q. 11:00 something?

**A. It might be in the record somewhere. These exact -- again, it would require a great deal of sifting. But I might be able to narrow that down if I were to actually look at the exchange of text messages and evidence that was sent to various entities last year. I can't recall off of the top of my head, okay, this was the start time, this was the end time. But I consumed about -- something like a drink and a half, close to two drinks over an hour and a half to two-hour period approximately. I didn't drink them fast. I was drinking them slowly.**

Q. Tell me about the first drink. Where was it mixed?

MR. MITCHELL: Objection, form.

**A. In the kitchen.**

Q. Were you there?

**A. I was in the home.**

Q. Were you in the kitchen when the first drink was being mixed?

**A. I don't believe I was standing there watching Cooprider make the drink the whole time. I might have passed through the kitchen. I might have been in and out. I might have seen the kitchen or a portion of it**

Page 158

the dose, the initial dose. And possibly one Mifepristone because there was only one of those in the bottle. And again, we know he ordered two sets, so 2 minus 1 is 1.

Q. So you think that Mr. Cooprider dissolved 23 pills in your hot cocoa?

MR. MITCHELL: Objection, form.

A. It's possible that he dissolved as many as 22. There's no way to know the true number. It could have been --

Q. Zero --

A. -- any amount.

Q. -- right? It could have been nothing?

MR. MITCHELL: Objection, form.

Q. (By Ms. Klein) Isn't that right, Ms. Davis, it could have been zero?

MR. MITCHELL: Objection, form.

A. It's possible. It would be awfully coincidental if the first time that we spent time together in that way in a month after he had been trying to badger me, trying to blackmail me, threaten me, do every tactic he could to get an abortion. If, you know, he came over, the very first night he comes over to spend time in about a month and insists on making me a drink, which was odd, and leaves abortion pills on my table, and

Page 159

you know, I start bleeding within the correct time frame after he gives me these drinks, that would be awfully coincidental. But sure, it could be zero.

Q. Are you sure that these were abortion pills, not something different?

MR. MITCHELL: Objection, form.

A. I am sure they were the same as the pills he had ordered. And I believe, having skimmed this exhibit we're looking at, it was either the patrol officer or Detective Manzano even says that when the pills were taken into evidence, Drugs.com confirmed what they are. So yes, they were one Mifepristone and two Misoprostol that I turned in to the police.

Q. Starting on the morning of April 6th, continuing to approximately April 11th, didn't you text Chris Cooprider and ask him what pills he put in your drink?

A. I don't know that I texted him every day asking something to that effect. The main day I recall trying to get this information was on -- I definitely remember Monday, April 7th, when I was following up with Dr. Canterbury, my ob/gyn, as instructed, as part of my ER discharge instructions. I didn't really think he would be honest with me. But if there -- my concern was my health at this point. I had been told at the ER two

Page 160

nights prior that the baby was lost and I just wanted to take care of my health, make sure I was okay. If there was any chance he was going to be honest about what he had done to me, I wanted to give my doctor as much information as possible so that she could help me.

Q. When you drank the hot cocoa, on the recording as you're drinking it, you say it's so sweet. Do you remember that?

MR. MITCHELL: Objection, form.

A. I don't recall exact statements that I made on a recording that totalled, I'm not sure how many minutes, but I believe it was under an hour.

Q. On the recordings the night of April 5th, 2025, you never said there's chunks in this hot cocoa, did you?

MR. MITCHELL: Objection, form.

A. No, I didn't say that there were chunks because there were no chunks.

Q. There were no chunks?

A. No.

Q. You also didn't say, ooh, this tastes funny, did you?

MR. MITCHELL: Objection, form.

A. I don't know that I said that.

Q. You didn't say it tastes bitter, did you?

MR. MITCHELL: Objection to form.

Page 161

A. I don't believe I said that. I did notice that he put alcohol in the first hot cocoa, or one of them, against my will without telling me. He gave alcohol to a pregnant woman who intended on keeping the pregnancy.

Q. Why didn't you just dump it out if you didn't want to drink it?

A. It was at the --

MR. MITCHELL: Objection, form.

A. It was at the very bottom. I guess it had kind of concentrated at the bottom. It was essentially gone when I noticed the alcohol, like the last sip or two when I tasted the Amaretto he had put in so it was -- I would have dumped it out if I had noticed sooner and I would have refused, you know, to drink it.

Q. You texted -- you texted Chris Cooprider as he was coming to your house that if he was bringing booze, he should keep it down low so that it wouldn't get caught on the Ring camera. Do you remember that?

A. I don't recall exactly what I texted him on a given night. I would have to go back and review the volumes of text messages spanning months.

Q. Did the second drink have Disaronno in it?

MR. MITCHELL: Objection, form.

A. I don't believe so.

Q. Okay. Were you present when the second drink

Page 174

A. To my knowledge, there actually wasn't a court order. I think there was just an agreement that a hearing -- and this is all, you know, secondhand information. But to my knowledge, I technically volunteered my phone to all of you.

Q. Do you know if the clinking of the spoon is actually Chris Cooprider stirring your drink?

MR. MITCHELL: Objection, form.

A. That is exactly what it sounds like. I can't imagine what else it could have been. And given the circumstances and the fact that he was standing right next to my drink when I reentered the house, that is beyond a shadow of a doubt for me what was going on. I have, following that night, attempted to -- you know, just using the surrounding objects in the room, attempted to recreate what that could have been, you know, and to me it was pretty clear that it was a spoon stirring.

Q. How many times does the spoon clink the side of the cup?

MR. MITCHELL: Objection, form.

A. I don't know what one complete rotation of a spoon sounds like but it was a couple of seconds. A few second maybe.

Q. Do you think that this second drink was the drink that -- where you were, what do you call it,

Page 175

drugged?

MR. MITCHELL: Objection, form.

A. I will never know exactly how much or which drink or when he put the medication in. It's possible that he put some in when he first prepared it. And he was just giving it an extra stir when I stepped outside because he saw something or made sure it was dissolved. It's possible he put some in when he first made it and he was adding some more.

It's possible he was putting some in for the first time when I stepped outside. I will not know that. But that was, for me, the most clear audio of him handling my drink, and it was odd the scuffling around, the fact that he would touch my drink when he's already prepared it to me and given it to me. You know, why would he be so quick to do that and send me outside.

Q. You went outside to let the dog out, right? He did not send you outside, you went outside to let your dog out to go potty, right?

A. He volunteered to go outside first. I feel pretty comfortable saying, in all likelihood, pretended not to see my dog because I have a pretty wide open rectangular yard. I mean, there's not really anything to hide behind. You can't miss her. If you listen to the full recording, not that less than 30-second snippet that

Page 176

I initially gave to law enforcement, but everything from that night, he goes out, not very long at all, claims he can't see her. I went out, saw her right away. She's right there. She was a, I believe, 13 and a half -- 13-year-old dog with mobility issues. I mean, it's not like she could have been sprinting or hiding, she's a very old dog, right there, you know.

So it seems like he, listening to the whole audio, you know, pretended not to see her or that he couldn't find her, to send me out, quickly did something, either mixed something in my drink or remixed it, and kind of scuffled away or like tried to jump away quickly when he saw me coming back in.

Q. Did you see Chris Cooprider's hands on your cup at that moment?

A. I did not see his hands on my cup, but he was standing right there next to it. He could have been anywhere. He could have been --

Q. Did you see his hands on your spoon?

A. No, but he was standing right there next to it.

Q. Did you see where his cup was?

A. His cup was either on the other side of the room or in the kitchen.

Q. How do you know he wasn't holding his cup?

A. He was not holding a cup when I walked in.

Page 177

Q. Why do you have a memory of that?

A. Because I happen to remember he wasn't holding a cup when I walked in.

Q. How do you know he wasn't stirring his own cup?

A. There wouldn't have been enough time for him to do that and then end up where he was, based on the audio and based on where I saw him standing.

Q. Did the second drink taste different than the first drink?

A. Not substantially.

Q. Were there any like Chicklets in either cup of hot cocoa?

MR. MITCHELL: Objection, form.

A. I don't know what a Chicklet is.

Q. It's a little piece of gum. Maybe that's a boomer thing.

A. Was there gum in my hot cocoa?

Q. Do you know what a Chicklet is?

A. I do, those rainbow candies that used to come in a packet and you'd rip it and --

Q. Yeah.

A. That is just about the strangest thing I've ever heard. No, there was no gum or Chicklets in my hot cocoa.

Q. Were there any globs in your cocoa?

# LIANA DAVIS - May 28, 2026

Page 178

MR. MITCHELL: Objection, form.
A. Maybe, like a marshmallow globs.
Q. You detected marshmallow globs?
A. There were marshmallows in my hot cocoa.
Q. Both of them?
A. I can't say with certainty, but I think so.
Q. Was there any chalky debris at the bottom of either one of your cups?
MR. MITCHELL: Objection, form.
A. It's possible.
Q. Did you see any?
A. It's possible, but I would have, no pun intended, chalked it up to being leftover cocoa powder because as anyone who has mixed any type of powdered drink knows, tends to be a little left over at the bottom, or I thought it was marshmallow. I didn't -- it didn't strike me as something that -- I didn't look at that and go, there are drugs in my drink, if that's what we are getting at.
Q. Did you detect anything unusual other than the Disaronno in either cup of hot cocoa?
MR. MITCHELL: Objection, form.
A. At the time, no, not by taste.
Q. All right. And not by having anything -- no residue, no chunks, no taste, correct?

Page 179

A. Now that you bring it to my attention, to be honest, the residue, which I had assumed was, you know, just normal leftover undissolved powder and marshmallow, you know, partially melted marshmallow at the bottom, it could have been that. But I didn't taste anything.
Q. When you got to the hospital, were you projectile vomiting?
A. No.
MR. MITCHELL: Objection, form.
Q. (By Ms. Klein) Were you having explosive diarrhea?
MR. MITCHELL: Objection, form.
A. No.
Q. Were you having any diarrhea?
MR. MITCHELL: Objection, form.
A. No.
Q. Were you running a fever?
MR. MITCHELL: Objection, form.
A. I don't believe so. My medical record should say what my temperature was. That was something they took when they took my vitals.
Q. Did the -- at the hospital did they give you some charcoal so you would vomit?
MR. MITCHELL: Objection, form.
A. No.

Page 180

Q. Did they call in poison control?
MR. MITCHELL: Objection, form.
A. No. And nor were these presented as options. I remember distinctly both myself and Jackie Samuelson, who was feigning being a friend to me, asking if there were any options of the sort to, you know -- if it was too late for me to take some kind of product or something to make me vomit if he had given me abortion drugs. That was -- if that's an option, I was not told that it was.
Q. Have you ever had food poisoning?
MR. MITCHELL: Objection, form.
A. It's possible. Not very often because I'm vegetarian and don't eat meat, seafood or poultry, so I'd say I get food poisoning less than most people.
Q. Have you ever gotten food poisoning?
MR. MITCHELL: Objection, form.
A. I can't say with certainty. Possibly.
Q. Have you ever had the flu, stomach flu?
MR. MITCHELL: Objection, form.
A. I don't believe there's such thing as a stomach flu. I think that's a common misconception and that's known as gastroenteritis. But I had influenza in spring of 2022.
Q. Did you have projectile vomiting and diarrhea during that episode?

Page 181

MR. MITCHELL: Objection, form.
A. No.
Q. Did you have -- were you vomiting?
A. No.
Q. Were you -- were you dizzy and unable to walk after you hit the -- you got to the hospital?
A. Dizzy, no. If I was having difficulties walking, it was due to the intense cramping, being in pain from the drug that I believe I was unwillingly administered. And then once I was given a bed, I didn't really get up from there for many hours. I used a bedpan. So I don't know if I would have had difficulty walking until much closer to when I was discharged. I think that was when I first used the bathroom.
Q. Were you incoherent?
MR. MITCHELL: Objection to form.
A. No, I don't believe I was at all.
Q. If I said alert, oriented to time and place, do you know what that means?
MR. MITCHELL: Objection, form.
A. I've heard of those phrases. I --
Q. Were you alert?
MR. MITCHELL: Let her finish.
A. I've heard of those phrases before but I'm not a medical professional. Kinesiology is considered an

Page 182

allied health profession. I believe I was as alert as one can be given that it was the middle of the night. I was up all night, you know, and I hadn't anticipated that. It's not like I had gotten extra sleep or napped that day in anticipation of being up all night.

You know, I had this violent traumatic crime committed against my body. I was in pain. My circumstances were changing rapidly. I think I was as alert and coherent as one could be given the pain, lack of sleep, and trauma.

Q. Did you know where you were? When you hit the ER, did you know where you were?

A. Yes, absolutely.

Q. Did you know what your name was?

A. Yes.

Q. Did you know what time it was?

A. Yes.

Q. Did you know what day it was?

A. Yes.

Q. Were you able to talk?

A. Yes. As you can see, I gave a full report to a patrol officer, and I was able to participate in my medical care, so yes.

Q. Have you ever overdosed on Xanax before?

MR. MITCHELL: Objection, form.

Page 183

A. I have never taken Xanax before, so no, I have never overdosed on Xanax before.

Q. Did you believe that you were given Xanax on April 5th, 2025 by Chris Cooprider?

MR. MITCHELL: Objection, form.

A. I did not know whether I was. The reason that that came up was because one of the many medical staff who passed through had initially suggested he might have mixed something like that in my drink or that one of the pills possibly resembled that. But again, it turns out I was right. What I handed over was Mifepristone and two Misoprostol.

But I was just checking with Cooprider when I asked him about that in hopes that he would, just to say I tried really, tell me anything he knew or was willing to tell me about what he had given me so that I could get proper medical attention, just in case he had given me something like Xanax.

Q. And he told you he gave you nothing, correct?

MR. MITCHELL: Objection, form.

A. Of course he did. That's his stance in this case.

Q. And it's possible that he did give you nothing at all; isn't that possible?

MR. MITCHELL: Objection, form.

Page 184

A. Possible, but I believe highly unlikely.

Q. And that is simply your belief, isn't it, Professor Davis?

MR. MITCHELL: Objection, form.

A. I don't believe it's only my belief. I believe there is plenty of evidence corroborating that Cooprider gave me abortion pills against my will that night.

Q. But you don't know which drink, correct?

MR. MITCHELL: Objection, form.

Q. (By Ms. Klein) Number one, number two?

MR. MITCHELL: Objection, form.

A. It could have been either or both.

Q. You don't know, right?

A. No, there's no --

MR. MITCHELL: Objection, form.

A. There's no way to tell because there is no test for this substance, nor were these drinks tested at the time even if there was a test.

Q. You don't know if there was abortion medication in the first cup of hot cocoa, do you?

MR. MITCHELL: Objection, form.

A. I did not catch Cooprider in the act of mixing abortion medication in my drink, but all of the other evidence I've turned over and described suggest that this is what happened to me. No one can say with 100 percent certainty.

Page 185

Q. You don't know if there was abortion medication in the second drink that you drank part of, correct?

MR. MITCHELL: Objection, form.

A. The same as my most recent response. I did not catch him in the act of crushing up pills or mixing them into my drink, but I believe I have overwhelming evidence suggesting that this is what occurred.

Q. Was there any pill powder left on the little side table where your drink was located when you came back in from outside?

MR. MITCHELL: Objection, form.

A. I did not search my home. I did not notice "pill powder" or any powder on a table.

Q. When you came back inside, you say you have a distinct recollection that Chris Cooprider was not holding a cup, right?

A. Correct.

Q. And then you looked at the table and you saw your drink sitting there, right?

A. Correct.

Q. What is the surface of this table made of?

A. It's a TV tray. It's a round wooden fold-out TV tray. It's lightweight. It's about -- about that big.

Page 202

Q. Have you ever done any Internet research on how quickly abortion medication would dissolve in a hot drink?
MR. MITCHELL: Objection, form.
A. I don't know that I've personally looked up something like that. I think that was something that someone involved in my case looked into, but I don't know that I personally Googled that.
Q. What's your understanding of what abortion medicine tastes like?
MR. MITCHELL: Objection, form.
A. I don't know.
Q. What's your understanding of how quickly abortion medicine would dissolve in a cup of hot cocoa?
MR. MITCHELL: Objection, form.
A. I don't know, I've never experimented or tinkered with abortion medication to see. I know that it is dissolvable because that is the route that, for those who are seeking and desire to have an abortion, this does not describe me, you're supposed to dissolve it in your cheeks buccally, so it is a dissolvable medication that dissolves easily. I do not believe that is how it was administered to me. I was -- I ingested it orally.
Q. Why didn't you call an ambulance on the night of April 5th, 2025?

Page 203

A. As a mother, I always put my children first. I did not want to frighten or wake my children. I always have their best interest in mind, because I thought I had a timely ride, route to get to the hospital. I had a plan in place. I thought it was acceptable to -- and the best thing to do would be to have my mother come over, just as I had arranged, and watch the children. And for their grandmother, who they loved, to be the one who they wake up to rather than them potentially getting woken up by lights and sirens.
And also, to be honest, I don't know logistically how that works, if a -- if an adult who lives alone, you know, has a medical emergency and has young children in the home, to this day, I couldn't actually tell you what happens to the young children if they, you know -- if they take them along. I don't know.
I was concerned with my children. As a mother, even if you are having a medical emergency, you think of your children. If absolutely necessary, I would have called an ambulance.
Q. Do you -- do you Google Chris Cooprider and keep track of where he is?
MR. MITCHELL: Objection, form.
A. I do not do that right now. I may have Googled him in the past. For instance, when it was relevant to

Page 204

this case or when it came to my attention that there was a bunch of articles came up in the media, but I don't Google him just for the fun of it or to keep tabs on him.
Q. Do you Google him to see where he's working?
MR. MITCHELL: Objection, form.
A. I already know where he works, so I think -- no.
Q. Where does he work?
A. My understanding is he's -- or was, I'm not sure of the status, but a marine pilot in training. So he is at the base here locally in Corpus Christi.
Q. Do you Google for information about him renting his home?
MR. MITCHELL: Objection, form.
A. When I saw a sign out front in recent months, I may have Googled -- I don't know about his name, but I may have looked that up to see if he had moved to get some indication of whether he was renting out the house because that would have been big news if the murderer next-door had moved out and I no longer had to be about 30 feet and two walls away from him at all times anymore.
Q. You continually refer to him as a murderer. Do you call him a murderer to everyone that you talk to him about?
MR. MITCHELL: Objection, form.

Page 205

A. Not consistently, not every single person, but I believe it's accurate because he murdered our baby.
Q. Well, you don't even know if you ingested even one single abortion pill, do you?
MR. MITCHELL: Objection, form.
A. I am nearly certain enough that I feel comfortable referring to him as a murderer because I believe he murdered our baby.
Q. You do not know if you drank any abortion medication on April 5th, 2025, do you?
MR. MITCHELL: Objection, form; asked and answered.
A. I believe I already answered this. But no one can say with 100 percent certainty because I did not walk in on him in the middle of crushing up pills and putting them in my drink, and I don't have a video recording of it, but I have plenty of circumstantial evidence. I believe everything points to he murdered our baby. I stand by that and I've been consistent about that.
Q. Did you -- why do you say he crushed up the abortion medication?
MR. MITCHELL: Objection, form. That's not what she said.
Q. (By Ms. Klein) Why do you say that he's crushed it up? What evidence do you have that he crushed

Page 206

up anything?

MR. MITCHELL: Objection, form. She didn't say that. She said she didn't -- she said she didn't walk in on him crushing up the pills.

Q. (By Ms. Klein) What evidence do you have of him crushing up anything and putting it in your drink?

**A. I never said he crushed it up. And I don't have evidence. I imagine if you're trying to dissolve something in a drink, it might dissolve faster if you crush it up. I wouldn't know personally.**

Q. You don't know whether he crushed anything up, do you?

MR. MITCHELL: Objection, form.

**A. I did not personally witness him crushing something up.**

Q. When you say that he crushed something up, this is just based upon your imagination, isn't it?

MR. MITCHELL: Objection, form. She never said he crushed something up.

**A. I never said he crushed something up.**

Q. What have you said?

**A. I said I didn't -- or that I didn't walk in on him crushing something up, but I don't need to. I have plenty of other evidence that he committed this crime and I have stood by that and provided everything that I do**

Page 207

**have.**

Q. You didn't see Chris Cooprider crush up any medicine on the night of April 5th, 2025, right?

MR. MITCHELL: Objection, form; asked and answered.

**A. I agree that I've already answered that I did not personally witness this.**

Q. You found no crushed up pill residue on the TV tray, did you?

MR. MITCHELL: Objection, form; asked and answered.

**A. I was not looking for any. It's possible there was some there. I had to go to the hospital to get medical attention.**

Q. So the answer to my question is no, right?

MR. MITCHELL: Objection, form.

**A. I did not have the time or opportunity to inspect surfaces for what could have been crushed up pill residue.**

Q. Okay. There was no crushed up pill residue on your kitchen counter, was there?

MR. MITCHELL: Objection, form.

**A. I don't know. There very well could have been. My kitchen counter is a granite material. I say that it looks like a calico cat. It's every color. It**

Page 208

**camouflages a lot.**

Q. Did you ask the police to come and look at all the surfaces where this medication could potentially have been crushed up?

MR. MITCHELL: Objection, form.

**A. I would have been glad to give them access to my home if they wanted to. I believe I asked the officer if they needed the mugs to try to get trace evidence. It was -- when I told the story, no one ever suggested coming to my home. I don't know how to conduct a crime scene preservation.**

**My job as the victim was to report the crime. I gave all of the information and evidence that I had, and no one suggested that someone should be going to my home and swiping or swabbing surfaces.**

Q. When you used the term "crushed up the pills," again, that is just speculation on your part, isn't it?

MR. MITCHELL: Objection, form. Again, she didn't say he crushed up the pills.

**A. I don't know if he crushed up the pills.**

Q. When you -- after you reported the crime to Corpus Christi, were you happy with the investigation that they conducted?

MR. MITCHELL: Objection, form.

**A. I don't have much frame of reference for how an**

Page 209

**investigation should go. I mean, this is a hopefully once in a lifetime event that, you know, most people will never have to go through as part of the human experience. So I don't know how it should have gone. But no, I'm not satisfied.**

Q. Okay. You wrote in an email or a text message to Yvonne on April 9th, 2025 -- and this is in Exhibit 29, page 1.

(Exhibit No. 29 was marked.)

MS. KLEIN: Perfect. Just a little smaller. Thank you.

Q. (By Ms. Klein) Do you see where it starts, "This just in from the executive director of Pregnancy Center of the Coastal Bend." Do you see where that says?

**A. Yes.**

Q. The next sentence you say, "Although it goes against my personal convictions, this lady has been helping me make connections with powerful pro-life entities who can take Chris down." When you use the words "goes against my personal convictions," what do you mean?

MR. MITCHELL: Objection, form.

**A. Generally speaking, I am pro-choice. Personally I did not want an abortion, or at least not in this situation. But I don't consider myself any sort of**

# LIANA DAVIS - May 28, 2026

Page 238

CHANGES AND SIGNATURE

WITNESS NAME: LIANA DAVIS

DATE OF DEPOSITION: MAY 28, 2026

Reason Codes: (1) to clarify the record; (2) to conform to the facts; (3) to correct a transcription error; (4) other (please explain)

PAGE LINE CHANGE REASON

______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________

Page 239

I, LIANA DAVIS, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

___________________________________
LIANA DAVIS

THE STATE OF TEXAS:
COUNTY OF NUECES:

Before me, ___________________________, on this day personally appeared LIANA DAVIS, known to me (or proved to me under oath or through ____________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this __________ day of ________________________, 2026.

___________________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS
COMMISSION EXPIRES: _______________

Page 240

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

LIANA DAVIS, §
Plaintiff §
§ CASE NO. 2:25-CV-220
VS. §
§
CHRISTOPHER COOPRIDER, §
AID ACCESS GmbH & §
REBECCA GOMPERTS, §
Defendants §

REPORTER'S CERTIFICATION
ORAL DEPOSITION OF LIANA DAVIS
MAY 28, 2026

I, SYLVIA KERR, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, LIANA DAVIS, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition was delivered to MS. BETH KLEIN;

That a copy of this certificate was served on all parties and/or the witness shown herein on June 4, 2026.

That the amount of time used by each party at the deposition is as follows:

MS. BETH KLEIN - 05:49:42

I further certify that pursuant to FRCP Rule 301(f)(i) that signature of the deponent:

_XXX_ was requested by the deponent or a party

Page 241

before the completion of the deposition and that the signature is to be before any notary public and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefore:

_____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 4th day of June, 2026.

Sylvia Kerr
_______________________________
SYLVIA KERR, Texas CSR #4776
Date of Expiration: 10/31/2027
Associated Court Reporters
Firm Registration No. 29
425 Austin Avenue, Suite 1206
Waco, Texas 76701
(254) 753-3330
(800) 340-5881