**Roberta L. Krueger M.D.**
Diplomate
American Board of Obstetrics and Gynecology
Fellow of American College of Obstetrics and Gynecology

17 September, 2026

Barry Moscowitz
Victoria Jimenez
Craig Dupen
Thompson Coe, Cousins and Irons, LLP
700 North Pearl Street, 25th Floor
Dallas, Texas 75201

RE: Liana Davis v. Christopher Cooprider; Aid Access GmbH and Rebecca Gomperts
Case No. 2:25-cv-220

Dear Barry Moscowitz, Victoria Jimenez and Craig Dupen,

My name is Roberta L. Krueger, MD. I am board certified in Obstetrics and Gynecology. I have 39 years of experience as a practicing obstetrician-gynecologist. I have reviewed the records pertaining to the defendant Christopher Cooprider and plaintiff Liana Davis. Liana Davis alleges she experienced an early pregnancy loss as a direct result of ingesting misoprostol (Cytotec, I will use this name for this medication to help with confusion with the other medication) and mifepristone. I have been asked to give an opinion on the causation of pregnancy loss in relation to the patient's medical history and other factors that may have contributed to the loss. I have used the medication Cytotec in obstetric practice for many years. It is used for term induction of labor, management of documented pregnancy loss in the first trimester and to help control obstetric hemorrhage after delivery.

## SUMMARY OF EVENTS

In the review of the records I found the following timeline to be relevant:

2/22/2025 Date of conception as determined by sonogram 3/21/2025

3/21/2025 First OB appointment with Ms. Penaflor APRN-FNP
Sonogram: dates the fetus at 5 weeks 6 days +/- 3 days, (5 3/7-6 2/7 )
Due date 11/15/2025. Fetal heart rate 98 bpm
Quantitative human chorionic gonadotropin (HCG) level 15,000
Progesterone 14.7
Positive Chlamydia culture

**EXHIBIT**
**G**

| | |
|---|---|
| | Elevated liver enzymes AST 57. ALT 107 |
| 3/24/2025 | Quantitative HCG 17,250. (Should be greater than 20,000).<br>Progesterone 13.9 |
| 3/26/2025 | HCG 24,269 (Should be greater than 30,000) |
| 4/5/2025 | C. Cooprider arrives a L. Davis's house around 9:35 pm<br>Hot chocolate is prepared and consumed |
| 4/6/2025 | L. Davis discovers bleeding when placing vaginal medication<br>L. Davis arrives at Corpus Christi emergency department (ED) 01:21<br><br>Sonogram in the ED reads: 7 weeks 3 days (based on the sonogram of 3/21/2025 she would be 8 weeks 1 day.) There is no fetal cardiac activity. A subchorionic hematoma is noted measuring 2.0 cm x .6 cm x 1.9 cm<br><br>HCG level is 30,086 (Should be around 60,000)<br><br>Hospital notes show "scant bleeding" and no diarrhea or temperature.<br><br>Urine drug screen positive for barbiturates and narcotics.<br><br>Patient asks to file police report. She shows the officer a picture of one empty mifepristone package, blister pack noted and a pill bottle containing 3 pills. |
| 4/7/2025 | Appointment with Dr. Cantabury, the patient's OB/GYN physician. Patient was given 800 mg Cytotec, but she stated she would wait to take it.<br>HCG level 12,309 |
| 4/11/2025 | Pathology report shows no chorionic villi |
| 4/15/2025 | HCG 560 |
| 4/22/2025 | HCG 123 |
| 5/7/2025 | HCG 8 |
| 5/14/2025 | HCG 3 |

## Analysis of Pregnancy Loss

Using a reasonable degree of medical probability, it is my opinion that the plaintiff, L Davis had an unhealthy pregnancy which resulted in a first trimester loss. Measured by the 3/21/2025 ultrasound she was 5 weeks and 6 days. Early ultrasound remains one of the most accurate ways of dating a pregnancy. At the time of her ultrasound the fetal

heart rate recorded was 98 beats/minute. An average heart rate at this gestational age is 100-120 bpm.

In a normal pregnancy, doubling of HCG usually occurs every 48-72 hours, or every 2-3 days. In this pregnancy the HCG increased from 15,000 to 24,269 over 5 days, which is worrisome for early pregnancy loss. The level doubled to 30,000 (the measurement in the ED), after 16 days. This is another sign of a failing pregnancy. The diagnosis of a failing pregnancy is best made with addition of a follow up ultrasound, usually after 2 weeks. The ultrasound done in the emergency department was in this time frame. The sonogram confirmed the early pregnancy loss. The very slow rise of the HCG, abnormally slow, is the most concerning sign for an unhealthy pregnancy.

The patient’s progesterone level was also low. A progesterone of greater than 25 mg/ml suggests a healthy intrauterine pregnancy. Her level was 13.9. The grey zone is 5-20 mg/ml, usually doctors will follow a progesterone in the grey zone. The patient was prescribed progesterone to help increase the progesterone level.

Another factor contributing to possible pregnancy loss is the patient’s age. She was 37 years old at the time of this pregnancy. The risk of pregnancy loss increases with age, from roughly 20% at age 35 to 40% at age 40. The chance of spontaneous loss is about 20-25% or 1 in 4-5 pregnancies. The majority of first trimester (up to 13 weeks) losses are caused by factors intrinsic to the pregnancy, most commonly a fetal chromosomal anomaly (60%).

When the patient presented to the ED her pregnancy measured 7 weeks 3 days when she should have been 8 weeks 1 day based on her earlier ultrasound. Although it is uncertain when the loss occurred this gives the impression that the loss occurred earlier than April 6, 2025.

An additional factor that may have contributed to the early pregnancy loss is a subchorionic hemorrhage. This was reported on her ED sonogram. Bleeding behind the developing placenta has been associated with early loss.

Criteria that are considered suggestive of, but not diagnostic of, early pregnancy loss are a slow fetal heart rate of less than 100 beats per minute at 5-7 weeks, a low progesterone of 13.9, advanced maternal age of 37 (obstetrics uses the age of the mother at delivery which would have been 38), and most worrying is the very slow increase of HCG.

## Analysis of medication allegations

It is my medical opinion that the medications the plaintiff alleges she was given in hot chocolate did not cause her pregnancy loss. For the following reasons described below:

There is no blood or urine test available to test for these medications. Detective Manzano's notes say the plaintiff had a photo on her phone of :

Box labeled mifepristone 200 mg single dose with empty blister pack
Pill bottle labeled misoprostol containing 3 pills
These medications were purported to have been left on the table in L Davis's house.

Mifepristone works by blocking progesterone, which takes 24-48 hour to cause cramping and bleeding. This medication is given first if inducing an abortion. Cytotec is given after the first medication to cause a softening of cervical tissues. In my opinion it would be unlikely for the possible ingestion of mifepristone to cause bleeding in less than 30 minutes as per the police report or even 4 hours later as per the doctor's impression of when the medicine may have been ingested.

Looking at the Cytotec, this medication is quickly degraded with humidity, air, or a temperature greater than 77 degrees F. This medication should be stored in a sealed foil blister pack. Exposure to the open air, heat, or moisture rapidly degrades the active chemical structure, making the medication much less effective or entirely useless. There is no evidence that the Cytotec was stored properly. There is no mention of this in the police report or in L. Davis's testimony. There is no mention of a sealed blister pack except for the mifepristone.

If the medication had possibly been stored improperly for greater than one month, C. Cooprider allegedly would have obtained the mediation in February. During this time this medication could have been degraded and become useless. It is alleged that it was stored in his truck for an undetermined amount of time, possibly causing the heat and humidity in Corpus Christi to degrade the medicine.

If the Cytotec had been placed in the hot chocolate, which would have been greater than 77 degrees, the heat would have quickly rendered the medication ineffective.

Lastly, in the ED, the patient did not report diarrhea nor was a temperature of greater than 100.4 recorded in the ED. These are common side effects of the medication. This suggests that she did not ingest a high dose of Cytotec.

## Conclusion

It is my medical opinion that it is very unlikely that mifepristone, if ingested, could have caused the fetus to be without a heart beat at most 4 hours after exposure. Even if the Cytotec had been properly stored, with no exposure to heat or moisture, the effectiveness of the medication would have been rendered useless after being placed in hot chocolate. Additionally, the patient does not show the usual side effects of high dose ingestion.

For these reasons I do not believe that the loss of this pregnancy was caused by ingestion of mifepristone or Cytotec.

I believe that, to a reasonable degree of medical probability, this pregnancy was unhealthy and was nonviable before the patient came to the emergency department. This loss occurred sometime after the first ultrasound on 3/21/2025 and before the ED visit of 4/6/2025. For the above described reasons the first trimester loss did not occur as a result of alleged medication ingestion.

My opinions are based on my training, education, and background as a Board Certified Obstetrician/Gynecologist. They are also based on my review of the medical records supplied to me regarding this matter. A reasonable degree of medical probability was utilized to arrive at these opinions. I reserve the right to amend my opinions if other information becomes available.

Sincerely,

Roberta L. Krueger M.D.

CONFIDENTIAL